UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X

In Re:                                                              Chapter 7

Blue Diamond Air Systems, Inc.,                                     Case No. 822-72698-AST

        Debtor.

----------------------------------------------------------X

Marc A. Pergament, Chapter 7 Trustee of the                         Adv. Proc. No. 824-08071-AST
Bankruptcy Estate of Blue Diamond Air
Systems, Inc.

        Plaintiff,

      - against -

Douglas Gene Belz a/k/a Douglas Belz,
Stephen DiMeglio and James Edwin Dvorak
a/k/a James Dvorak,

        Defendants.

----------------------------------------------------------X

Opposition to Defendants' Motion to Dismiss
Adversary Proceeding Pursuant to Federal Rule 12(b)(6)

TO:    The Honorable Alan S. Trust,
       Chief United States Bankruptcy Judge

        Marc A. Pergament, Chapter 7 Trustee ("Trustee" or "Plaintiff") of the Estate of

Blue Diamond Air Systems, Inc., ("Debtor"), by his attorneys, Weinberg, Gross & Pergament

LLP, as and for his Opposition to the Motion filed by Defendants Douglas Gene Belz a/k/a Douglas

Belz, Stephen DiMeglio and James Edwin Dvorak a/k/a James Dvorak (hereinafter sometimes

referred to as the "Defendants" or "Defendant Belz", "Defendant DiMeglio" and "Defendant

Dvorak") seeking, *inter alia*, the entry of an Order dismissing the Plaintiff's Complaint (the

"Complaint") with prejudice and without leave to replead the adversary complaint dated July 29, 2024 pursuant to Bankruptcy Rule 7012 and 7009 incorporating by reference Federal Rule of Civil Procedure 12(b)(6) and 9, respectfully alleges and represents to the Court as follows:

1.     This case was commenced by the filing of a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code on October 4, 2022 (the "Petition Date").

2.     By Order of the Bankruptcy Court entered on February 10, 2023, the case was converted to a Chapter 7 liquidation proceeding.

3.     Plaintiff, Marc A. Pergament, is the Chapter 7 Trustee, duly qualified and acting as such pursuant to 11 U.S.C. §702(d).

A.     **MOTION TO DISMISS UNDER FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6)**

4.     The primary thrust of the Defendants' Motion under Federal Rule 12(b)(6), which provides that a complaint may be dismissed if it fails to state a claim upon which relief can be granted.

5.     Federal Rule of Civil Procedure 12(c), made applicable by Bankruptcy Rule 7012, states that "[a]fter the pleadings are closed -- but early enough not to delay trial -- a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). In the interest of due process, courts sparingly grant such motions, limiting relief to circumstances "where material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings." *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988). In ruling on a Rule 12(c) motion, "the Court must accept as true all of the non-movant's well pleaded factual allegations, and draw all reasonable inferences in favor of the non-movant." *Mennella v. Office of*

2

*Court Admin.*, 938 F.Supp. 128, 131 (E.D.N.Y. 1996), *aff'd*, 164 F.3d 618 (2d Cir. 1998). Exhibits attached to the complaint may be considered in deciding a Rule 12(c) motion. *See Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir. 2001). It is the movant's burden "to show the absence of any material issue appearing genuinely to be in dispute." *Falls Riverway Realty, Inc. v. City of Niagara Falls, N.Y.*, 754 F.2d 49, 54 (2d Cir. 1985) (citing *Adickes v. S.H. Kress Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). "[A] defense of failure to state a claim may be raised in a Rule 12(c) motion for judgment on the pleadings, and when this occurs the court simply treats the motion as if it were a motion to dismiss. *Nat'l Ass'n of Pharm. Mfrs., Inc. v. Ayerst Labs., Div. of/& Am. Home Prods. Corp.*, 850 F.2d 904, 909 n.2 (2d Cir. 1988). See *In re Peiris*, 539 B.R. 19, 21 (Bankr.E.D.N.Y. 2015).

6.    To survive dismissal under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). A claim is facially plausible when a plaintiff pleads facts that allow the Court to draw a "reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.; see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) ("Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement."). In deciding a motion to dismiss, the Court should assume the factual allegations are

true and determine whether, when read together, they plausibly give rise to an entitlement of relief. *Iqbal*, 556 U.S. at 679. "And, of course, a well-pl[ed] complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556. See *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 2022 Bankr. LEXIS 1826 (New York Southern Bankruptcy Court June 30, 2022).

   7.  In deciding a motion to dismiss under Federal Rule 12(b)(6), "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007). A complaint is "deemed to include any written instrument attached to it as an exhibit[,] . . . documents incorporated in it by reference[,]" and other documents "integral" to the complaint. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002) (citations omitted). A document is "integral" to a complaint when the plaintiff has "actual notice" of the extraneous information and relied on it in framing the complaint. *DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010) (citing *Chambers*, 282 F.3d at 153). In ruling on a motion pursuant to Rule 12(b)(6), the Court may consider the complaint, documents attached to the complaint, documents incorporated into the complaint by reference, and matters subject to judicial notice. *In re Peiris*, 539 B.R. 19, 22 (Bankr.E.D.N.Y. 2015) citing *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991). The Court accepts factual allegations in a complaint as true and draws all reasonable inferences in favor of the non-movant. *In re Peiris* , *Id* at 22 citing *Roth v. Jennings*, 489 F.3d 499, 501 (2d Cir. 2007). When deciding a motion to dismiss, courts may consider: (1)

facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents 'integral' to the complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information contained in [a] defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint, (4) public disclosure documents required by law to be, and that have been, filed with the Securities and Exchange Commission, and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence . *Geron v. Cent. Park Realty Holding Corp. (In re Nanobeak Biotech, Inc.)* 656 B.R. 350, 362 (Bankr.S.D.N.Y. 2024) citing *Eaves v. Designs for Fin., Inc.*, 785 F. Supp. 2d 229, 244 (S.D.N.Y. 2011). Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint "relies heavily upon its terms and effect," which renders the document "integral" to the complaint. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002) citing *International Audiotext Network v. American Tel. & Tel. Co.*, 62 F3d 69, 72 (2d Cir. 1995). The Court's responsibility is to "assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geron v. Cent. Park Realty Holding Corp. (In re Nanobeak Biotech, Inc.)* Id at 361 citing *Liu v. Credit Suisse First Bos. Corp. (In re Initial Pub. Offering Sec. Litig.)*, 383 F. Supp. 2d 566, 574 (S.D.N.Y. 2005) (internal quotation makers and citation omitted). *See also Koppel v. 4987 Corp.*, 167 F.3d 125, 133 (2d Cir. 1999) (Plaintiff need only allege, not prove, sufficient facts to survive a motion to dismiss).

8.    Plaintiff submits that he has sustained his burden of pleading "enough facts to state a claim to relief that is plausible on its face" to successfully refute Defendants' Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6). Pursuant to Federal Rule of Civil

Procedure 8(a)(2) a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." In the case of *In re Ridley v. Deutsche Bank Nat'l Trust Co. (In re Ridley)*, 453 B.R.58, 65 (Bankr.E.D.N.Y. 2011) citing In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007), the Supreme Court stated that under this rule, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted). As can be discerned herein, Plaintiff has provided sufficient grounds for his entitlement to the relief requested in all the causes of action in his Complaint.

**B.    THE TRUSTEE HAS LAID OUT THE FRAMEWORK FOR THE ALLEGATIONS IN THE COMPLAINT**

9.    Plaintiff has sufficiently pled the particulars concerning the transaction in question, which is the subject of this lawsuit, which Defendants cannot dispute .On or about July 1, 2020, Defendant Belz, Defendant DiMeglio and Defendant Dvorak entered into an Equity Security Purchase Agreement wherein they consented to a leveraged buy-out transaction (the "Transaction") wherein they agreed to sell their ownership and membership interests in Blue Diamond Sheet Metal Inc., Diam-N-Blu Mechanical Corp., Mirage Mechanical Systems, Inc. and Blue Station Realty, LLC to the remaining shareholders and/or members of these entities, Al LaBella and Meghan LaBella. A copy of the July 1, 2020 Equity Security Purchase Agreement is annexed hereto as Exhibit "A."

10.    According to the terms of the Equity Security Purchase Agreement, Defendants Belz, DiMeglio and Dvorak were each to receive $2,850,000.00 for their ownership and

6

membership interests in Blue Diamond Sheet Metal Inc., Diam-N-Blu Mechanical Corp., Mirage Mechanical Systems, Inc. and Blue Station Realty, LLC (hereinafter the "Transaction").

11.    On or about December 22, 2020, Defendant Belz, Defendant DiMeglio and Defendant Dvorak sold their ownership interests in Blue Diamond Sheet Metal Inc., Diam-N-Blu Mechanical Corp. and Mirage Mechanical Systems, Inc. to Al LaBella and Meghan Labella. A copy of the closing statement generated in connection with the sale of the Defendants' interests in Blue Diamond Sheet Metal Inc., Diam-N-Blu Mechanical Corp. and Mirage Mechanical Systems, Inc. to Al LaBella and Meghan Labella is annexed hereto as Exhibit "B."

12.    Defendants Belz, DiMeglio and Dvorak each sold their interests in Blue Diamond Sheet Metal Inc., Diam-N-Blu Mechanical Corp. and Mirage Mechanical Systems, Inc. to Al LaBella and Meghan Labella, and each were paid the sum of $1,482,750.00.

13.    In order to finance the purchase of Defendants Belz's, DiMeglio's and Dvorak's interests in Blue Diamond Sheet Metal Inc., Diam-N-Blu Mechanical Corp. and Mirage Mechanical Systems, Inc., the entities Blue Diamond Sheet Metal Inc., Diam-N-Blu Mechanical Corp. and Mirage Mechanical Systems, Inc., obtained loans from Dime Community Bank as successor by merger to BNB Bank (sometimes referred to as either "Dime" or "Bank"), including but not limited to:

> SBA Loan: (1) Note for the original principal balance of $4,650,000.00, dated December 18, 2020, executed by Blue Diamond Sheet Metal Inc., Diam-N-Blu Mechanical Corp. and Mirage Mechanical Systems, Inc. Blue Station Realty, LLC and Al LaBella and Meghan LaBella (the "LaBellas") in favor of Bank; (2) Mortgage, dated December 18, 2020, executed by Blue

7

Station Realty  and the LaBellas in favor of Bank; (3) Loan Agreement, dated December 18, 2020, executed by and among Bank, Blue Diamond Sheet Metal Inc., Diam-N-Blu Mechanical Corp. and Mirage Mechanical Systems, Inc., Blue Station Realty and the LaBellas.

14.     On or about June 24, 2021, Diam-N-Blu Mechanical Corp. merged into Blue Diamond Sheet Metal, Inc.

15.     On or about June 24, 2021, Mirage Mechanical Systems, Inc. merged into Blue Diamond Sheet Metal, Inc.

16.     On or about July 7, 2021, the Certificate of Incorporation of Blue Diamond Sheet Metal, Inc. was amended to change its name to the Debtor, Blue Diamond Air Systems, Inc.

17.     In essence, Blue Diamond Sheet Metal, Inc., Diam-N-Blu Mechanical Corp. and Mirage Mechanical Systems, Inc. merged to form the Debtor, Blue Diamond Air Systems Inc.

18.     The Debtor assumed all of the assets and liabilities of Blue Diamond Sheet Metal, Inc., Diam-N-Blu Mechanical Corp. and Mirage Mechanical Systems, Inc., including but not limited to the indebtedness owed to Dime Community Bank.

19.     Moreover, in order to secure the Debtor's obligation for this indebtedness, Dime obtained a blanket UCC-1 Article 9 security interest in all of the Debtor's assets.

20.     The total amount in loans obtained from Dime Community Bank by Blue Diamond Sheet Metal Inc., Diam-N-Blu Mechanical Corp. and Mirage Mechanical Systems, Inc. and Blue Station Realty totaled $9,565,821.32 as evidenced by the Proof of Claim filed by Dime Community Bank against this Estate on December 5, 2022. A copy of the Proof of Claim of Dime Community Bank  is annexed hereto as Exhibit "C."

8

21.     The Transaction eventually doomed the Debtor. Following the closing on the sale and loan of $9,565,821.32 from Dime to finance the Transaction, the Debtor was unable to operate profitably, and on October 4, 2022 (less than two years from the Closing Date of the transaction of December 22, 2020), the Debtor was compelled to file a Chapter 11 Petition.

22.     The increased debt load to finance the transaction plus the payments made to Defendants Belz, DiMeglio and Dvorak left the Debtor so encumbered by debt that it was unable to confirm a plan of reorganization, resulting in its Chapter 11 Bankruptcy being converted to a Chapter 7 liquidation proceeding on February 10, 2023.

23.     In reviewing the United States Trustee's Motion to Convert the Debtor's Chapter 11 Case to Chapter 7 filed on January 17, 2023 [Dkt Item No. 114], barely more than four (4) months into its Chapter 11, the United States Trustee reported that the Debtor's post-petition operations were so poor that the Debtor was unable to make its first pension benefit payment to the Sheet Metal Workers National Pension Fund in the amount of $169,085.88, its first insurance premium finance installment payment in the sum of $114,876.71, and its payroll taxes in the approximate amount of $200,000.00.

24.     Total claims against this Bankruptcy Estate, including the debt incurred to Dime to finance the Transaction, total $46,493,054.81.

