# EXHIBIT "A"

## EQUITY SECURITY PURCHASE AGREEMENT

This **EQUITY SECURITY PURCHASE AGREEMENT** (this "Agreement") is made and entered into as of the 1st day of July, 2020, by and between Douglas Belz ("DB"), Stephen DiMeglio ("SD") and James Dvorak ("JD") (DB, SD and JD individually, a "Seller" and collectively, the "Sellers"), and Meghan LaBella ("ML") and Al LaBella ("AL") (ML and AL, individually, a "Purchaser" and collectively, the "Purchasers").

WHEREAS, each of the Sellers owns shares of common stock ("Common Stock") of Blue Diamond Sheet Metal, Inc. ("Blue Diamond"), Diam-N-Blue Mechanical Corp. ("Diam-N-Blue") and Mirage Mechanical Systems, Inc. ("Mirage"), each a New York corporation, and membership interests ("Membership Interests") in Blue Station Realty LLC ("Blue Station", a New York limited liability company (the Common Stock and the Membership Interests are referred to herein as the "Equity Securities" and Blue Diamond, Diam-N-Blue, Mirage and Blue Station are referred to herein individually as a "Company" and collectively as the "Companies").

WHEREAS, the Sellers desire to sell, and the Purchasers desire to purchase from each of the Sellers, the number of Equity Securities set forth on Exhibit A attached hereto.

WHEREAS, the Sellers are parties to an amended and restated stockholders agreement, dated December 22, 2008, with respect to Blue Diamond, Diam-N-Blue and Mirage (such agreement, the "Stockholders Agreement") and an Operating Agreement with respect to Blue Station (the "Operating Agreement").

WHEREAS, concurrently with the execution of this Agreement, each of the Sellers is entering into a consulting agreement with the Companies (the "Consulting Agreement") to be effective on the Closing Date (as hereinafter defined).

WHEREAS, effective on the Closing Date, ML shall own sixty percent (60%) of the issued and outstanding Equity Securities of the Companies and AL shall own forty percent (40%) of the issued and outstanding Equity Securities of the Companies.

NOW, THEREFORE, in consideration of the mutual representations, warranties and covenants contained herein, the parties hereto agree as follows:

1.    <u>Purchase and Sale of the Equity Securities</u>. Subject to the terms and conditions of this Agreement, the Sellers hereby sell, transfer, convey and deliver to the Purchasers, and the Purchasers hereby purchase, acquire and accept from the Sellers, all of the Sellers' right, title and interest in and to the Equity Securities free and clear of all liens and encumbrances.

2.    Purchase Price for the Equity Securities.  The consideration to be paid by the Purchasers for each of the Seller's Equity Securities shall be $2,850,000 per Seller (the "Purchase Price") and shall be paid by the Purchasers to each of the Sellers as set forth on Exhibit A hereto.

3.    Payment of Purchase Price, Other Payments.

(a)    The Purchase Price shall be paid by the Purchasers at the Closing, as provided in Section 4 below.

(b)    On or prior to the Closing, the Purchasers shall also pay to each Seller (x) all compensation accrued or income earned by such Seller but unpaid through the Closing Date and (y) all unpaid distributions from the Companies in respect to all federal, state and local income taxes owed by such Seller for fiscal 2019 and for fiscal 2020 through the Closing Date.

4.    The Closing.

(a)    The purchase and sale of the Equity Securities (the "Closing") shall take place at such date and place mutually agreed upon by the parties (which time date is designated as the "Closing Date"). At the Closing, the Sellers shall deliver to the Purchasers (x) the certificate(s) representing the Common Stock, duly endorsed to the Purchasers, or duly executed stock powers and (y) assignments of the Sellers' Membership Interests, in each case against payment of the Purchase Price therefor by wire transfer of immediately available funds. At the Closing, the Sellers shall deliver to the Purchasers the Sellers' resignations as employees, directors and officers of the Companies, effective as of the Closing Date.