25.     In addition to the sale of their ownership interests in Blue Diamond Sheet Metal Inc., Diam-N-Blu Mechanical Corp. and Mirage Mechanical Systems, Inc., Defendants Belz, DiMeglio and Dvorak entered into "Consulting Agreements" with Blue Diamond Sheet Metal Inc., Diam-N-Blu Mechanical Corp. and Mirage Mechanical Systems, Inc. wherein they would be paid a consulting fee of $3,683.33 per month for forty-two (42) months (the "Consulting

9

Fee"), commencing effective as of the Closing Date of December 22, 2020. Under the Consulting Agreements, Defendants Belz, DiMeglio and Dvorak each received Consulting Fees in the sum of $73,666.60. A copy of these Consulting Agreements is annexed hereto as Exhibit "D."

26.    On the closing of the Transaction, there were present and existing creditors of the Debtor, including priority unsecured claims owed to the United States of America, Internal Revenue Service and New York State Department of Labor, plus liability owed to the Sheet Metal National Workers' Pension Fund. All of these creditors were holding claims allowable under 11 U.S.C. § 502 who could have avoided the payment of the Consulting Fees paid to Defendants Belz, DiMeglio and Dvorak.

27.    In documentation received from the Defendants, payments under the Consulting Agreement were made between October 25, 2021 and May 24, 2022. During that period, the Debtor was indebted to various creditors for amounts reflected in the creditors' proofs of claims, including but not limited to a claim by Metro Insulation Corporation for the sum of $40,049.39, Independent Sheet Metal Company, Inc. in the sum of $241,662.92, Alta Material Handling in the sum of $19,639.07, Airside Fabricators, Inc. in the sum of $63,228.63 and Harry Brainum, Jr., Inc. in the sum of $543,426.00.

28.    Predicated upon the aforementioned facts, the Complaint has been pled with sufficient weight and particularity to withstand a Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6). The Trustee's complaint satisfies Federal Rule of Civil Procedure 8(a)(2) as this pleading contains well in excess of "a short and plain statement of the claim showing that the pleader is entitled to relief." Additionally, the allegations in the complaint contain more than labels and conclusions. The factual scenario concerning the Transaction and the Consulting Agreements

have been laid out, and Plaintiff's complaint contains more than "a formulaic recitation of the elements of a cause of action" to withstand a Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6).

## C.    THE TRUSTEE HAS SUFFICIENTLY PLED BOTH THE ACTUAL AND FRAUDULENT CONVEYANCE CLAIMS

29.    The Defendants assert that those causes of action in the Trustee's Complaint seeking to avoid the Transaction on the grounds that it was an actual fraudulent conveyance should be dismissed due to the non-compliance with Bankruptcy Rule 7009, which incorporates by reference Federal Rule of Civil Procedure 9.  According to Federal Rule of Civil Procedure 9(b), in alleging a cause of action for fraud and mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge and other conditions of a person's mind may be alleged generally.

30.    It has been established that actual fraudulent transfer claims brought under either § 548(a)(1)(A) of the Code or New York State law must meet the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure ("Rule 9(b)"). *Picard v. Cohmad Sec.Corp. (In re Bernard L. Madoff Inv. Sec. LLC)* 454 B.R. 317, 329 (Bankr.S.D.N.Y. 2011) citing *Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 351 F. Supp. 2d 79, 106-07 (S.D.N.Y. 2004); *Andrew Velez Constr., Inc. v. Consol. Edison Co. of N.Y., Inc. (In re Andrew Velez Const, Inc.)*, 373 B.R. 262, 269 (Bankr. S.D.N.Y. 2007). Namely, a trustee must: (1) "state with particularity the circumstances constituting fraud or mistake," but may plead (2) the "[m]alice, intent, knowledge, and other conditions of a person's mind" generally. Fed. R. Civ. P. 9(b); Fed. R. Bankr. P. 7009.

11

31.      The Chapter 7 Trustee is the party Plaintiff in this adversary proceeding. In defining the applicability of the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) as it concerns actual fraudulent conveyance claims, case law had held  that when a bankruptcy trustee is the party asserting the actual fraudulent transfer claim, the Second Circuit has adopted "'a more liberal view . . . since a trustee is an outsider to the transaction who must plead fraud from second-hand knowledge.'" *Silverman v. Meister Seelig & Fein, LLP (In re Agape World, Inc.)* 467 B.R. 556, 569 (Bankr.E.D.N.Y. 2012) citing *Picard v. Cohmad Sec. Corp. et al. (In re Bernard L. Madoff Inv. Sec. LLC)*, 454 B.R. 317, 329 (Bankr. S.D.N.Y. 2011) ("*Picard v. Cohmad*") (citing *Nisselson v. Softbank AM Corp. (In re MarketXT Holdings Corp.)*, 361 B.R. 369, 395 (Bankr. S.D.N.Y. 2007) (other citations omitted) (quoting *Picard v. Taylor (In re Park South Sec., LLC)*, 326 B.R. 505, 517-18 (Bankr. S.D.N.Y. 2005) (internal quotations omitted); *see also Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994).

32.      Additionally, the Transaction is not a simple transaction, as it involves other parties besides the Debtor and the transferees and is a more unusual transaction than one that is often encountered.  Under the circumstances, the Trustee's pleading requirements under Federal Rule of Civil Procedure 9(b) should be afforded more deference. See *Picard v. Cohmad Sec. Corp. et al. (In re Bernard L. Madoff Inv. Sec. LLC)*, 454 B.R. 317, 329 (Bankr. S.D.N.Y. 2011) citing *SIPC v. Stratton Oakmont, Inc.*, 234 B.R. 293, 310 (Bankr. S.D.N.Y. 1999) (holding that "the [T]rustee's lack of personal knowledge is compounded with complicated issues and transactions [that] extend over lengthy periods of time, the trustee's handicap increases," and "even greater latitude" should be afforded).

33.     Under either the Bankruptcy Code or the applicable New York State law, to state an actual claim with sufficient particularity as required by the ambit of Federal Rule of Civil Procedure 9(b), a party must ordinarily allege: (1) that the property was conveyed; (2) the timing and if applicable, frequency of the transfer; and (3) the consideration paid for the transfer. *Picard v. Cohmad Sec. Corp. et al. (In re Bernard L. Madoff Inv. Sec. LLC)*, Id at 329 citing *United Feature Syndicate Inc. v. Miller Features Syndicate, Inc.*, 216 F.Supp. 2d 198, 221 (S.D.N.Y. 2002).

34.     Courts have ruled that even under the relaxed pleading standard described earlier "[p]leadings still must be particular enough to fulfill Rule 9(b)'s purpose: to protect the defending party's reputation, to discourage meritless accusations, and to provide detailed notice of fraud claims to defending parties." *Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs., Ltd,)*, 337 B.R. 791, 801 (Bankr. S.D.N.Y. 2005), quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994). See also *In re Nine West LBO Securities Litigation*, 505 F.Supp 3d 292 (S.D.N.Y. 2020), holding that Plaintiff Liquidating Trustee plead the transfers with sufficient particularity under Federal Rule of Civil Procedure 9(b), with the Court finding that the complaints provided a list of the alleged change in control payments recipients and how much was transferred, and broadly outlined the circumstances under which the transfers occurred.

35.     In his complaint, the Plaintiff Trustee has sufficiently pled all of the elements, and the allegations contained therein do not "...suffer from the sort of "opacity" that courts find insufficient under the relaxed pleading standard." *In re Nine West LBO Securities Litigation, Id* at 321 citing *In re Bernard L. Madoff Inv. Sec.*, LLC 458 B.R. 87, 106 (Bankr.S.D.N.Y. 2011). The property conveyed was the assets of the Debtor that were encumbered

13

by Dime Community Bank in order to finance the LaBella's purchase of the Defendants' shares. The property conveyed also consisted of the payments that Defendants Belz, DiMeglio and Dvorak received from the sale of their ownership interests in the sum of $1,482,750.00 each, and the Consulting Fees that they received pursuant to the Consulting Agreements.

36.     The Trustee adequately pled the timing of the transfers, indicating that the Transaction had closed on December 22, 2020 and that the payments that the Defendants received for their Consulting Fees under the Consulting Agreements as conceded by the Defendants' Proofs of Claims was $73,666.60 each from December 22, 2020.

37.     The Trustee also adequately alleged that the Debtor did not receive consideration for the transfer. The loans obtained from Dime Community Bank, which were secured by the Debtor's unencumbered assets did not provide benefit to the Debtor. The total debt incurred by the Debtor to finance the Transaction was the sum of $9,565,821.32, which doomed the Debtor.

**D.     TRUSTEE HAS DEMONSTRATED BADGES OF FRAUD TO SUSTAIN A CLAIM FOR ACTUAL FRAUDULENT CONVEYANCE UNDER 11 U.S.C. § 544**

38.     Defendants cite to the case of *Salomon v. Kaiser (In Re Kaiser)*, 722 F.2d 1574 (2d Cir 1983) for the proposition that evidence of actual fraud can be determined by the existence of certain "Badges of Fraud." These Badges of Fraud include: (1) the lack or inadequacy of consideration, (2) the family, friendship or close associate relationship between the parties, (3) the retention of possession, benefit or use of the property in question, (4) the financial condition of the party sought to be charged both before and after the transaction in question, (5) the existence or cumulative effect of a pattern or series of transaction or course of conduct after incurring of

14

debt, onset of financial difficulties, or pendency or threat of law suits by creditors, and (6) the general chronology of the events and transactions under inquiry. *In re Kaiser*, 722 F.2d at 1582–83.

39.     *In re Kaiser* was decided under the prior version of § 276 of the New York Debtor & Creditor Law. The New York Debtor & Creditor Law was repealed effective as of April 4, 2020. The New York Debtor & Creditor Law that was cited in *Kaiser* has now been replaced by the New York Uniform Voidable Transactions Act (NYUVTA). The NYUVTA governs New York State fraudulent conveyances which occurred after the effective date of the Act of April 4, 2020. As the Transaction closed on December 22, 2020 it falls within the ambit of the NYUVTA, not the former New York Debtor & Creditor Law.

40.     In a claim for intentional fraudulent transfer, the Trustee must plead the fraudulent intent of the transferor, not the transferee, to defraud creditors. "Mutual fraudulent intent" is not necessary. See *In re Nanobeak Biotech Inc.*, 656 B.R. 350, 366 (S.D.N.Y. 2024). In order to prove actual fraud under the New York Debtor & Creditor Law § 276, a creditor must show intent to defraud on the part of the transferor. *In re Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)* 403 F.3d 43, 56 (2d Cir 2005). Where actual intent to defraud creditors is proven, the conveyance will be set aside regardless of the adequacy of consideration given. *In re Sharp Int'l Corp. v. State St. Bank & Trust Co.*, Id at 56.

41.     Assuming the applicability of the "Badges of Fraud" under former New York Debtor & Creditor Law § 276 and the holding of *In re Kaiser* to this scenario, case law dictates that while the presence or absence of one badge of fraud is not conclusive, the presence of several factors can constitute conclusive evidence of an actual intent to defraud. See *LaMonica v*

15

*Tilton (In re TransCare Corp.)*, 81 F.4th 37, 54 (2d Cir.2023). Moreover, in addition to the "Badges of Fraud," it has been established that actual fraudulent intent may be inferred from the circumstances surrounding the transaction, including the relationship among the parties and the secrecy, haste, or unusualness of the transaction. See *In re Kaiser, Id* at 1582-1583.

42.    The Debtor is a corporation, and it acts through its agents under New York Business Corporation law (i.e., officers, directors and shareholders). Although the Second Circuit has yet to formulate a test for determining when an officer's intent should be imputed to a corporation, Courts have agreed that the intent of the Debtor's officers may be imputed to the Debtor if the officers were "in a position to control the disposition of [the transferor's] property," thereby effectuating the underlying offense. *Kirschner v. Fitzsimons (In re Tribune Co. Fraudulent Conveyance Litig.)* 2017 U.S. Dist. LEXIS 3039 (District Court Southern District of New York January 6, 2017) citing *In re Lyondell Chem. Co.*, 503 B.R. 348, 388 (Bankr. S.D.N.Y. 2014).

43.    The Debtor's shareholder and director, Al LaBella, was in a position to control the disposition of the Debtor's property. The term sheet issued by Dime Community Bank's predecessor, BNB Bank, was executed by Al LaBella on March 19, 2020. The term sheet specifically delineated the borrowers for the Loans from BNB Bank as Blue Station Realty, Blue Diamond Sheet Metal Inc., Diam-N-Blu Mechanical Corp. and Mirage Mechanical Systems, Inc. The term sheet for the loan from BNB Bank was executed by both Al LaBella and Meghan LaBella, both in their individual capacity as guarantors and on behalf of the borrowers, Blue Station Realty, Blue Diamond Sheet Metal Inc., Diam-N-Blu Mechanical Corp. and Mirage Mechanical Systems, Inc. A copy of the term sheet is annexed hereto as Exhibit "E."

44.    The term sheet specifically provides that the loan proceeds were to be used to purchase seventy-five (75%) percent of the shares in the operating entities and seventy-five (75%) percent of the membership of Blue Station Realty, LLC. The term sheet also dictates that the loans would be secured by UCC-1 financing statements on all of the assets of both the individual guarantors and the Borrowers Blue Station Realty, Blue Diamond Sheet Metal Inc., Diam-N-Blu Mechanical Corp. and Mirage Mechanical Systems, Inc. See Exhibit "E."