(b)    The obligations of (x) each party to effectuate the Closing shall be subject to no statute, rule or regulation having been enacted or promulgated by any governmental authority which prohibits the consummation of the Closing and no order or injunction of a court of competent jurisdiction being in effect precluding consummation of the Closing; (y) the Sellers to effectuate the Closing shall be subject to (i) the Purchasers' representations and warranties contained in this Agreement being true and correct at the Closing and the Purchasers having performed and complied with all covenants and agreements required by this Agreement to be performed or complied with by them at or prior to the Closing, (ii) the termination of any guarantee given by any of the Sellers in connection with the operation of the business of the Companies before, on or after the Closing Date, (iii) the transfer to the Sellers of title to the automobiles identified on Exhibit B hereto (without further payment by the Sellers except as set forth on Exhibit B) and (iv) the assignment to the Sellers (without further payment by the Sellers except for premiums due on or after the Closing) of the insurance policies described in Section 5(a) of the Stockholders Agreement; and (z) the Purchasers to effectuate the Closing shall be subject to the Sellers' representations and warranties contained in this Agreement being true and correct at the Closing and the Sellers having performed and complied with all covenants and agreements required by this Agreement to be performed and complied with by them at or prior to the Closing.

Belz0000002

5.    <u>Representations and Warranties</u>

(a)    Each Seller hereby represents and warrants to the Purchaser as follows:

(1)    Such Seller has full power, authority and capacity to enter into this Agreement and to carry out the transactions contemplated hereby. This Agreement constitutes the valid and binding obligation of such Seller, enforceable against such Seller in accordance with its terms.

(2)    The execution and delivery of this Agreement by such Seller and the consummation by such Seller of the transactions contemplated hereby do not, and with notice or the passage of time or both, will not (i) violate any statute, rule, regulation, order or decree of any public body or authority to which such Seller, or such Seller's assets or properties are bound; (ii) result in a violation or breach of, or constitute a default under, any lease, loan, license, franchise, permit, indenture, agreement or other instrument to which such Seller, or any of such Seller's assets or properties, are bound; and (iii) require such Seller to obtain any consent, approval or action of or waiver from, or make any filing with, or give any notice to, any person or entity, governmental or otherwise.

(3)    Such Seller is the sole, legal and beneficial owner of the Equity Securities, and has all right, title and interest in the Equity Securities to permit such Seller to sell and transfer full, legal and beneficial title to the Purchasers free and clear of all liens and encumbrances pursuant to Section 1 of this Agreement. Such Seller's Equity Securities represent such Seller's entire ownership interest in the Companies, including economic interest, capital interest, capital account, voting interest, governance interest, and any other interest such Seller may have in the Companies. Such Seller has not pledged, assigned, or transferred or agreed to pledge, assign, or transfer, such Seller's Equity Securities or any part thereof to any other person or entity other than the Purchasers pursuant to this Agreement.

(4)    Such Seller is not a party to any action or proceeding before any governmental authority and, to the knowledge of such Seller, there is no action or proceeding that has been threatened against such Seller or the Companies that impairs the ability of such Seller to perform the obligations required of such Seller under this Agreement.

(5)    No broker, finder, or investment banker is entitled to any brokerage, finder's, or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf such Seller.

(b)    Each Purchaser hereby represents and warrants to the Sellers as follows:

(1)    Such Purchaser has the full legal right, power and authority to execute and deliver this Agreement, and to consummate the transactions contemplated hereby. This Agreement constitutes the legal, valid and binding obligation of such Purchaser, enforceable against such Purchaser in accordance with its terms.

Belz0000003

(2)     Except as expressly set forth herein, such Purchaser has not relied upon any representation, warranty, promise or assurance made by or on behalf of any Seller with respect to the value of the Companies or of the Equity Securities.

(3)     The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby do not, and with notice or the passage of time or both, will not (i) violate any statute, rule, regulation, order or decree of any public body or authority to which such Purchaser, or such Purchaser's assets or properties are bound; (ii) result in a violation or breach of, or constitute a default under, any lease, loan, license, franchise, permit, indenture, agreement or other instrument to which such Purchaser, or any of such Purchaser's assets or properties, are bound; and (iii) require such Purchaser to obtain any consent, approval or action of or waiver from, or make any filing with, or give any notice to, any person or entity, governmental or otherwise.