45.    As the term sheet with Dime's predecessor BNB Bank demonstrates, Al LaBella as shareholder and director had control to dispose of the assets of the Debtor and incur debt on behalf of the Debtor. Al LaBella authorized the financing for the Transaction with BNB, and also arranged for the pledging of the Debtor's collateral in order to obtain this loan by authorizing Blue Station Realty, Blue Diamond Sheet Metal Inc., Diam-N-Blu Mechanical Corp. and Mirage Mechanical Systems, Inc. to provide BNB Bank with Article 9 UCC-1 security agreements on all of their assets.

46.    Based upon the fact that the shareholder/director Al LaBella had control over the disposition of the Debtor's assets, the Badges of Fraud can be imputed upon Blue Diamond Air Systems, Inc. The Transaction and the Consulting Agreements showed the lack or inadequacy of consideration. The Defendants each received $1,482,750.00 for the sale of their ownership in Blue Diamond Sheet Metal Inc., Diam-N-Blu Mechanical Corp. and Mirage Mechanical Systems, Inc. to Al LaBella and Meghan Labella, the other shareholders. The Debtor did not derive a benefit. There was a close relationship between the parties, Al Labella, the purchaser of the shares of Blue Diamond Sheet Metal Inc., Diam-N-Blu Mechanical Corp. and Mirage Mechanical Systems, Inc. and Defendants Belz, DiMeglio and Dvorak. Al LaBella was

17

also a shareholder and a director of Blue Diamond Sheet Metal Inc., Diam-N-Blu Mechanical Corp. and Mirage Mechanical Systems, Inc. as was Defendants Belz, DiMeglio and Dvorak at the time that the Transaction and Consulting Agreement were consummated. Al Labella retained the possession, benefit or use of the property in question in that after purchasing the shares of Blue Diamond Sheet Metal Inc., Diam-N-Blu Mechanical Corp. and Mirage Mechanical Systems, Inc. from the Defendants, he and his wife became the only shareholders of these entities.

47.    As detailed herein and in the allegations in the Trustee's complaint, the Debtor was indebted to several creditors. After the Transaction closed, the Debtor could not operate profitably, resulting in its failed Chapter 11 Bankruptcy filing. In analyzing the Transaction, the Debtor incurred in excess of $9,000,000.00 in debt in order to finance the Transaction. That loan increased the Debtor's then existing debt load, which at that time was already liable to the Sheet Workers National Metal Pension Fund for pension liability in excess of $19,000,000.00.

48.    In reviewing the general chronology of events and transactions under inquiry as it concerns the Transaction, Al Labella states in his 1007-4 Affidavit [Dkt. 32] that "Like so many companies, the Debtor suffered financial setbacks as a result of the COVID-19 shutdowns and continuing delays in the construction industry." LaBella claimed that at this time, six of the Debtor's major projects were for the New York City School Authority, which had become severely in arrears on approved requisitions. LaBella further stated that the earliest unpaid requisition was in December 2020, when the Transaction closed. These factors were already exacerbated by the Debtor's debt load at the time.

18

49.    At the time the Transaction was being contemplated, the country was in the grasp of the COVID-19 Pandemic.  The Debtor was unable to operate without government financial assistance during this time.  One of the documents executed at the closing of the Transaction were Side Letter Agreements wherein the Defendants as Sellers placed their own funds in the aggregate amount of $2,886,600 (the "Seller Escrow") into escrow pending the determination by its lender of the forgiveness of certain PPP Loans.  At the time of the closing of the Transaction, the Debtor had three (3) PPP Loans with People's United Bank National Association ("Peoples"): one between Blue Diamond Sheet Metal, Inc. and Peoples for the sum of $2,555,400.00: one between Diam-N-Blu Mechanical Corp and Peoples for the sum of $289,500.00; and one between Mirage Mechanical Systems Inc and Peoples for the sum of $41,700.00.  All of the Side Letter Agreements were executed by the Defendants and Al LaBella and Meghan LaBella.  Accordingly, all of the parties to the Transaction were fully cognizant of the Debtor's poor financial condition at the time of the Transaction.  A copy of the Side Letter Agreements executed by Defendants Belz, DiMeglio and Dvorak are annexed hereto as Exhibit "F."

50.    The Transaction was not a transaction in the ordinary course of business. Accordingly, the Trustee has sufficiently pled a cause of action for Actual Fraud based upon the "Badges of Fraud."

**E.    THE TRUSTEE HAS SUFFICIENTLY PLED THE CAUSES OF ACTION FOR CONSTRUCTIVE FRAUDULENT CONVEYANCE UNDER BOTH THE BANKRUPTCY CODE AND THE NYUVTA.**

51.    It has been established that courts consistently hold that "claims of constructive fraud do not need to meet the heightened pleading requirements of Federal Rule Civil

19

Procedure 9(b) *Picard v. Cohmad Sec. Corp. et al. (In re Bernard L. Madoff Inv. Sec. LLC)*, 454 B.R. 317, 332 (Bankr. S.D.N.Y. 2011). The pleading of constructive fraud as opposed to actual fraud, must only comply with F.R.C.P. 8(a). The Trustee need only satisfy Rule 8(a) by providing a "short and plain statement of the claim showing that [he] is entitled to relief." Fed. R. Civ. P. 8(a)(2). *Picard v. Cohmad Sec. Corp. et al.* Id at 332 . Therefore, "the sole consideration should be whether, consistent with the requirements of Rule 8(a), the complaint gives the defendant sufficient notice to prepare an answer, frame discovery and defend against the charges." *Picard v. Cohmad Sec.Corp. (In re Bernard L. Madoff Inv Sec. LLC) Id at 332 citing Nisselson v. Drew Indus., Inc. (In re White Metal Rolling & Stamping Corp.)*

52.    Under the Constructive Fraud claims pursuant to 11 U.S.C. § 548(a)(2), the Trustee may recover a constructive fraudulent transfer where the "Debtor received...less than a reasonably equivalent value in exchange for such transfer or obligation." It has been established that reasonably equivalent value is determined by the value of the consideration exchanged between the Parties at the time of the conveyance which is challenged. *In re NextWave Pers. Commc'ns, Inc.* 200 F.3d 43, 56 (2d Cir. 1999). In determining whether the Debtor received "reasonably equivalent value, the Court need not strive for mathematical precision...but must keep the equitable purpose of the statute firmly in mind...recognizing that any significant disparity between the value received and the obligation assumed...will have significantly harmed the innocent creditors." *Rubin v. Mfrs. Hanover Tr. Co*, 661 F.2d 979, 994 (2d Cir 1981).

53.    In the appraisal conducted for BNB Bank by Reliant Business Valuation ("Reliant") on September 30, 2019, with an effective date of April 10, 2020 as to the value of the shares of Blue Diamond Sheet Metal Inc., Diam-N-Blu Mechanical Corp. and Mirage Mechanical

Systems, Inc. and Blue Station Realty, LLC, the shares were valued at $11,290,000.00.  The Defendants sold their shares in the entities to LaBella in exchange for the $1,482,750.00 that they each received.  However, the evaluation conducted by Reliant did not reflect the $19,087,733.76 obligation owed to the Sheet Metal Workers National Pension Fund.  The Debtor did not receive any consideration, but incurred a large debt to Dime Community Bank.  A copy of the Reliant Appraisal is annexed as Exhibit "G."

  54. The Trustee also pled constructive fraudulent conveyance claims under the NYUVTA.  Pursuant to 11 U.S.C. § 544(b)(1), the Trustee can assert fraudulent conveyance claims rooted under either the New York Debtor & Creditor Law or the NYUVTA.  Pursuant to 11 U.S.C. § 544(b)(1) ("the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim. . . .").  The NY DCL states that a conveyance by a debtor is deemed constructively fraudulent if it is made without "fair consideration" (now referred in the statute as "reasonably equivalent value") and one of the following conditions is met: (i) the transferor is insolvent or will be rendered insolvent by the transfer in question; (ii) the transferor is engaged in or is about to engage in a business transaction for which its remaining property constitutes unreasonably small capital, DCL § 274; or (iii) the transferor believes that it will incur debt beyond its ability to pay, DCL § 275. *In re Sharp Int'l Corp.*, 403 F.3d 43, 53 (2d Cir. 2005) (quoting N.Y. Debt. & Cred. §§ 272-275).  Fair consideration requires both (1) fair equivalency of the consideration and (2) good faith by both parties.  However, the plaintiff need only plead either a lack of fair equivalency or a lack of good faith on the part of the transferee to defeat a motion to dismiss. *Geron v. Reifer (In re Eight-115 Assocs., LLC)* 650 B.R. 43, 55 (Bankr.S.D.N.Y. 2023 citing *In re Bernard L.*

*Madoff Inv. Sec. LLC*, 458 B.R. 87, 110 (Bankr. S.D.N.Y. 2011) (citing *In re Dreier LLP*, 452 B.R. 391, 443 (Bankr. S.D.N.Y. 2011). A claim of constructive fraudulent conveyance is pleaded adequately if the complaint alleges sufficient facts to indicate that the transfers were made without fair consideration. Here, the Trustee has made such allegations.

55.    The Trustee has demonstrated, that the Debtor did not receive fair consideration in connection with the Transaction or the subsequent payment of Consulting Fees.

56.    Moreover, the Defendants are not "good faith transferees." It has been established the "fraud" that is relevant in considering the "good faith" defense is the alleged fraud upon which the intentional fraudulent transfer claim is based — namely, a fraud aimed at creditors. *Geron v. Craig (In re Direct Access Partners, LLC)*, 2017 Bankr. LEXIS 4205 (Bankruptcy Southern District of New York December 11, 2017) citing *In re Bayou Group, LLC*, 439 B.R. 284, 310 (S.D.N.Y. 2010) (in evaluating the good faith defense under 11 U.S.C. § 548(c), "[t]he first question typically posed is whether the transferee had information . . . that *the transfer might be made with a fraudulent purpose*" (emphasis added); *Terry v. June*, 432 F. Supp. 2d 635, 641 (W.D. Va. 2006) ("In order to establish the element of good faith, the transferee must prove [among other things that] he did not have knowledge of facts that should have reasonably put him on notice that *the transfer was made in order to delay, hinder, or defraud creditors* of the debtor. Here, all of the Defendants knew that there were outstanding PPP loan obligations that had to be forgiven before the Transaction occurred and that there was substantial liabilities, including the pension debt. As such, they were aware that the Debtor was in a very precarious financial position at the time of the Transaction.

22

**F.    THE TRUSTEE HAS SATISFIED THAT HE HAS STANDING TO BRING CAUSES OF ACTION UNDER § 544**

57.    The Trustee has brought the within action under various sections of the Bankruptcy Code, including but not limited to 11 U.S.C. § 544. It has been established that the power given to a Trustee under 11 U.S.C. § 544(b) to avoid a transfer or obligation is derivative, that is, there must be an actual existing creditor holding an allowable unsecured claim who would have had that right outside of bankruptcy. *In re Mendelsohn v. Nationstar Mortgage (In re Hyung Taek Hong)*, 2002 Bankr. LEXIS 3644 (Bankr.E.D.N.Y December 22, 2022) citing *Mendelsohn v. Kovalchuk (In re APCO Merch. Servs., Inc.)*, 585 B.R. 306, 314 (Bankr. E.D.N.Y. 2018). In order for a Trustee to maintain an action for avoidance of a fraudulent conveyance, the Trustee must show that at least one of the present unsecured creditors of the estate holds an allowable claim, against whom the transfer or obligation was invalid under applicable state or federal law." *In re Mendelsohn v. Nationstar Mortgage (In re Hyung Taek Hong) citing Young v. Paramount Commc'ns Inc. (In re Wingspread Corp.)*, 178 B.R. 938, 945 (Bankr. S.D.N.Y. 1995). *See also MC Asset Recovery, LLC v. Southern Co.*, No. 1:06-CV-0417-BBM, 2006 U.S. Dist. LEXIS 97034, 2006 WL 5112612, at *3 (N.D. Ga. Dec. 11, 2006) ("[I]n order to maintain an avoidance action under § 544(b), a Trustee must demonstrate the existence of a so-called 'golden' or 'triggering' creditor: (1) an unsecured creditor, (2) who holds an allowable unsecured claim under § 502, and (3) who could avoid the transfers at issue under applicable (i.e., state) law."); ("[B]efore a Trustee is able to utilize applicable state or federal law referred to in § 544(b), there must be an allegation and ultimately a proof of the existence of at least one unsecured creditor of the Debtor who at the time the transfer occurred could have, under applicable local law, attacked and set aside the transfer

23

under consideration.") *In re Mendelsohn v. Nationstar Mortgage (In re Hyung Taek Hong)*, 2002 Bankr. LEXIS 3644 (Bankr.E.D.N.Y December 22, 2022) (quoting *Smith v. Shoemaker (In re Smith)*, 120 B.R. 588, 590 (Bankr. M.D. Fla. 1990)).

58.     The Proofs of Claims filed against this Bankruptcy Estate, demonstrated that there were creditors whose debts (or parts of their debts) were due when the Transaction closed on December 22, 2020, including New York State Department of Labor ("DOL"), which filed an Amended Proof of Claim on January 8, 2024 in the sum of $97,616.57.   For the period of April 2020 to March 2021, the Debtor owed DOL the sum of $3,586.28. Annexed hereto as Exhibit "H" is a true copy of the Amended Proof of Claim of DOL.