(4)     Such Purchaser is fully familiar with the Companies, their assets, operations, valuation and financial condition, and has received all information relevant to such Purchaser's decision to purchase the Equity Securities as such Purchaser has deemed necessary or appropriate (including the Valuations), and such Purchaser has had sufficient opportunity to ask questions of and receive answers from management of the Companies with respect to such matters. Neither the Sellers nor anyone on behalf of the Sellers has induced such Purchaser to sign this Agreement or purchase the Equity Securities by making any promises, representations or agreements that are not expressly set forth in this Agreement. For purposes of this Section 5(b)(4), "Valuations" means the (x) Reliant Business Valuation of Blue Diamond, Diam-N-Blue and Mirage dated April 20, 2020, (y) Reliant Equipment Appraisal of the machinery and equipment of Blue Diamond, Diam-N-Blue and Mirage dated April 6, 2020, and (z) R.D. Geronimo Ltd. Appraisal Report dated April 3, 2020 of the market valuation of the one story building located at 1165 Station Road, Medford, NY 11763.

(5)     Such Purchaser is not a party to any action or proceeding before any governmental authority and, to the knowledge of such Purchaser, there is no action or proceeding that has been threatened against such Purchaser or the Companies that impairs the ability of such Purchaser to perform the obligations required of such Purchaser under this Agreement.

(6)     No broker, finder, or investment banker is entitled to any brokerage, finder's, or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf such Purchaser.

6.    <u>Indemnification</u>.

(a)     From and after the Closing Date, each Seller and each Purchaser agrees, severally and not jointly, to indemnify and hold harmless the Purchasers (in the case of the Sellers) and the Sellers (in the case of the Purchasers) from any and all damages, claims, losses, costs, liabilities or expenses, including reasonable attorneys' fees (collectively, "Losses"), that a party may incur by reason of any other party's breach of this Agreement or by reason of the untruth or inaccuracy of any of the breaching party's representations, warranties, covenants or agreements contained herein. In addition, from and after the Closing Date, the Purchasers and the Companies

4

Belz0000004

agree, jointly and severally, to indemnify and hold harmless each of the Sellers for any and all Losses that such Seller may incur by reason of the operation of the business of one or more of the Companies at any time on or after the Closing Date, including as the result of any guarantee given by such Seller in connection therewith. Notwithstanding the foregoing, in no event shall a party be liable under this Section 6 for any punitive, special, consequential or indirect damages, including without limitation damages from lost profits.

(b) All representations and warranties made herein shall survive the Closing Date for a period of eighteen (18) months. The covenants and other agreements contained in this Agreement shall survive the Closing Date for the period contemplated thereby. All claims for indemnification under this Section (6) must be asserted on or prior to the expiration of the applicable representation, warranty or covenant giving rise to such Losses.

(c) Each party's obligations under this Agreement are unconditional and not subject to defense, counterclaims, setoff(s), or offset and no party shall have any right to withhold from and/or offset against any amounts due to any other party, pursuant to this Agreement, the amount of any claims against such party under this Section 6 or otherwise.

(d) In the absence of fraud or willful misconduct, the indemnification rights of the parties under this Section 6 shall be the exclusive rights and remedies the parties may have at law or in equity or otherwise with respect to matters subject to indemnification for any misrepresentation, breach of warranty or failure to fulfill any agreement or covenant hereunder on the part of any party hereto.

7. Mutual Release.

(a) Release by Sellers. From and after the Closing Date, each of the Sellers on his own behalf and on behalf of his heirs, beneficiaries, successors, assigns, agents, and representatives (collectively, the "Sellers' Releasing Parties"), do hereby covenant not to sue, and acknowledge complete satisfaction of and hereby release, absolve and forever discharge, Purchasers and the Companies, and each of their affiliates, subsidiaries, heirs, beneficiaries, successors, assigns, members, owners, officers, agents, and representatives (hereinafter collectively referred to as "Purchaser Releasees") with respect to and from any and all claims, demands, liens, agreements, contracts, covenants, actions, suits, causes of action, obligations, debts, expenses, attorneys' fees, damages, dues, sums of money, accounts, reckonings, bonds, bills, specialties, controversies, promises, variances, trespasses, costs, extents, executions, judgments, orders and liabilities of whatever kind or nature in law, equity or otherwise, whether now known or unknown, suspected or unsuspected, that the Sellers' Releasing Parties now own or hold or have at any time heretofore owned or held as against said Purchaser Releasees, or any one of them, except excluded from the foregoing release are obligations of any nature whatsoever arising and to be performed on or after the Closing Date by any of the Purchaser Releasees under this Agreement or such Seller's Consulting Agreement.