59.     United States of America, Internal Revenue Service ("IRS") filed an Amended Proof of Claim on May 25, 2023 in the sum of $2,445,212.34. For the tax period ending December 31, 2020, the Debtor owed the IRS the sum of $16,150.00 plus interest of $1,336.36. Annexed hereto as Exhibit "I" is a true copy of the Amended Proof of Claim of the IRS.

60.     The Sheet Metal Worker's National Pension Fund filed an Amended Proof of Claim on May 30, 2023, in the sum of $18,285.07.   For the period of January 18, 2018 to October 20, 2020, the Debtor owed the sum of $839.11.   Annexed hereto as Exhibit "J" is a true copy of the Amended Proof of Claim of the Sheet Metal Worker's National Pension Fund.

61.     The Sheet Metal Worker's National Pension Fund filed an Amended Proof of Claim on May 30, 2023 in the sum of $19,087,733.76.  That sum was owed as of December 20, 2020.  Annexed hereto as Exhibit "K" is a true copy of the Amended Proof of Claim of the Sheet Metal Worker's National Pension Fund.

62.    Under Bankruptcy Rule 3001(f), a Proof of Claim executed and filed is prima facie evidence of the validity and amount of that creditor's claim. No objections to the aforementioned claims have been filed.

63.    By virtue of the fact that all of the aforementioned triggering creditors had claims which were in existence at the time of the Transaction, the Trustee has established that he had the requisite standing to avoid the Transaction under 11 U.S.C. § 544(b) and applicable state law.

64.    With regards to monies paid to the Defendants under the Consulting Agreements, in addition to the creditors mentioned in Paragraphs 66 to 69, *supra*, at the time that Consulting Fees were paid to the Defendants, the Debtor was indebted to other creditors for amounts reflected in their respective proofs of claims filed against this Bankruptcy Estate, including but not limited to claims filed by Metro Insulation Corporation for the sum of $40,049.39, Independent Sheet Metal Company, Inc. in the sum of $241,662.92, Alta Material Handling in the sum of $19,639.07, Airside Fabricators, Inc. in the sum of $63,228.63 and Harry Brainum, Jr., Inc. in the sum of $543,426.00. The Claims Register reflecting these claims is annexed hereto as Exhibit "L."

65.    Thus, the Trustee has not only met but exceeded his burden, by identifying specific creditors with outstanding claims at the time that the Transaction closed and the Consulting Fees were paid. The Trustee is not required to specifically identify a qualifying unsecured creditor in its complaint to assert standing under § 544 of the Code in accordance with the pleading requirements of Rule 8, but he has done so. *Picard v. Estate of Chais (In re Bernard L. Madoff Inv. Sec. LLC)*, 445 B.R. 206, 234 (Bankr.S.D.N.Y. 2011) citing *Musicland Holding*

*Corp. v. Best Buy Co., (In re Musicland Holding Corp.)*, 398 B.R. 761, 780 (Bankr. S.D.N.Y. 2008).

66.    Accordingly, any objections to the Trustee's standing to commence this lawsuit should be overruled.

## G.    THE DEFENDANTS WERE INSIDERS OF THE DEBTOR

67.    The Defendants claim that they are not Insiders under 11 U.S.C. § 101(31) when they received the Consulting Fees as they were former shareholders and directors of the Debtor.

68.    Under the Bankruptcy Code, in the corporate context, the term "insider" includes a "director of the debtor; officer of the debtor; person *in control* of the debtor; partnership in which the debtor is a general partner, general partner of the debtor; or relative of a general partner, director, officer, or person in control of the debtor." 11 U.S.C. § 101(31)(B) (emphasis added).  Persons falling within this definition are considered "statutory insiders." *Pergament v. Amton, Inc.  (In re PHS Grp. Inc)*, 581 B.R. 16, 31 (Bankr.E.D.N.Y. 2018).

69.    Courts, recognizing that this statutory definition was not intended to be an exhaustive or exclusive list of roles that may qualify a person for insider status, have developed the concept of a "non-statutory" insider.  The non-statutory insider need not have actual control over the Debtor; rather, the question there "is whether there is a close relationship [between debtor and third party] and . . . anything other than closeness. *Pergament v. Amton, Inc. (In re PHS Grp. Inc)*, Id at 31. An insider's status, i.e., control, should be determined "based on the totality of the circumstances, including the degree of an individual's involvement in a debtor's affairs." *Pergament v. Amton, Inc. (In re PHS Grp. Inc)*, Id at 32, citing *In re Borders*, 453 B.R. 459, 469

26

(Bankr.S.D.N.Y. 2011). An insider should either exercise sufficient authority over the debtor to "dictate corporate policy and the disposition of corporate assets" or have at least a "controlling interest in the debtor." *Pergament v. Amton, Inc. (In re PHS Grp. Inc),* Id at 32.

70. There are a number of factors that should be taken into consideration in this "totality of the circumstances" control analysis. Those factors are: (1) the close relationship between the debtor and the third party, (2) the degree of the individual's involvement in the debtor's affairs, *In re Borders Grp., Inc.,* 453 B.R. at 469, (3) whether the defendant had opportunities to self-deal and (4) whether the defendant holds or held a controlling interest in the debtor corporation. *Pergament v. Amton, Inc. (In re PHS Grp. Inc), Id* at 33, citing *In re Borders,* 453 B.R. at 469.

71. According to the Amended and Restated Shareholders Agreement dated December 22, 2008, all of the Defendants were shareholders and directors of Blue Diamond Sheet Metal Inc., Diam-N-Blu Mechanical Corp. and Mirage Mechanical Systems. At the time that the Transaction closed and thereafter, Defendants Belz, DiMeglio and Dvorak were Insiders of the Debtor as that term is defined under 11 U.S.C. § 101(31) under the totality of the circumstances test. A copy of the Amended and Restated Shareholders Agreement is annexed hereto as Exhibit "M."

72. Defendants Belz, DiMeglio and Dvorak were in close relationship with the Debtor as shareholders and directors and once held a controlling interest in the Debtor and were continually involved through the Consulting Agreements.

73. Defendants claim that the payments that the Defendants received within one year prior to the Debtor's Bankruptcy filing are not avoidable on the grounds that they are not

27

insiders. In support of this assertion, the Defendants claim that they were no longer insiders because they were now former directors and shareholders of the Debtor at the time they were receiving those payments due to them under the Consulting Agreements. However, at the time that the Consulting Agreements had been executed and implemented, Defendants Belz, DiMeglio and Dvorak were still shareholders and directors.

74.     It has been established that transactions benefitting officers and directors at the time that the transfers were arranged are "Insiders" for purposes of § 101, and the fact that such officers and directors cease to be such at the time that the transfers are made is of no significance. *In re Vaniman International, Inc.,* 22 B.R. 166 189 (Bankr.E.D.N.Y. 1982) accord *In re F & S Cent. Mfg. Corp.*, 53 B.R. 842, 849 (Bankr.E.D.N.Y. 1985)- a creditor who is an insider at the time the transfer of the debtor's property is arranged is an insider at the time of the transfer.

75.     Accordingly, Defendants Belz, DiMeglio and Dvorak were "Insiders" under 11 U.S.C. § 101(31) at the time of the Consulting Agreements and the time that they received Consulting Fees paid to them under the Consulting Agreements based upon the totality of the circumstances.

**H.     THE CONSULTING FEES WERE PROPERTY OF THE DEBTOR SUBJECT TO AVOIDANCE UNDER 11 U.S.C. § 547 OR 548**

76.     The Defendants have asserted that the Transaction (and by extension the Consulting Fees that they were paid) are insulated from avoidance as a preference under 11 U.S.C. § 547(b) on the grounds that whatever conveyances that the Defendants received, they were not a "transfer of an interest of the Debtor in property.." That line of reasoning would likewise extend

to a cause of action to recover a fraudulent conveyance under 11 U.S.C. § 548(a), which like § 547(b) also requires a "transfer of an interest of the Debtor in property.."

77.    In support of this argument, the Defendants' claim that at the time the Consulting Fee Agreements were executed in July 2020, they had been entered into between Blue Diamond Sheet Metal Inc., Diam-N-Blu Mechanical Corp. and Mirage Mechanical Systems and not the Debtor, Blue Diamond Air Systems, Inc.  The Defendants also claim that the Plaintiff Trustee is being purposefully misleading in his pleadings, stating that the conveyances in question, namely the Transaction and the Consulting Fees, were effectuated by the non-Debtor entities, Diam-N-Blu Mechanical Corp., Mirage Mechanical Systems, Inc. and Blue Diamond Sheet Metal, and not the Chapter 7 Debtor, Blue Diamond Air Systems, Inc.

78.    This argument is a non-sequitur.  The entire sequence of the change of ownership from these entities into the Debtor is described with specificity in Paragraphs 44-48 of the Complaint.  On or about June 24, 2021, Diam-N-Blu Mechanical Corp. merged into Blue Diamond Sheet Metal, Inc.  A Certificate of Merger of Diam-N-Blu Mechanical Corp. into Blue Diamond Sheet Metal, Inc. was filed with New York Secretary of State's Office pursuant to New York Business Corporation Law § 904 on June 24, 2021.  Annexed hereto as Exhibit "N" is a true copy of the Certificate of Merger Diam-N-Blu Mechanical Corp. into Blue Diamond Sheet Metal, Inc.

79.    On or about June 24, 2021, Mirage Mechanical Systems, Inc. merged into Blue Diamond Sheet Metal, Inc.  A Certificate of Merger of Mirage Mechanical Systems, Inc. into Blue Diamond Sheet Metal, Inc. was filed with New York Secretary of State's Office pursuant to New York Business Corporation Law § 904 on June 24, 2021.  Annexed hereto as Exhibit "O" is

29

a true copy of the Certificate of Merger of Mirage Mechanical Systems, Inc. into Blue Diamond Sheet Metal, Inc.

80.    On or about July 7, 2021, the Certificate of Incorporation of Blue Diamond Sheet Metal, Inc. that was filed with the Secretary of State's Office was amended to change of the corporation from "Blue Diamond Sheet Metal. Inc." to the Debtor, "Blue Diamond Air Systems, Inc." pursuant to New York Business Corporation Law § 805. Annexed hereto as Exhibit "P" is a true copy of the Amendment of the Certificate of Incorporation of Blue Diamond Sheet Metal, Inc.

81.    Pursuant to New York Business Corporation Law § 906(a) upon the filing of the certificate of merger or consolidation by the Department of State or on such date subsequent thereto, not to exceed thirty days, as shall be set forth in such certificate, the merger or consolidation shall be effected. As the Certificate of Merger between Diam-N-Blu Mechanical Corp. into Blue Diamond Sheet Metal, Inc. was filed with the New York Secretary of State's Office pursuant to New York Business Corporation Law § 904 on June 24, 2021, this merger became effected between these two entities on July 24, 2021, within thirty (30) days of the filing of the respective Certificate of Merger. See Exhibit "N."

82.    As the Certificate of Merger between Mirage Mechanical Systems, Inc into Blue Diamond Sheet Metal, Inc. was filed with New York Secretary of State's Office pursuant to New York Business Corporation Law § 904 on June 24, 2021, this merger became effected between these two entities on July 24, 2021, within thirty (30) days of the filing of the respective Certificate of Merger. See Exhibit "O."

30

83.    Pursuant to New York Business Corporation Law § 906(b)((2), once the merger has been effected, all of the property, real and personal, including subscriptions to shares, causes of action and every other asset of each of the corporations, shall vest in such surviving or consolidated corporation without further act or deed.  Thus, all of the assets of Diam-N-Blu Mechanical Corp. and Mirage Mechanical Systems, Inc. became those of Blue Diamond Sheet Metal, Inc. once their respective mergers had been effected.

84.    Pursuant to New York Business Corporation Law § 906(b)(3), once the merger has been effected, the surviving or consolidated corporation shall assume and be liable for all the liabilities, obligations and penalties of each of the corporations.  No liability or obligation due or to become due, claim or demand for any cause existing against any such constituent entity, or any shareholder, member, officer or director thereof, shall be released or impaired by such merger or consolidation. No action or proceeding, whether civil or criminal, then pending by or against any such constituent entity, or any shareholder, member, officer or director thereof, shall abate or be discontinued by such merger or consolidation, but may be enforced, prosecuted, settled or compromised as if such merger or consolidation had not occurred, or such surviving or consolidated corporation may be substituted in such action or special proceeding in place of any constituent entity.  See New York Business Corporation Law Section 906(b)(3).

85.    Accordingly, once the mergers of Diam-N-Blue Mechanical and Mirage Mechanical Systems, Inc into Blue Diamond Sheet Metal, Inc. had been effected, Blue Diamond Sheet Metal, Inc. became the owner of all of the assets of these corporations and assumed all of the liabilities of the corporations.  As stated in the case of *Chatham Corp. v. Argonaut Ins.Cp.* 70

Misc. 2d 1028 (Sup. Ct. Nassau County 1972) regarding the effect of New York Business

Corporation Law § 906(b)(2):

> "It may be said, under the construction of this statute, that nothing is lost by a merger of corporations and that any right lawfully belonging to any of the constituent corporations merged together can be asserted by the surviving corporation."

*Chatham Corp. v. Argonaut Ins.Cp.* 70 Misc. 2d 1028, 1029 (Sup. Ct. Nassau County 1972) *citing*

*Platt Corp. v. Platt*, 21 AD2d 116, 120 aff'd 15 NY 2d 705.