(b) Release by Purchasers and the Companies. From and after the Closing Date, each of the Purchasers and the Companies, on their own behalf and on behalf of their heirs, beneficiaries, successors, assigns, agents, affiliates, subsidiaries, members, owners, officers, agents, and representatives (collectively, the "Purchaser Releasing Parties"), do hereby covenant

5

Belz0000005

not to sue, and acknowledge complete satisfaction of and hereby release, absolve and forever discharge, each Seller, and each of their heirs, beneficiaries, successors, assigns, agents, and representatives (hereinafter collectively referred to as "Seller Releasees") with respect to and from any and all claims, demands, liens, agreements, contracts, covenants, actions, suits, causes of action, obligations, debts, expenses, attorneys' fees, damages, dues, sums of money, accounts, reckonings, bonds, bills, specialties, controversies, promises, variances, trespasses, costs, extents, executions, judgments, orders and liabilities of whatever kind or nature in law, equity or otherwise, whether now known or unknown, suspected or unsuspected, that the Purchaser Releasing Parties now own or hold or have at any time heretofore owned or held as against said Seller Releasees, or any one of them, except excluded from the foregoing release are obligations of any nature whatsoever arising and to be performed on or after the Closing Date by any of the Seller Releasees under this Agreement or each Seller's Consulting Agreement.

8. Covenants.

(a) Confidentiality.

(1) Each Seller will, at all times from the Closing Date, keep confidential all Information made known to such Seller by the Purchasers or the Companies prior to the Closing Date, and such Seller will not, directly or indirectly, disclose or divulge during such time, except for the benefit and only at the request of the Companies, any such Information,

(2) Information and all patents, trademarks, trade names, copyrights, inventions, all applications therefor and all other intellectual property rights of the Companies ("Intellectual Property") shall at all times be and remain the sole property of the Companies for their sole and exclusive use and benefit, and each Seller agrees to deliver all documents, notes, drawings and analyses containing or reflecting such Information and Intellectual Property to the Companies at any time upon request of the Companies.

(3) "Information" means (i) any confidential and proprietary information relating to the business or businesses of the Companies, including any proprietary information pertaining to actual or potential clients of the Companies, including the identity of each client, and (ii) documents and information regarding the Companies' methods of operation, marketing strategy, client or client lists, specialized training procedures, forms, computer programs, secret or confidential techniques, methods, processes, equipment, books, notes, drawings, tapes, prints, profit and loss information and other related internal business information and documents pertaining to the affairs of the Companies; provided, however, that "Information" shall not include information that pertains solely to personal matters relating to such Seller, and provided further that "Information" shall not include any information that (x) is or becomes generally available to the public other than as a result of an unauthorized disclosure, (y) becomes available to a Seller on a non-confidential basis from a source other than the Purchasers or the Companies, provided such source did not disclose such information in breach of any confidentiality obligation known by any Seller, or (z) is required to be disclosed pursuant to applicable law, subpoena, order by a court, or by a governmental body, provided that each Seller shall notify the Companies promptly and in writing of any such disclosure requirement.

6

Belz0000006

(b)     Non-Disparagement.

(1)     Each Seller agrees not to make any statement which is intended, or would reasonably be expected, to harm the Companies and/or the Purchasers or their reputations and shall not disparage the Companies and/or the Purchasers personally, professionally or in their business activities, in any statement (whether oral or written) made to any third party.

(2)     The Companies and Purchasers agree not to make any statement which is intended, or would reasonably be expected, to harm the Sellers and shall not, disparage the Sellers personally, professionally or in their business activities, in any statement (whether oral or written) made to any third party.

(3)     Notwithstanding the foregoing, nothing in this Section or elsewhere in this Agreement shall prohibit any party from making any statement or disclosure which such party shall have been advised by counsel in writing is required under the federal or state securities laws or other applicable laws or pursuant to subpoena or the order of a governmental authority; provided that such party shall provide written notice to the other parties at least five (5) business days (or, if five (5) days is not possible, then as promptly as reasonably possible) prior to making any such required statement or disclosure.

(c)     Blue Pencil.  Each subsection of this Section 8 is independent of each other subsection, and the invalidity of any subsection shall have no effect on the validity or effectiveness of any other subsection. In the event that any of the provisions of Section 8 relating to the period of restriction shall be deemed to exceed the maximum period of time which a court or arbitration tribunal of competent jurisdiction would deem valid and enforceable, said period shall be deemed to be  revised to the minimum extent which a court or arbitration tribunal of competent jurisdiction would deem necessary for such provision to be enforceable in any state in which such court of competent jurisdiction shall be convened.