86.     Accordingly, Blue Diamond Sheet Metal, Inc. (and after the Amendment of

the Certificate of Incorporation, the Debtor, Blue Diamond Air Services, Inc.) obtained all of the

assets and liabilities of the constituent members after the merger.  As such, any payments made to

the Defendants in connection with the Consulting Agreements that they had executed with Blue

Diamond Sheet Metal, Inc., Diam-N-Blue Mechanical, Corp. and Mirage Mechanical Systems,

Inc. became property of the Debtor under New York Business Corporation Law § 906(b)(2) once

the merger had been effected. See *Foster v. IOU Cent., Inc. (In re Shoot the Moon, LLC)*, 2020

Bankr. LEXIS 1374 (United States Bankruptcy Court, District of Montana May 21, 2020),

interpreting Montana and Idaho Statutes similar to New York Business Corporation Law §

906(b)(2) and holding that if merged entities maintained the right to avoid a transfer as preferential,

the surviving entity would be vested with the same rights upon merger.  Upon merger, all of the

rights of the merged entities vested in the Debtor.  This would be true even if the Debtor did not

exist until after the debts arose and after the transfers had been made.

87.     By virtue of the foregoing and under New York Business Corporation Law

§ 906(b)(2), the payments that the Defendants received from the Transaction and the Consulting

Fees paid to the Defendants under the Consulting Agreements were a transfer of the Debtor's interest in property which could be avoided as preferential under 11 U.S.C. § 547 or as a fraudulent conveyance under 11 U.S.C. § 548.

88.     Defendant DiMeglio makes the argument that the Consulting Fee and Consulting Agreement that he had executed are not subject to avoidance because they were made with the non-Debtor entity, Blue Station Realty, LLC.  On or about June 15, 2023, Defendant DiMeglio filed a Proof of Claim against this Bankruptcy Estate. See Exhibit "Q."

89.     Although the Official 410 Proof of Claim form indicated that Defendant DiMeglio filed his Proof of Claim for an "unknown" amount, in the Rider that he annexed to the Proof of Claim, DiMeglio asserted that: (i) This Proof of Claim arises from amounts owed to Claimant under that certain Consulting Agreement (the "Consulting Agreement") by and among Claimant, Blue Diamond Sheet Metal, Inc., Diam-N-Blue Mechanical Corp. and Mirage Mechanical Systems, Inc., each a New York corporation, and Blue Station Realty LLC, a New York limited liability company (collectively, the "Companies"); Under the Consulting Agreement, Claimant served as a consultant on a nonexclusive basis to provide certain consulting services to the Companies.  In consideration for those consulting services, Claimant was supposed to receive forty-two (42) monthly payments in the amount of $3,683.33 on the fifteenth (15th) day of every month for forty-two (42) months.  The Companies agreed to be jointly and severally liable under the Consulting Agreement for the monthly payments due to Claimant.  Upon information and belief, the Debtor is the result of a merger between one or more of the Companies and, therefore, is jointly and severally liable for any amounts owed to Claimant under the Consulting Agreement. As of the Petition Date, Claimant is owed a general unsecured claim in the amount of not less than

33

$81,033.26 for twenty-two (22) unpaid monthly payments due under the Consulting Agreement. A copy of DiMeglio's Proof of Claim with Rider is annexed as Exhibit "Q."

90.    It is clear based upon this Proof of Claim that Defendant DiMeglio is seeking payment from this Bankruptcy Estate under the Consulting Agreements that were executed by the corporations. Even if DiMeglio had executed the Consulting Agreement with the Non-Debtor entity, Blue Station Realty, LLC, his own averments in the Rider to his proof of claim that all of the companies would be jointly and severally liable for the payment of the consulting fees belies this assertion. Moreover, the Rider to his Proof of Claim acknowledges that Blue Diamond Sheet Metal, Inc., Diam-N-Blu Mechanical Corp. and Mirage Mechanical Systems, Inc. merged to form the Debtor, Blue Diamond Air Systems Inc. The Debtor assumed all of the assets and liabilities of Blue Diamond Sheet Metal, Inc., Diam-N-Blu Mechanical Corp. and Mirage Mechanical Systems, Inc., including but not limited to the indebtedness allegedly owed to Defendants under their Consulting Agreements.

I.    **THE CONSULTANT FEES ARE NOT INSULATED FROM AVOIDANCE UNDER 11 U.S.C. § 547 (c)**

91.    The Defendants claim that any payments paid to them under the Consulting Agreements are insulated from avoidance under 11 U.S.C. § 547(c) to the extent that the transfers were: (1) made in the regular course of business; (2) intended by the transferor and transferee to be a contemporaneous exchange for new value given to the debtor; or (3) on account of which, after the transfer, new value is given to the debtor. Pursuant to 11 U.S.C. § 547(g), it is the Defendants' burden of proving any affirmative defenses under 11 U.S.C. § 547( c). See *Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.)*, 78 F.3d 30, 34,39 (2d Cir. 1996). Based upon this

criteria, Defendant DiMeglio cannot satisfy this burden, as he testified unequivocally at his Rule 2004 Examination that he did not perform any consulting services. See DiMeglio's Rule 2004 Examination Transcript at Page 50, lines 9-15 annexed hereto as Exhibit "R."

92.     Moreover, when questioned if he had performed any services for the Debtor after the Transaction on December 22, 2020, which the Trustee identified as "…any type of services work, labor, consulting?" DiMeglio responded, "Nothing. Nothing at all." See Defendant DiMeglio's Rule 2004 Examination Transcript at Page 49, lines 13-22 annexed as Exhibit "S." Accordingly, based upon these statements by Defendant DiMeglio, he cannot insulate himself from an avoidance action for the Consulting Fees he received under either the ordinary course of business defense under 11 U.S.C. § 547(c)(2) or 11 U.S.C. § 547(c)(4), because he did not provide any "new value."

93.     Defendants Belz and Dvorak are also precluded from the ordinary course of business defense. They assert that the Consulting Fees that they received were payroll payments as employees of the Debtor. This is not correct. At that time that they were receiving Consulting Fees, all of the Defendants were former shareholders of the Debtor. All of the payments that they received under the Consulting Agreements were for the gross monthly amount of the Consulting fee in the sum of $3,683.33. No social security or withholding taxes were withheld from these payments, evidencing that the Defendants were independent contractors and not employees. A copy of the payments received by Defendants Belz and Dvorak under the Consulting Agreements are annexed hereto as Exhibit "T."

94.     Moreover, the Consulting Fees that the Defendants received were on account of antecedent debts. According to the terms of the Consulting Agreements, the Defendants

were to be paid the sum of $3,683.33 per month on the 15th day of every month during the term. The term was forty-two (42) months from the Effective Date, which was the date that the Equity Purchase Security Agreement had been entered on July 1, 2020 (although the sale of the Defendants' shares in Blue Diamond Sheet Metal, Inc., Diam-N-Blue Mechanical, Inc. and Mirage Mechanical Systems, Inc. did not close until December 22, 2020). See Exhibit "D."

95.    In reviewing the Consulting Fees paid to Defendant Belz, the Consulting Fees he received were beyond the 15th day of each month as evidenced by the payments made into his bank account maintained at Teachers Federal Credit Union; $3.383.33 on October 25, 2021; $3,918.19 on November 27, 2021; no payment for December 2021; $3,183.33 on January 6, 2022; $3,183.33 on January 24, 2022; $3,823.33 on February 28, 2022; $3,83.33 on March 28, 2022; $3,683.33 on April 26, 2022 and $3,683.33 on May 24, 2022. See Exhibit "S."

96.    It has been established that for purposes of 11 U.S.C. § 547(b)(2), "a debt is antecedent if the Debtor incurs it before making the alleged preferential transfer." See *(Garcia v. Garcia) In re Garcia*, 494 B.R. 799, 813 (Bankr.E.D.N.Y. 2013) citing *G. G. Survivor Creditor Corp. v. Harari (In re G. Survivor Corp.)*, 217 B.R. 433, 440 (Bankr. S.D.N.Y. 1998). A debt is considered "antecedent" for purposes of 11 U.S.C. Section 547(b)(2) if it was incurred prior to the alleged transfer. See *Geltzer v. Fleck (In re ContinuityX, Inc.)*, 569 B.R. 29, 34 (Bankr.S.D.N.Y. 2017) citing *Pereira v. Lehigh Sav. Bank, SLA (In re Artha Mgmt.)*, 174 B.R. 671, 678 (Bankr. S.D.N.Y. 1994); *Nisselson v. Salim (In re Big Apple Volkswagen, LLC)*, Adv. Proc. No. 11-02251 (JLG), 2016 Bankr. LEXIS 834, 2016 WL 1069303, at *10 (Bankr. S.D.N.Y. March 17, 2016). Clearly, based upon the date that the Consulting Fees were due under the Consulting Agreement versus the dates that these fees were actually paid to the Defendants, the payments that these

Defendants received under the Consulting Agreements were on account of antecedent debts capable of being avoided under 11 U.S.C. § 547(b).

97.    Even if this Court wanted to consider the Defendants as "employees", that status per-se would not preclude them from preference avoidance under 11 U.S.C. § 547(b) nor would that insulate the payments that they received from avoidance under the contemporaneous exchange for new value defense under 11 U.S.C. § 547(c)(1). While there is case law in support of Defendants' position that timely payments of salary to an employee in exchange for the employee's continued services to the Debtor may be excepted from recovery as contemporaneous exchanges for new value, case law has also held that "Courts have interpreted [new value] to include the continued services of employees and payments to those employees may be construed as 'contemporaneous' so long as the employer-Debtor keeps current by paying the employees' salaries and benefits when due."); *Geltzer v Fleck (In re ContinuityX, Inc.)* 569 B.R. 29, 38 (Bankr.S.D.N.Y. 2017) citing, *Jacobs v. D'Alessandro (In re Dewey & Leboeuf LLP)*, (Bankr.Adv. Proc. No. 14-01919 (MG), 2014 Bankr. LEXIS 4051, 2014 WL 4746209, at *9 (Bankr. S.D.N.Y. Sept. 23, 2014). Here, even if one were to attempt to construe the Debtor as the Defendants' "employer" (when at the time that they received the Consulting Fees they were only former shareholders of the Debtor), the Defendants could not utilize the defense under 11 U.S.C. § 547(c)(1). As evidenced at Exhibit "S", the Debtor was not current on the Consultant Fee payments, in that it was not paying them when they became due. The Consultant Fees were due to be paid on the 15th day of each month of the term of the Consulting Agreement. According to Exhibit "S", numerous payments were made well beyond the 15th day of the month, and no payment had even been made for December 2021. Accordingly, the Defendants cannot insulate

37

the avoidance of the Consulting Fees that they were paid under the affirmative defenses that they raised under 11 U.S.C. § 547(c).

98.     The Defendants cite to the case of *In re George Sharp, Inc.* 2022 WL 1714178 Adv. Pro. No. 21-1000 (MEW), 2022 WL 1714178, at *12–13 (Bankr. S.D.N.Y. May 25, 2022) for the proposition that that if a contract actually requires a 'prepayment' … then no preference occurs when such a payment is made. In the case of *In Re George Sharp, Inc.*, the defendant argued that the preferential payment it received was insulated from avoidance because the payment in that case occurred prior to a delivery of goods, thereby raising the question if there was even an antecedent debt.  However, it should be noted that the Court in *George Sharp Inc.* denied Defendant Pac Mar Indus. Corp.'s motion for summary judgment, holding that summary judgment was not proper in favor of either party as to the "new value" issues under 11 U.S.C. § 547 (c) because the record did not contain sufficient information to enable a decision as to whether new value was provided to or for the benefit of the Debtor.

99.     In the present case, there was no pre-payment of the Consulting Services. According to the Consulting Agreements, the Consulting Fees were due to be paid on the 15th of every month. In reviewing Defendant Belz's payments, he was receiving them on dates well past the 15th day due date.  Clearly, this is not prepayment.  All of the Consulting Fees due to the Defendants were based upon the date that they entered into the Consulting Agreements with the Debtor, which was on July 1, 2020 and became effective as of the closing of the Transaction, which was December 22, 2020. As such, the prepayment of any consulting fees prior to the due date of the 15th day of each month would still be a payment on account of an antecedent debt because the obligation to pay the consulting fee occurred prior to the transfer date. See *Official Comm. of*

38

that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation." It has been established in the Second Circuit that insolvency for purposes of 11 U.S.C. § 548(a)(1)(B) is determined by the "balance sheet test," specifically whether the debtor's assets were exceeded by its liabilities at the time of the transfer. *Universal Church v. Geltzer*, 463 F.3d 218, 226 (2d. Cir 2006) citing *In re Centennial Textiles, Inc.*, 220 B.R. 165, 174 (Bankr. S.D.N.Y. 1998); and *In re Durso Supermarkets, Inc.*, 193 B.R. 682, 701 (Bankr. S.D.N.Y. 1996); *accord Pryor v. Nelson & Sons Formals, Ltd. (In re Coco Foods, Inc.)* 2023 Bankr. LEXIS 718 (United States Bankruptcy Court, March 21, 2023) citing *Coan v. Orlando Predators Sports Group, LLC (In re People's Power and Gas, LLC)*, 608 B.R. 333, 339 (Bankr. D. Conn. 2019) (Courts have held that a debtor is insolvent if the debtor's liabilities exceeded its assets at the time of each transfer, under a balance sheet test).