9.     Further Assurances.  From time to time, the parties shall execute and deliver to each other such additional documents and shall provide such additional information as any party may reasonably require to perform the terms of this Agreement.

10.     Notices.  Any notices, consents or information required, requested or permitted by this Agreement shall be sent to the parties at the addresses below, unless such address is changed by written notice hereunder:

If to the Purchasers:   Meghan LaBella
                        Al LaBella
                        79 Handsome Avenue
                        Sayville, NY 11782
                        Email: mlabella@bdssheetmetal.com
                        Email: albella@bdssheetmetal.com

7

With a copy to (which shall not constitute notice):

    Campolo, Middleton & McCormick, LLP
    4175 Veterans Memorial Highway
    Ronkonkoma, NY 11779
    Attention: Joseph N. Campolo, Esq.
    Facsimile: (631) 738-0659
    Email: jcampolo@cmmllp.com

If to the Sellers:

    Douglas Belz
    22 S. Gillette Avenue
    Bayport, NY 11705
    Email: rbelz@dnbmechanical.com

    Stephen DiMeglio
    755 Harbor Lane
    Cutchogue, NY 11935
    Email: sdimeglio@dnbmechanical.com

    James Dvorak
    179 Oakwood Avenue
    Bayport, NY 11705
    Email: jdvorak@dnbmechanical.com

With a copy to (which shall not constitute notice):

    Ruskin Moscou Faltischek, P.C.
    East Tower, 15th Floor
    1425 RXR Plaza
    Uniondale, NY 11556-1425
    Attention: Adam P. Silvers, Esq.
    Facsimile: (516) 663-6719
    Email: asilvers@rmfpc.com

11.    <u>Binding Effect, Assignment and Entire Agreement</u>. This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior agreements and understandings, whether oral or written, may not be modified or amended except by an instrument in writing signed by the party or parties against whom enforcement is sought, shall bind and inure to the benefit of the parties hereto and their respective permitted successor and assigns, and may not be assigned without the prior written consent of the other parties hereto.

12.    <u>Legend</u>. Each certificate representing the Equity Securities may bear the following legend printed conspicuously on the face or backside thereof:

    "THE TRANSFER, SALE, ASSIGNMENT, ENCUMBRANCE
    OR OTHER CONVEYANCE OF SHARES OF COMMON

Belz0000008

STOCK REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO THE TERMS AND CONDITIONS OF A STOCKHOLDER AGREEMENT, DATED DECEMBER 22, 2008, AS AMENDED FROM TIME TO TIME, A COPY OF WHICH IS ON FILE AT THE OFFICE OF THE COMPANY."

"THE TRANSFER, SALE, ASSIGNMENT, ENCUMBRANCE OR OTHER CONVEYANCE OF MEMBERSHIP INTERESTS REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO THE TERMS AND CONDITIONS OF AN OPERATING AGREEMENT, DATED AS OF _____, AS AMENDED FROM TIME TO TIME, A COPY OF WHICH IS ON FILE AT THE OFFICE OF THE COMPANY."

13.    Severability. Any provision of this Agreement which is deemed to be invalid or unenforceable shall be ineffective only to the extent of such invalidity or unenforceability without invalidating or rendering unenforceable the remaining provisions hereof.

14.    Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which taken together shall constitute one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

15.    Changes Must Be In Writing.  No delay or omission by any Seller or Purchaser in exercising any right shall operate as a waiver of such right or any other right. This Agreement may not be altered, amended, changed, modified, waived or terminated in any respect or particular unless the same shall be in writing signed by the parties hereto.  No waiver by any party hereto of any breach hereunder shall be deemed a waiver of any other or subsequent breach.

16.    Governing Law; Jurisdiction. This Agreement shall be governed by and construed in accordance with the laws of the State of New York, excluding its choice of law principles.  If any provisions of this Agreement shall be unenforceable or invalid, such unenforceability or invalidity shall not affect the remaining provisions of this Agreement. Each party hereto consents to the exclusive personal jurisdiction of the State of New York, and further agrees that the exclusive venue for any action arising out of this Agreement shall be the State Courts located in the County of Suffolk, State of New York or the Federal Courts located in the Eastern District of New York.