102.    The Debtor was insolvent at the time of the Transaction. According to Reliant's appraisal of the Debtor's assets in connection with the Transaction, the value of the Stock Equity Interest of Blue Diamond Sheet Metal, Inc., Diam-N-Blu Mechanical Corp. and Mirage Mechanical Systems was $11,290,000.00. See Exhibit "G."

103.    At the time of the Transaction, the Debtor was indebted to various creditors, namely Sheet Metal Worker's National Pension Fund, which filed an Amended Proof of Claim against this Bankruptcy Estate on May 30, 2023 in the sum of $19,087,733.76. See Exhibit "K."

104.    When asked about this Proof of Claim at his Rule 2004 Examination, Defendant Belz testified that it was an unfunded liability for withdrawal, and that the Debtor's pension was not completely funded. See pages 46 and 47 of Defendant Belz's testimony as it

concerns Amended Proof of Claim filed by the Sheet Metal Worker's National Pension Fund in the sum of $19,087,733.76 annexed hereto as Exhibit "U."

105.    The Debtor contributed to a number of multiemployer defined benefit pension plans under the terms of collective bargaining agreements that covered its employees. A copy of the Agreement with Local 28 and a footnote from the Debtor's Financial Statement is annexed hereto as Exhibit "V."

106.    Under the Multiemployer Pension Plan Amendments Act of 1980, an employer incurs withdrawal liability when it withdraws from a multiemployer pension plan pursuant to 29 U.S.C. Section 1381(a). See *UFCW Local One Pension Fund v. Enivel Props. LLC*, 791 F3d 369, 372 (2d Cir. 2015). The Multiemployer Pension Plan Amendments Act of 1980 was designed to protect the interests of participants and beneficiaries in financially distressed multi-employer plans. *UFCW Local One Pension Fund v. Enivel Props. LLC, Id*, at 372 citing *T.I.M.E.-DC, Inc. v. Mgmt,-Labor Welfare and Pension Funds of Local 1730 Int'l Longshoremen's Ass'n*, 756 F.2d 939,943 (2d Cir. 1985). Withdrawal liability discourages employers from evading their obligations to pension funds by fractionalizing or balkanizing their operations. *UFCW Local One Pension Fund v. Enivel Props. LLC, Id*, at 372 citing *Bd. of Trs. of the W. Conf. of Teamsters Pension Tr. Fund v. H.F. Johnson, Inc.*, 830 F.2d 1009, 1013 (9th Cir. 1987). Additionally, it has been established that unfunded pension liability debt qualifies as "debt under 11 U.S.C. § 101, and should be included as a debt in determining whether a Bankruptcy Debtor was solvent. See *Brown v. Shell Can, (In re Tennessee Chem. Co.)* 143 B.R. 468, 474 (Bankr.E.D.Tenn 1992), holding that the Debtor's total unfunded pension liability should be counted as a debt in order to determine if the Debtor Tennessee Chemical was solvent.

41

107.    The liability of the Debtor to Sheet Metal Worker's National Pension Fund in the sum of $19,087,733.76 should be counted as a debt for the purposes of determining the Debtor's solvency at the time of the Transaction.  As this debt vastly exceeds the value of the Defendants' shareholder interest of $11,200,000.00 in Blue Diamond Sheet Metal Inc., Diam-N-Blu Mechanical Corp. and Mirage Mechanical Systems, Inc. the Debtor was insolvent at the time of the Transaction and the time it paid the Consulting Fees to the Defendants.

108.    Additionally, Schedule L (Balance Sheet) of Blue Diamond Sheet Metal's Tax return for 2020 (for the period of October 1, 2020 to September 30, 2021), reflects assets of $13,570,590.00 against liabilities of $13,570,590.00.  However, according to Line Item 2b of Schedule L, Blue Diamond Sheet Metal, Inc. listed as an asset were "bad debts", in the sum of $6,841,884.00.  While "bad debts" may serve as a deduction to reduce Blue Diamond Sheet Metal Inc.'s taxable income it is not an asset.  The Balance Sheet did not reflect the liability of $19,000,000.00 to the Sheet Metal Workers National Pension Fund nor the debt of $9,000,000.00 to Dime.  A copy of Schedule L of Blue Diamond Sheet Metal, Inc.'s 2020 Federal Tax Return is annexed as Exhibit "W".

109.    Additionally, Line Item 2a of Schedule L of Blue Diamond Sheet Metal's 2020 Tax Return listed trade notes and accounts receivable in the sum of $6,841,884.00 as an asset.  However, in reviewing a Borrowing Base Certificate that Blue Diamond Sheet Metal and Diam-N-Blu Mechanical Corp. executed in favor of Dime Community Bank on April 4, 2021, while the combined accounts receivable were valued at $8,238,886.91, the actual value of this collateral was only $3,401,061.74. As such, while the trade notes and accounts receivable line item 2a of Blue

Diamond Sheet Metal, Inc.'s 2020 tax return listed this number at $6,841,884.00, this number was substantially smaller. A copy of the Borrowing Base Certificate is annexed hereto as Exhibit "X."

110.    Defendants cite to the case of *In re Iridium Operating LLC*, 373 B.R. 283, 345 (Bankr. S.D.N.Y. 2007) in support of their assertion that the Debtor was solvent as of the time of the Transaction. The Defendants claim that insolvency should be based upon cash flow projections rather than balance sheet as the accepted method in the Second Circuit.

111.    In *Iridium Operating*, the Court was referencing cash flow projections as to whether the Debtor was adequately capitalized as required by 11 U.S.C. § 548(a)(1)(B)(ii)(II), and not insolvency, which is defined under 11 U.S.C. § 548(a)(1)(B)(ii)(I). However, even if this Court were inclined to consider cash flow for purposes of insolvency in this case, in reviewing the Statement of Income and Retained Earnings for the period ending September 30, 2020, Mirage Mechanical Systems, Inc. had net income of negative $144,861.00 and Blue Diamond Sheet Metal, Inc. had net income of negative $2,196,070.00. A copy of the Statement of Income and Retained Earnings for the period ending September 30, 2020, for Mirage Mechanical Systems, Inc. and for Blue Diamond Sheet Metal, Inc. is annexed hereto as Exhibit "Y."

**K.    THE TRANSACTION AND THE CONSULTING FEES LEFT THE DEBTOR WITH UNREASONABLY SMALL CAPITAL**

112.    In the Second and Seventh Causes of Action, the Trustee has asserted that the Transaction and the Consulting Fees should be avoided as constructive fraudulent conveyances under 11 U.S.C. § 548(a)(1)(B)(ii)(II) on the grounds that they left the Debtor with "unreasonably small capital." Case law has held that the test for determining if a transaction left a Debtor with "unreasonably small capital" requires a showing "...short of actual insolvency: and 'is aimed at

transfers that leave the transferor technically solvent but doomed to fail." *Pryor v. Nelson & Sons Formals, Ltd. (In re Coco Foods, Inc.)* 2023 Bankr. LEXIS 718 (United States Bankruptcy Court, March 21, 2023) citing [*Tese-Milner v. Edidin & Assocs.*, 490 B.R. 84, 98 (Bankr. S.D.N.Y. 2013)] (citing *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Services Co.*), 910 F.Supp. 913, 944 (S.D.N.Y. 1995). Under the promulgation of this test, the Debtor is deemed to have 'unreasonably small' assets if insolvency was inevitable in the reasonably foreseeable future. *Pryor v. Nelson & Sons Formals, Ltd. (In re Coco Foods, Inc.), Id* citing *Adelphia Recovery Trust v. FPL Grp., Inc. (In re Adelphia Communs. Corp.)*, 652 F. App'x 19, 22 (2d Cir. 2016).

113.    The Transaction closed on December 22, 2020. The large debt existing at that time to Sheet Metal Worker's National Pension Fund in the sum of $19,087,733.76, the debt that the Debtor incurred to finance the Transaction with Dime Community Bank in the sum of $9,565,821.32 and the additional debt that the Debtor incurred, completely doomed the Debtor. The Debtor buckled under the weight of this increased debt load and was inevitably required to file a Chapter 11 Plan of Reorganization less than two (2) years later on October 4, 2022.

114.    These transactions left the Debtor so depleted that even while it was in Chapter 11, the Debtor was unable to make its first pension benefit payment to the Sheet Metal Workers National Pension Fund in the amount of $169,085.88, its first insurance premium finance installment payment in the sum of $114,876.71, and its payroll taxes in the approximate amount of $200,000.00. After less than four months, the Debtor conceded that it would be unable to fund a viable Chapter 11 Plan, and thereafter consented to the United States Trustee's Motion converting this case to Chapter 7 on February 10, 2023.

115.    The Plaintiff Trustee has demonstrated that both the Transaction and the

Consulting Fees left the Debtor with unreasonably small capital as required by under 11 U.S.C. §

548(a)(1)(B)(ii)(II).

**L.    THE TRANSACTION IS NOT PROTECTED FROM AVOIDANCE UNDER THE
SAFE HARBOR PROVISION OF 11 U.S.C. § 546 (e)**

116.    The Defendants assert that the Transaction is prohibited from avoidance by

virtue of the safe harbor provision found in 11 U.S.C. Section 546 (e).  According to that section:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this
> title [11 USCS §§ 544, 545, 547, 548(a)(1)(B), and 548(b)], the trustee may not
> avoid a transfer that is a margin payment, as defined in section 101, 741, or 761 of
> this title [11 USCS § 101, 741, or 761], or settlement payment, as defined in section
> 101 or 741 of this title [11 USCS § 101 or 741], made by or to (or for the benefit
> of) a commodity broker, forward contract merchant, stockbroker, financial
> institution, financial participant, or securities clearing agency, or that is a transfer
> made by or to (or for the benefit of) a commodity broker, forward contract
> merchant, stockbroker, financial institution, financial participant, or securities
> clearing agency, in connection with a securities contract, as defined in section
> 741(7) [11 USCS § 741(7)], commodity contract, as defined in section 761(4) [11
> USCS § 761(4)], or forward contract, that is made before the commencement of the
> case, except under section 548(a)(1)(A) of this title [11 USCS § 548(a)(1)(A)].

117.    § 546 (e) references very precise terms of art under the Bankruptcy Code.

A securities contract is defined under the Bankruptcy Code as "a contract for the purchase, sale,

or loan of a security." 11 U.S.C. § 741(7)(A)(i).  The term "commodity broker" under 11 U.S.C.

§ 101(6) means futures commission merchant, foreign futures commission merchant, clearing

organization, leverage transaction merchant, or commodity options dealer, as defined in § 761 of

this title.

118.    The term "forward contract merchant" under 11 U.S.C. § 101(25) means a

Federal reserve bank, or an entity the business of which consists in whole or in part of entering

into forward contracts as or with merchants in a commodity (as defined in § 761 [11 USCS § 761])
or any similar good, article, service, right, or interest which is presently or in the future becomes
the subject of dealing in the forward contract trade.

      119.   "Stockbroker" under § 101 (53A) means a person:

         a.     with respect to which there is a customer, as defined in § 741
of this title [11 USCS § 741]; and

         b.     that is engaged in the business of effecting transactions in
securities,

            i.     for the account of others; or

            ii.     with members of the general public, from or for such
person's own account.

      120.   The term "financial institution" under 11 U.S.C. § (22) means a Federal
reserve bank, or an entity that is a commercial or savings bank, industrial savings bank, savings
and loan association, trust company, federally-insured credit union, or receiver, liquidating agent,
or conservator for such entity and, when any such Federal reserve bank, receiver, liquidating agent,
conservator or entity is acting as agent or custodian for a customer (whether or not a "customer",
as defined in § 741 [11 USCS § 741]) in connection with a securities contract (as defined in § 741
[11 USCS § 741]) such customer.

      121.   The term "financial participant" under 11 U.S.C. § 22(A) means an entity
that, at the time it enters into a securities contract, commodity contract, swap agreement,
repurchase agreement, or forward contract, or at the time of the date of the filing of the petition,
has one or more agreements or transactions described in paragraph (1), (2), (3), (4), (5), or (6) of

§ 561(a) [11 USCS § 561(a)] with the debtor or any other entity (other than an affiliate) of a total gross dollar value of not less than $1,000,000,000 in notional or actual principal amount outstanding (aggregated across counterparties) at such time or on any day during the 15-month period preceding the date of the filing of the petition.

122.    The term "securities clearing agency" under 11 U.S.C. § 101(48) means person that is registered as a clearing agency under § 17A of the Securities Exchange Act of 1933.

123.    By its very terms, the Safe Harbor provision does not to apply to the avoidance of those transfers that the Trustee is seeking to avoid made with actual intent to defraud creditors under 11 U.S.C. § 548(a)(1)A).    Accordingly, the "Safe Harbor" provisions is inapplicable to the First Cause of Action in Plaintiff's Complaint, wherein the Trustee seeks to avoid the Transaction as a conveyance made with actual intent to hinder, delay, or defraud any entity.    Additionally, it has been established that the "Safe Harbor Provision" under 11 U.S.C. Section 546 (e) is an affirmative defense.    The Defendants therefore bear the burden of demonstrating that the transfers fall within the safe harbor.    *In re Nine West LBO Sec. Litig.*, 87 F4th 130, 144 (2d. Cir. 2023) citing *Capitol Records v. Vimeo, LLC*, 826 F.3d 78, 94 (2d Cir. 2016). The Plaintiff is under no obligation to plead facts supporting or negating an affirmative defense in the complaint.    *In re Nine West LBO Sec. Litig., Id at 144 citing, Picard v. Citibank N.A. (In re Bernard L. Madoff Inv. Sec. LLC)*, 12 F.4th 171, 195 (2d Cir. 2021) (first citing Fed. R. Civ. P. 8(c); and then citing *Perry v. Merit Sys. Prot. Bd.*, 582 U.S. 420, 137 S. Ct. 1975, 1987 n.9, 198 L. Ed. 2d 527 (2017) ("An affirmative defense to a plaintiff's claim for relief is not something the plaintiff must anticipate and negate in her pleading." (cleaned up))), *cert. denied sub nom. Citibank, N.A. v. Picard*, 142 S. Ct. 1209, 212 L. Ed. 2d 217 (2022).