17.    Waiver of Jury Trial. EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED    HEREBY.    EACH    PARTY    (I) CERTIFIES    THAT    NO REPRESENTATIVE, AGENT  OR  ATTORNEY  OF  ANY  OTHER  PARTY  HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD

Belz0000009

NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

18.     No Third Party Beneficiaries.  No person, entity, firm, organization not a party to this Agreement shall be entitled to rely upon or enforce any of the provisions of this Agreement.

19.     Representation by Counsel; Interpretation.  The parties hereto acknowledge that they have been represented by counsel in connection with this Agreement and the transactions contemplated hereby.  Accordingly, any rule or law or any legal decision that would require the interpretation of any claimed ambiguities in this Agreement against the party or parties that drafted it has no application and is expressly waived by the parties hereto.  The provisions of this Agreement shall be interpreted in a reasonable manner to give effect to the intent of the parties hereto.

20.     Sales, Transfer and Documentary Taxes.  The Purchasers shall pay all federal, state and local sales, documentary and other transfer taxes, if any, due as a result of the purchase, sale and transfer of the Equity Securities in accordance herewith, whether imposed by law on the Sellers or the Purchasers, and the Purchasers shall jointly and severally indemnify, reimburse and hold harmless the Sellers in respect of the liability for payment of or failure to pay any such taxes or the filing of or failure to file any reports required in connection therewith.

21.     Schedules K-1 for 2019.  The Purchasers shall cause each of the Companies to deliver to the Sellers a Schedule K-1 for the 2020 tax year prepared in a manner and substance consistent with prior years, such Schedules K-1 to be delivered not later than six (6) months after the end of the Company's fiscal year.  The Sellers shall not be allocated any operating results of any of the Companies for any period on or after the Closing Date.

22.     Legal Fees; Prevailing Party Legal Fees.  The Companies shall pay all reasonable legal and accounting fees and expenses incurred by the Sellers in connection with the negotiation, execution and delivery of this Agreement and the Consulting Agreements and the consummation of the transactions contemplated hereby and thereby. The prevailing party in any dispute that arises out of or relates to the making or enforcement of the terms of this Agreement or any Consulting Agreement shall be entitled to receive an award of such party's expenses incurred in pursuit or defense of said claim(s), including reasonable attorneys' fees and costs, incurred in such action.

23.     Indemnification of Officers, Directors and Members.  From and after the Closing Date, the Purchasers shall cause the Companies, to the fullest extent permitted by applicable law, to indemnify, defend and hold harmless, and provide advancement of expenses to, each Seller who is now, or has been at any time prior to the date hereof or who becomes prior to the Closing Date, an officer, director, employee or member of any of the Companies (each, a "D&O Indemnified Party"), against all losses, claims, damages, costs, expenses, liabilities or judgments or amounts that are paid in settlement of or in connection with any claim, action, suit, proceeding or investigation based in whole or in part on or arising in whole or in part out of the fact that such Seller is or was an officer, director, employee or member of any of the Companies, and pertaining

10

to any matter existing or occurring, or any acts or omissions occurring, at or prior to the Closing, whether asserted or claimed prior to, or at or after, the Closing Date (including matters, acts or omissions occurring in connection with the consummation of the transactions contemplated hereby) to the same extent that such Seller is indemnified or has the right to advancement of expenses as of the date hereof by any of the Companies pursuant to their respective organizational documents in existence on the date hereof with any D&O Indemnified Party.

24.    Consents, Approvals and Waivers. If the consummation of the transactions contemplated by this Agreement requires the consent, approval or waiver by any party hereto under any provisions of the Stockholders Agreement or the Operating Agreement, then the execution of this Agreement by such party shall constitute the grant by such party of such consent, approval or waiver it being the intention of the parties hereto that no further consent, approval or waiver under the Stockholders Agreement or the Operating Agreement shall be required to consummate the transactions contemplated by this Agreement.

25.    Stockholders Agreement and Operating Agreement. From and after the Closing Date, notwithstanding the terms thereof, the Sellers shall cease to be subject to any terms or provisions of the Stockholders Agreement or the Operating Agreement. For the avoidance of doubt, from and after the Closing Date the Sellers shall not be subject to the provisions of Section 4 of the Stockholders Agreement and the provisions of such Section 4 may not be enforced against the Sellers.