47

124.    In the present case, the Defendants have just made conclusory statements and have not proved the applicability of the affirmative defense of the Safe Harbor Provision under 11 U.S.C. Section 546(e) as it applies to the Transaction.

125.    Moreover, from a historical perspective, Congress enacted the safe harbor provision in 1982 to shield certain transfers that, if avoided by trustees, could trigger systemic risk in financial markets. *In re Nine West LBO Sec. Litig.,* 87 F4th 130, 146 (2d. Cir. 2023). Too broad of an interpretation as suggested by the Defendants herein would limit the avoidance power even where it would not threaten the financial system -- an expansion of the safe harbor provision likely not intended by Congress. As by noted by the Second Circuit in *Tribune II,* "[t]he broad language used in Section 546(e) protects *transactions* rather than firms, reflecting a purpose of enhancing the efficiency of securities markets in order to reduce the cost of capital to the American economy." *In re Nine West LBO Sec. Litig.,.* 87 F4th 130, 144 (2d. Cir. 2023). It is highly unlikely that this private Transaction that the Trustee seeks to avoid herein would lead to a systemic risk of damage to the financial markets as a whole to warrant protection under the safe harbor provision of 11 U.S.C. Section 546(e).

126.    Although there has been varying Circuit decisions concerning Safe Harbor, the issue was addressed by the Supreme Court in the case of *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 583 U.S. 366 , 138 S. Ct. 883,   200 L. Ed. 2d 183 (2018). In that case, when determining whether the safe harbor provision of 11 U.S.C. § 546 (e) saved the transfer from avoidance, the Supreme Court needed to decide whether it should look at the transfer that the Trustee sought to avoid (*i.e.,* A → D, which the Court defined as the "overarching transfer) or to examine each component part of the overarching transfer (*i.e.,* A → B → C → D). The Court in

48

*Merit* concluded that according to the plain meaning of 11 U.S.C. § 546 (e) the only relevant transfer for purposes of the safe harbor was the transfer that the Trustee sought to avoid.

127.    In accord with the holding in *Merit Management*, the safe harbor provision will not exempt a transfer from avoidance merely because a qualified intermediary (i.e. made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency) acted as a conduit between the Debtor and the transferee.

128.    Congress signaled [in drafting and amending § 546(e)] that the exception applies to the *overarching* transfer that the trustee seeks to avoid, not any component part of that transfer. *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 583 U.S. 366, 379, 138 S. Ct. 883, 200 L. Ed. 2d 183 (2018).

129.    The Defendants herein cite to the case of *In re Nine West LBO Sec. Litig.* 87 F4th 130 (2d. Cir. 2023) for the proposition that Section 101(22)(A) includes for purposes of the definition of "financial institution" the situation when a bank is acting as an agent for its customer. To satisfy that definition, the plain language of § 101(22)(A) indicates that courts must look to each transfer and determine "when" a bank "*is acting as agent*" for its customer for a transfer, assuming, of course, the transfer is made in connection with a securities contract. It should also be noted that the Court in *9 West* concurred and upheld the rationale of *Merit Management*, agreeing that Section 546(e) does "not protect transfers in which financial institutions served as mere conduits"). *In re Nine West LBO Sec. Litig.*, Id at 144.

130.    The Court in *9 West* then looked to the holding of *Deutsch Bank Trust Co. AMS v. Large Ben. Owners (In re Tribune Co. Fraudulent Conveyance Litig.)(Tribune II)* 946 F.3d

49

66 (2d. Cir. 2019), which held in that case that Computershare Trust Company ("Computershare"), a trust company and bank that the Tribune Company had hired as a depositary and paying agent, acted as the Tribune Company's "agent" in connection with the underlying LBO securities contract, rendering the Tribune Company a "financial institution" and triggering the safe harbor for payments made in the LBO to the Tribune Company's public shareholders. See *In re Nine West LBO Sec. Litig.* Id at  87 F4th 130, 144, citing *Tribune II*, 946 F.3d at 77-81.

131.    In the present case, the Debtor funded the Transaction from funds received by Dime's predecessor, BNB Bank. The Debtor did not hire BNB or Dime to act as its depositary and paying agent, it simply funded the transaction. This is specifically acknowledged at Paragraph # 9 of the Declarations of Defendant Belz, Dvorak and DiMeglio, who all state that: "Certain loans were obtained by the LaBellas through the Pre-Petition Entities from Dime Bank to finance the Transaction." This clearly indicated that the Debtor had not hired BNB to act as a depository or paying agent, they simply funded the transaction. As such, BNB was not acting as the Debtor's agent so as to insulate the Transaction under the Safe Harbor Provision under 11 U.S.C. Section 546(e).

132.    Moreover, the transferees are the former shareholders of the Debtor, who sold their shares in Diam-N-Blu Mechanical, Corp., Mirage Inc. and Blue Diamond Sheet Metal, Inc. to LaBella. These transferees were not protected as a commodity broker as defined by 11 U.S.C. § 101(6), a forward contract merchant as defined by 11 U.S.C. § 101(25), a stockbroker as defined by 11 U.S.C. § 101(53A), a financial institution as defined by 11 U.S.C. § 101(22), financial participant as defined by 11 U.S.C. § 101(22A), or securities clearing agency as defined by 11 U.S.C. § 101(48), who can utilize the Safe Harbor provision of 11 U.S.C. § 546(e). As

reasoned by Judge Sonya Sotomayor in the Court's decision in *Merit*, the fact that protected financial institutions were used as intermediaries to effect that overarching transfer did not change the result and trigger the safe harbor, given that the transfers made "by or to" those qualifying entities were not targeted by the trustee for avoidance.

133.    In the present case, Dime Community Bank, as successor to BNB, enabled the LaBellas to purchase seventy-five (75%) percent of the shares in Diam-N-Blu Mechanical, Corp., Mirage Mechanical Systems, Inc and Blue Diamond Sheet Metal, Inc. The parties targeted for avoidance were the former shareholders of the Debtor, Defendants Belz, DiMeglio and Dvorak. They are not in the protected class of transferees that were being targeted by the Trustee (i.e. commodity broker, a forward contract merchant, stockbroker, financial institution, financial participant or securities clearing agency) who are able to utilize the safe harbor provision of 11 U.S.C. § 546 .

134.    *Merit's* application of limiting the transfer being avoided to the "overarching transfer" in the context of a leveraged buyout transaction was recently upheld in the Second Circuit case of *Holliday v. Credit Suisse Sec. (USA) LLC (In re Bos. Generating, LLC)*. 2024 U.S. App. LEXIS 23800 (United States Court of Appeals for the Second Circuit, September 19, 2024), holding that the decision in that case did not impact Merit's mandate that the court look to the "overarching transfer" (A-D) to assess the applicability of the safe harbor provision of 11 U.S.C. § 546(e).

135.    Accordingly, the Transaction is not insulated from avoidance under the safe harbor provision of 11 U.S.C. Section 546( e).

51

**M.    THE TRUSTEE ADEQUATELY PLED A CAUSE OF ACTION FOR BREACH OF FIDUCIARY DUTY**

136.    Under New York law, "[t]he elements of a cause of action to recover damages for breach of fiduciary duty are (1) the existence of a fiduciary relationship, (2) misconduct by the defendant, and (3) damages directly caused by the defendant's misconduct." *Picard v. Madoff (In re Bernard L. Madoff Inv. Sec. LLC)* 458 B.R. 87, 127 (Bankr.S.D.N.Y. 2011) citing *Rut v. Young Adult Inst., Inc.*, 74 A.D.3d 776, 901 N.Y.S.2d 715, 717 (N.Y. App. Div. 2010). Fiduciary duties include discharging corporate responsibilities "in good faith and with conscientious fairness, morality and honesty in purpose" and displaying "good and prudent management of the corporation." *Picard v. Madoff (In re Bernard L. Madoff Inv.Sec.LLC)*, Id at 128 citing *Alpert v. 28 Williams St. Corp.*, 63 N.Y.2d. 557, 569, 473 N.E.2d 19, 483 N.Y.S.2d [*129] 667 (1984) (internal quotations omitted).

137.    Moreover, the nature and scope of the fiduciary relationship that each individual Defendant had with the Debtor need not be ascertained in the context of a Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6).  Courts applying New York law have consistently held that such a determination is a mixed question of law and fact and cannot always be determined on a motion to dismiss. *Picard v. Madoff (In re Bernard L. Madoff Inv. Sec. LLC)*, *Id* at 127 Footnote 28 citing *Am Int'l Group, Inc. v. Greenberg*, 23 Misc. 3d 278, 877 N.Y.S.2d 614 (N.Y. Sup. Ct. 2008) (denying a motion to dismiss on the grounds that "factual issues concerning the precise nature and scope of the [fiduciary] relationship . . . undoubtedly must be explored"); and *Nisselson v. Ford Motor Credit Co. (In re Monahan Ford Corp. of Flushing)*, 340 B.R. 1, 41 (Bankr. E.D.N.Y. 2006) (explaining that "whether fiduciary duties actually arose

52

between the parties is a question of fact not properly addressed" at the motion to dismiss stage). Accordingly, the Trustee's assertions of breach of fiduciary duty cannot be summarily disposed of by a Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6).

138.    The Defendants acted in reckless disregard of their duty by entering into the Transaction. According to an Amended and Restated Shareholders Agreement dated December 22, 2008, all of the Defendants were on the Board of Directors of Blue Diamond Sheet Metal Inc., Diam-N-Blu Mechanical Corp. and Mirage Mechanical Systems, Inc. Diam-N-Blu Mechanical Corp. and Mirage Mechanical Systems, Inc. would eventually merge into Blue Diamond Sheet Metal Inc., which would be identified as the Debtor.  See Amended and Restated Shareholders Agreement dated December 22, 2008 at Exhibit "L."

139.    As Directors, Defendants Belz, DiMeglio and Dvorak had a duty to perform their duties as directors in good faith pursuant to New York Business Corporation Law § 717.

140.    In their testimony at their respective Rule 2004 Examinations, none of the Defendants took into consideration what was going to be the effect that the Transaction would have on the viability of the Debtor, and it continuing as an ongoing concern.  When asked if he was aware if Blue Diamond Sheet Metal Inc. owed any vendors any money at the time of the Equity Security Purchase Agreement dated July 1, 2020, DiMeglio stated that he "didn't really know." DiMeglio further stated that he didn't take care of the books and records since he was part of the operational arm of the business.  When DiMeglio was asked questions concerning the liabilities of the Debtor, he essentially conceded that he did not know this information because he didn't really look at the books and records of Blue Diamond Sheet Metal Inc., Diam-N-Blu Mechanical Corp. and Mirage Mechanical Systems, Inc. Similarly, Defendant Dvorak also stated

that during his time at Blue Diamond Sheet Metal Inc., Diam-N-Blu Mechanical Corp. and Mirage Mechanical Systems, Inc., he didn't really look at the books and records of these companies. Defendant Dvorak admitted that he would "occasionally" look at the books and records if Defendant Belz wanted to highlight something. Other than that, he wasn't involved in the financial affairs of these companies. Defendant Belz had some predilection to believe that at the time of the Equity Purchase Agreement there were financial difficulties with Blue Diamond Sheet Metal Inc., Diam-N-Blu Mechanical Corp. and Mirage Mechanical Systems, as he testified at his Rule 2004 Examination that there was "Constant stressful situations trying to meet cash flow every year...." This is evidence of Defendant Belz' apprehension. It has been established by precedent by Judge Learned Hand that one's mental apprehension of the consequences before it attaches to his conduct can be used as evidence of actual fraudulent intent. See *Weisfelner v. Hofmann (In re Lyondell Chem. Co.)* 554 B.R.635, 651 (S.D.N.Y. 2016) citing *In re Condon*, 198 F. 947, 950 (S.D.N.Y. 1912) (citing *Coder v. Arts*, 213 U.S. 223, 29 S. Ct. 436, 53 L. Ed. 772 (1909)).

141.    It is apparent that the Defendants acted with reckless disregard as it concerns their responsibilities to the Debtor. To plead "recklessness," one must allege that the directors knew, or had reason to know, of facts that created a degree of risk that a transaction would harm the Company, and that they deliberately acted or failed to act in disregard of the risk. See *In re Nine West LBO Securities Litigation*, 505 F.Supp 3d 292, 314 (S.D.N.Y. 2020). No analysis was performed to ascertain how the effect of consummating the Transaction would affect the Debtor's longevity and eventually leave the Debtor insolvent. The Defendants never exercised their responsibilities in reviewing the Debtor's financial health, as both DiMeglio and Dvorak concede that they never reviewed the Debtor's books and records. See *In re Nine West LBO*

*Securities Litigation*, 505 F.Supp 3d 292 (S.D.N.Y. 2020) (holding that director defendants were reckless in approving the 2014 Transaction allowing for a merger and a carve out as director defendants consciously disregarded whether the Additional Debt and Carve-Out Transactions were in the interest of the Company, specifically excluding those elements of the 2014 Transaction from their assessment. Director would have known that the Additional Debt and Carve-Out Transactions would leave the Company insolvent).