26.    Diam-N-Blue 401(k) Plan. During the term of the Consulting Agreements, unless prohibited by applicable law, the Purchasers shall take such action as shall be necessary to provide that DB or a member of his family designated by DB shall be the broker of record for the Diam-N-Blue 401(k) Plan.

27.    Tax and Accounting Services. The Companies shall pay for each of the Sellers' reasonable tax and accounting fees and expenses incurred by such Seller in connection with all tax returns required to be filed by such Seller for all calendar years during which such Seller was an equityholder of any of the Companies.

*[Signature page follows]*

11

Belz0000011

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of this 1st day of July, 2020.

PURCHASERS:

_____
Meghan LaBella

_____
Al LaBella

SELLERS:

_____
Douglas Belz

_____
Stephen DiMeglio

_____
James Dvorak

**COMPANIES** (for purposes of Sections 6, 7(b), 8(b), 23, 24, 25, 26 and 27 only)

BLUE DIAMOND SHEET METAL, INC.

By: _____
Name: Al LaBella
Title:  Vice President

DIAM-N-BLU _____ CORP.

By: _____
Name: Al LaBella
Title:  Vice President

MIRAGE MEC _____

By: _____
Name: Al LaBella
Title:  Vice President

BLUE STATION REALTY LLC

By: _____
Name: Meghan LaBella
Title:  Authorized Member

[Equity Security Purchase Agreement Signature Page]

12

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of this 1st day of July, 2020.

**PURCHASERS:**

_____
Meghan LaBella

_____
Al LaBella

**SELLERS:**

_____
Douglas Belz

_____
Stephen DiMeglio

_____
James Dvorak

**COMPANIES** (for purposes of Sections 6, 7(b), 8(b), 23, 24, 25, 26 and 27 only)

BLUE DIAMOND SHEET METAL, INC.

By:_____
Name: Al LaBella
Title:  Vice President

DIAM-N-BLU MECHANICAL CORP.

By:_____
Name: Al LaBella
Title:  Vice President

MIRAGE MECHANICAL SYSTEMS, INC.

By:_____
Name: Al LaBella
Title:  Vice President

BLUE STATION REALTY LLC

By:_____
Name: Meghan LaBella
Title:  Authorized Member

[Equity Security Purchase Agreement Signature Page]

12

Belz0000013

EXHIBIT A

Blue Diamond

| Name | No. of Shares | Purchasers | | Aggregate Purchase Price |
|------|---------------|------------|------|--------------------------|
| | | ML | AL | |
| Belz | 10 | 5 | 5 | $1,125,000 |
| DiMeglio | 10 | 5 | 5 | $1,125,000 |
| Dvorak | 10 | 4 | 6 | $1,125,000 |

Diam-N-Blu

| Name | No. of Shares | Purchasers | | Aggregate Purchase Price |
|------|---------------|------------|------|--------------------------|
| | | ML | AL | |
| Belz | 5 | 2.5 | 2.5 | $225,000 |
| DiMeglio | 5 | 2.5 | 2.5 | $225,000 |
| Dvorak | 5 | 2 | 3 | $225,000 |

Mirage

| Name | No. of Shares | Purchasers | | Aggregate Purchase Price |
|------|---------------|------------|------|--------------------------|
| | | ML | AL | |
| Belz | 10 | 5 | 5 | $25,000 |
| DiMeglio | 10 | 5 | 5 | $25,000 |
| Dvorak | 10 | 4 | 6 | $25,000 |

13

Belz0000014

Blue Station

| Name | Percentage Interest | Purchasers | | Aggregate Purchase Price |
|---|---|---|---|---|
| | | ML | AL | |
| Belz | 25 | 12.5 | 12.5 | $1,475,000 |
| DiMeglio | 25 | 12.5 | 12.5 | $1,475,000 |
| Dvorak | 25 | 10.0 | 15.0 | $1,475,000 |

14

Belz0000015

EXHIBIT B

Automobiles

<u>Douglas Belz</u>

2012 Lincoln Navigator

2011 Honda Ridgeline

<u>Stephen DiMeglio</u>

2016 Range Rover (lease to be assumed by Stephen DiMeglio)

2011 Honda Ridgeline

<u>James Dvorak</u>

2010 Jeep Liberty

2007 Honda Ridgeline

Belz0000016