142.    So here, the Defendants failed to properly assess the effect of the Transaction on the solvency of the Debtor.

143.    What is also telling is that the Defendants executed Side Letter Agreements wherein they acknowledged that at the time of the Transaction, the Defendants acknowledged and agreed that the Sellers had placed their own funds in the aggregate amount of $2,886,600.00 (the "Seller Escrow") into escrow pending the determination of the forgiveness of certain PPP Loans. At the time of the Transaction, the Debtor had three (3) PPP Loans with Peoples. See Exhibit "F."

144.    Accordingly, the Defendants are precluded from claiming that they had no knowledge of the Debtor's financial situation at the time that the Transaction closed and that they are innocent of any wrongdoing. In all of the Side Letter Agreements that the Defendants executed, they acknowledge that the Debtor had outstanding PPP loan liabilities of $2,886,600.00 owed to Peoples at the time of the Transaction, and that these liabilities had to be forgiven in order for the Transaction to proceed. The fact that the Transaction called for the escrowing of $2,866,600.00 for PPP loans demonstrates that the Debtor had been severely affected by the COVID-19 Pandemic. Moreover, these loans were not paid off but forgiven, indicating that had they not been, the Debtor would have been unable to proceed with the Transaction *ab initio*.

145.    Accordingly, the Trustee has adequately pled a cause of action for breach of fiduciary duty.

**N.    THE TRUSTEE ADEQUATELY PLED A CAUSE OF ACTION FOR AN ACCOUNTING**

146.    Under New York law, an accounting is a cause of action that seeks "an adjustment of the accounts of the parties and a rendering of a judgment for the balance ascertained to be due." *Picard v. Madoff (In re Bernard L. Madoff Inv. Sec. LLC)* 458 B.R. 87, 130 (Bankr.S.D.N.Y. 2011) *Ditolla v. Doral Dental IPA of New York, LLC*, 469 F.3d 271, 275 (2d Cir. 2006) (internal quotations omitted). Its purpose is to "help sort out [**94] what assets are involved [and] enable the parties to meaningfully pursue their respective claims concerning their private or business arrangement." *Wesselmann v. Int'l. Images*, 259 A.D.2d 448, 687 N.Y.S.2d 339 (N.Y. App. Div. 1999) (finding that where the parties shared a close working relationship, an accounting is appropriate to determine what assets are involved). An action for an accounting does require the "existence of a confidential or fiduciary relationship and a breach of the duty imposed by that relationship respecting property in which the party seeking the accounting has an interest." *In re Picard v. Madoff (In re Bernard L. Madoff Inv. Sec. LLC), Id* at 130 citing *Palazzo v. Palazzo*, 121 A.D.2d 261, 503 N.Y.S.2d 381 (N.Y. App. Div. 1986); *see Akkaya v. Prime Time Transp., Inc.*, 45 A.D.3d 616, 845 N.Y.S.2d 827, 828 (N.Y. App. Div. 2007).

147.    The Trustee has sufficiently pled a cause of action for an accounting. All of the Defendants were directors of the Debtor at the time the Transaction occurred. They all owed a fiduciary duty to the Debtor. The Defendants breached that fiduciary duty by not properly

evaluating the financial consequence of the Transaction upon the Debtor, and how this would lead to the Debtor's eventual downfall.

## O.    THE UNJUST ENRICHMENT CLAIM IS PROPER

148.    Plaintiff's claim for unjust enrichment is proper. It has been established that when a Chapter 7 Trustee brings a state law tort claim, he stands in the shoes of the debtor.  In order to prevail on a claim for unjust enrichment under New York law, plaintiff must demonstrate: (1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover. *Kramer v. Chin (In re Chin)*, 492 B.R. 117, 125 (Bankr.E.D.N.Y. 2013) citing *Briarpatch Ltd. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004), *cert. denied*, 544 U.S. 949, 125 S. Ct. 1704, 161 L. Ed. 2d 525 (2005).  Said another way, plaintiff must prove (i) defendant was enriched and (ii) such enrichment was unjust. *Songbird Jet Ltd., Inc. v. Amax, Inc.*, 581 F. Supp. 912, 926 (S.D.N.Y. 1984).

149.    In the present case, the Plaintiff has sufficiently pled a plausible cause of action for unjust enrichment against the Defendants who obtained payments for their shareholder interests in Blue Diamond Sheet Metal, Inc. Mirage Mechanical Corp. and Diam-N-Blue Mechanical Corp while the corporations received nothing of value.

## P.    THE TRUSTEE HAS ADEQUATELY PLED A CAUSE OF ACTION FOR A CONSTRUCTIVE TRUST

150.    In determining whether to impose a constructive trust under New York law, courts consider four (4) factors: (1) a confidential or fiduciary relationship; (2) a promise, express or implied; (3) a transfer made in reliance on that promise; and (4) unjust enrichment.  "*In re Picard v. Madoff (In re Bernard L. Madoff Inv. Sec. LLC)*, 458 B.R. 87, 127 (Bankr.S.D.N.Y.

2011) at Footnote 31 citing *Sharp v. Kosmalski*, 40 N.Y.2d 119, 351 N.E. 2d 721, 723, 386 N.Y.S.2d 72(1976). However, "these factors are merely useful guides and are not talismanic." *Coco v. Coco*, 107 A.D.2d 21, 485 N.Y.S.2d 286 (N.Y. App. Div. 1984).

151.    By sufficiently pleading that the Defendants were unjustly enriched as a result of the Transaction, Plaintiff has satisfactorily pled an equitable basis for the imposition of a constructive trust. *In re Picard v. Madoff (In re Bernard L. Madoff Inv. Sec. LLC), Id* at 132 citing *Simonds v. Simonds*, 45 N.Y. 2d 233, 242, 380 N.E.2d 189, 408 N.Y.S.2d 359 (1978) "[T]he purpose of a constructive trust is the prevention of unjust enrichment."

152.    Based upon their breach of fiduciary duty which enabled them to be unjustly enriched through the Transaction, the Plaintiff has sufficiently pled a cause of action for the imposition of a constructive trust.

## Q.    PLAINTIFF'S OBJECTION TO CLAIM CAUSE OF ACTION IS SUFFICIENTLY PLED

153.    On or about June 14, 2023 and June 15, 2023, Defendants Belz, DiMeglio and Dvorak each filed Proof of Claim against this Bankruptcy Estate for the fees that they claim were due under their Consulting Agreements. These Proofs of Claim are identified on the Claims Register as Claims numbered 59 to 61 respectively.

154.    According to the Thirteenth Cause of Action of the Complaint Plaintiff has sought to disallow the claims of these Defendants pursuant to 11 U.S.C. § 502(d),on the grounds that they are the recipients of transfers which could be avoidable under 11 U.S.C. §§ 542, 543, 550 or 553 of the Bankruptcy Code, or that a transferee of a transfer avoidable under §§ 522(f), 522(h),

544, 547, 548, 549 or 724(a) of the Bankruptcy Code § 502(d) further provides that such claims could be allowed once the Defendants have paid the amounts recoverable.

155.    The Trustee has sought to disallow the Proofs of Claims that the Defendants have filed on the grounds that they are the recipient of avoidable transfers in the form of the monies that they received under the Transaction and the Consulting Fees pursuant to 11 U.S.C. §§ 544, 547 and 548 of the Bankruptcy Code.

156.    It has been established that a request for disallowance under 11 U.S.C. § 502(d) may be joined as a cause of action by the estate or its representative in an adversary proceeding to recover the property or the avoidable transfer. Alternatively, if the estate or its representative seeks no affirmative recovery, § 502(d) may be asserted as a claim objection seeking to disallow or expunge the entity's claim. *In re Vivaro Corp*, 144, 146 (Bankr.S.D.N.Y. 2015).

157.    Here, Plaintiff has properly pled § 502(d) against these Defendants. The Trustee has sought to avoid the preferential/fraudulent transfers that these Defendants received, and is also utilizing the provisions of 11 U.S.C. § 502(d) to disallow the claims of these respective Defendants until they turn over the avoidable transfers. See *In re Mid Atlantic Fund, Inc.*, 60 B.R. 604 (Bankr.S.D.N.Y. 1986) permitting Trustee to utilize § 502(d) defensively to disallow Proof of Claim of creditor based upon preferential assignment of mortgage, even though statute of limitations to commence avoidance actins to recover preferences under 11 U.S.C. § 546 had expired.

**R.    THE RIGHT TO AMEND PLEADINGS IS UP TO THE COURT'S DISCRETION**

158.    As stated in the case of *G.G. Survivor Creditor Corp. v. Harari (In re G. Survivor Corp.)* 217 B.R. 433, 436 (Bankr.S.D.N.Y. 1998) under Fed. R. Civ. P. 15(a), made

applicable here by Fed. R. Bankr. P. 7015, after a responsive pleading is served, "a party may amend the party's pleading only by leave of court or written consent of the adverse party; and leave shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). This rule allows litigants to amend pleadings for a wide spectrum of purposes. *See Foman v. Davis*, 371 U.S. 178, 181-82, 9 L. Ed. 2d 222, 83 S. Ct. 227 (1962) (*quoting Conley v. Gibson*, 355 U.S. 41, 48, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)(stating that "the Federal Rules reject the approach that pleading is a game of skill in which one misstep . . . may be decisive to the outcome and accept the principle that the purpose of the pleading is to facilitate a proper decision on the merits")); *Ramos v. O'Connell, HSD*, 169 F.R.D. 260, 262 (W.D.N.Y. 1996) (stating that "the federal courts have demonstrated considerable leniency in allowing plaintiffs to amend their complaints whenever justice so requires"); *In re Private Capital Partners, Inc.*, 139 B.R. 120, 125 (Bankr. S.D.N.Y. 1992). The decision to grant or deny a motion to amend a complaint is within the discretion of the court. *See Champlain Enters, Inc. v. United States*, 945 F. Supp. 468, 474-75 (N.D.N.Y. 1996) (*citing Scottish Air Int'l Inc. v. British Caledonian Group, PLC.*, 152 F.R.D. 18, 29 (S.D.N.Y. 1993)).

159.    It has been established that leave to amend a complaint will be denied if it were sought in bad faith, it would cause undue delay or prejudice to the adversary, when it would be futile, or if there has been a repeated failure to cure amendments by amendments previously allowed. *See Champlain Enters.*, 945 F. Supp. at 475 (*citing Foman*, 371 U.S. at 182). This is the first complaint filed by the Plaintiff Trustee. Plaintiff Trustee has not sought to amend this pleading, and there has not been any failure to cure amendments by amendments previously allowed because there haven't been any.

160.    In the present case, the Defendants have asserted that permitting the Trustee to amend his complaint should be denied because same would be futile. Addressing this argument, it has been established that an amendment is deemed futile if the proposed claim could not withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *Lucente v. IBM*, 310 F.3d 243, 258 (2d. Cir. 2002) citing *Dougherty v. North Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002). Even if a complaint is dismissed under Federal Rule 12(b)(6), if the plaintiff requests permission to file an amended complaint, that request should ordinarily be granted. *See, e.g., Branum v. Clark*, 927 F.2d 698, 705 (2d Cir. 1991).

161.    The Trustee submits that he has satisfied the pleading standards of Federal Rules of Civil Procedure 8 and 9. The facts and assertions made in the complaint (and those documents which can be incorporated by reference into the complaint) supports the Trustee's assertion that the Trustee's claims should withstand a Motion to Dismiss under Federal Rule 12(b)(6), so that any amendment to pleadings if needed would not be futile.

162.    Defendants are also unable to satisfy their burden to support their Motion to Dismiss Plaintiff's Complaint under Federal Rule of Civil Procedure 12(b)(6) for failing to state a claim upon which relief can be granted.

163.    Plaintiff has plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). All of the causes of action averred in Plaintiff's Complaint are facially plausible, in that the Plaintiff has pled a sufficient number of facts that allow the Court to draw a reasonable inference that the Defendants are liable for the acts alleged in the Complaint.

164.    Additionally, the Complaint has also satisfied the pleading requirements under Federal Rule of Civil Procedure 8(a)(2) and 9. All of the causes of action pled in the Complaint contain facts which support these causes of action, not just labels and conclusions or a formulaic recitation of the elements of the causes of action covered in Plaintiff's Complaint.

WHEREFORE, Plaintiff, Marc A. Pergament, Chapter 7 Trustee of the Estate of Blue Diamond Air Systems, Inc respectfully requests that the Application filed by Defendants, Douglas Gene Belz a/k/a Douglas Belz, Stephen DiMeglio and James Edwin Dvorak a/k/a James Dvorak, seeking *inter alia*, the entry of an Order dismissing the Plaintiff's Complaint with prejudice and without leave to replead the adversary complaint dated July 29, 2024 pursuant to Bankruptcy Rule 7012 and 7009 incorporating by reference Federal Rule of Civil Procedure 12(b)(6) and 9 be denied in its entirety, along with such other and further relief as is just and proper.

Dated: Garden City, New York
       November 19, 2024

Weinberg, Gross & Pergament LLP
Attorneys for Plaintiff-Trustee

By: _____
    Marc A. Pergament
    400 Garden City Plaza, Suite 309
    Garden City, New York 11530
    (516) 877-2424 ext. 226

62