# EXHIBIT "D"

EXECUTION COPY

## CONSULTING AGREEMENT

This Consulting Agreement (this "Agreement"), effective as of the Closing Date under the Equity Security Purchase Agreement referred to below (the "Effective Date"), is entered into between Blue Diamond Sheet Metal, Inc. ("Blue Diamond"), Diam-N-Blue Mechanical Corp. ("Diam-N-Blue") and Mirage Mechanical Systems, Inc. ("Mirage"), each a New York corporation, and Blue Station Realty LLC ("Blue Station), a New York limited liability company (Blue Diamond, Dian-N-Blue, Mirage and Blue Station are referred to herein, individually, as a "Company" and collectively, as the "Companies"), and Douglas Belz (the "Consultant"). The Companies and the Consultant are collectively referred to herein as the "Parties" and individually as a "Party".

The Companies are in the business of HVAC/sheet metal, design, detailing, installing and servicing of ductwork and equipment (the "Business").

On the date of this Agreement, the Consultant has entered into an equity security purchase agreement with the Companies (the "Equity Security Purchase Agreement") pursuant to which he has agreed to sell all of his equity interests in the Companies and resign as a director, officer, manager or holder of any comparable positions in the Companies.

The Companies desire to retain the Consultant to perform consulting services with respect to guidance and advice solely in connection with the Business, and the Consultant is willing to perform such services (the "Consulting Services") on a non-exclusive basis, upon the terms and conditions herein.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants hereinafter set forth, the parties hereto do hereby agree, as follows:

1. **Retention; Consultant Duties**

    (a) Subject to the terms and conditions set forth herein, the Companies hereby retain the Consultant, and the Consultant hereby accepts such retention, to act as a consultant, on a non-exclusive basis, with respect to providing the Consulting Services.

    (b) The Consultant will, subject to his availability, provide the Consulting Services, from time-to-time, upon the request of the Chief Executive Officer of Blue Diamond, but shall be required to devote only such time (in no event to exceed five (5) hours in any one-month period) as the Consultant believes necessary to provide the Consulting Services. The Consultant may, in his sole discretion, provide the Consulting Services by e-mail, telephone or other means of communication as determined by the Consultant and shall not be required to provide the Consulting Services at any of the Companies' offices.

2. **Term**.

    (a) The term (the "Term") of this Agreement shall be in effect from the Effective Date until the fifteenth (15th) day of the forty-second (42nd) month after the Effective

Date, such that forty-two (42) payments shall be made under this Agreement pursuant to Section 3(a) hereof.

(b) Other than as set forth in Section 3(e), no Party shall have the right to terminate this Agreement for any reason.

3. **Compensation; Acceleration; Prepayment**.

(a) As compensation for the Consulting Services provided hereunder, the Companies jointly and severally agree to pay the Consultant (or an Affiliate or Successor as defined in Section 7(b)) $3,683.33 on the date hereof and $3,683.33 on the fifteenth (15th) day of each month during the Term (which amounts include a $350 gas allowance in lieu of the gas credit card currently provided to the Consultant) such that the Consultant shall receive a total of forty-two (42) payments (all of which amounts have been earned by the Consultant prior to the Effective Date hereof but are payable as aforesaid).

(b) In addition to the compensation set forth in Section 3(a), the Companies shall continue to provide Company owned cell phones to, and maintain cell phone service for, the Consultant and the members of the Consultant's family, in the manner currently provided and at the sole cost and expense of the Companies, for the period commencing on the Effective Date and terminating on the expiration of the term of the Companies' current agreement with the provider of such cell phone service, after which period the Consultant and such members of the Consultant's family may retain their current cell phone numbers and equipment at their sole cost and expense. The provision of cell phone service shall comply with the applicable rules set forth under Treas. Reg. §1.409A-3(i)(1)(iv).

(c) All amounts due and owing under this Agreement during the Term (including the value of the cell phones and service set forth in Section 3(a)) shall immediately be paid in full upon a Change of Control (as defined below) and if the Companies fail to make any payment within fifteen (15) days after Consultant's demand for such payment such payment shall bear interest at the maximum rate permitted by law until paid in full.

(d) The Companies may terminate this Agreement at any time and the Consultant shall have no further obligation to provide the Consulting Services upon payment to the Consultant of the remaining balance of compensation (including the value of the cell phones and service set forth in Section 3(a)) due to the Consultant over the remainder of the Term as set forth in Section 3(a)

(e) For purposes of this Agreement but subject to the provisions of Treas. Reg. §1.409A-3(i)(5)(v), (vi) and (vii), a "Change of Control" means the occurrence of any of the following events:

(i) A change in the ownership of any of the Companies which occurs on the date that any one person, or more than one person acting as a group ("Person"), acquires ownership of the stock of such Company that, together with the stock held by such Person, constitutes more than fifty percent (50%) of the total power of the stock of such Company; provided, however, that for purposes of this subsection, the acquisition of additional stock by any

2

Belz0000116

one Person who owns more than fifty percent (50%) of the total voting power of the stock of such Company, will not be considered a Change of Control; or

(ii) A change in the effective control of any of the Companies which occurs on the date that a majority of members of the board or comparable governing body of such Company (the "Board") is replaced during any twelve (12) month period by Persons whose appointment or election is not endorsed by a majority of the members of the Board prior to the date of the appointment or election of such Persons. For purposes of this clause (ii), if any Person is considered to be in effective control of such Company, the acquisition of additional control of such Company by the same Person will not be considered a Change of Control; or

(iii) A change in the ownership of a substantial portion of any of the Companies' assets which occurs on the date that any Person acquires (or has acquired during the twelve (12) month period ending on the date of the most recent acquisition by such Person or Persons) assets from such Company that have a total gross fair market value equal to or more than fifty percent (50%) of the total gross fair market value of all of the assets of such Company immediately prior to such acquisition or acquisitions; provided, however, that for purposes of this subsection (iii), the following will not constitute a change in the ownership of a substantial portion of such Company's assets: (A) a transfer to an entity that is controlled by such Company's equityholders immediately after the transfer, or (B) a transfer of assets by such Company to: (1) an equityholder of such Company (immediately before the asset transfer) in exchange for or with respect to such Company's stock, (2) an entity, fifty percent (50%) or more of the total value or voting power of which is owned, directly or indirectly, by such Company, (3) a Person that owns, directly or indirectly, fifty percent (50%) or more of the total value or voting power of all outstanding stock of such Company, or (4) an entity, at least fifty percent (50%) of the total value or voting power of which is owned, directly or indirectly, by a Person described in this subsection (iii)(B)(3). For purposes of this subsection (iii), gross fair market value means the value of the assets of such Company, or the value of the assets being disposed of, determined without regard to any liabilities associated with such assets.

For purposes of this definition, Persons will be considered to be acting as a group if they are owners of an entity that enters into a merger, consolidation, purchase or acquisition of stock, or similar business transaction with a Company.

Further and for the avoidance of doubt, a transaction will not constitute a Change of Control if: (i) its sole purpose is to change the state of a Company's incorporation or organization, or (ii) its sole purpose is to create a holding company that will be owned in substantially the same proportions by the Persons who held such Company's securities immediately before such transaction.

4. **Independent Contractor**. The relationship created hereunder is that of the Consultant acting as an independent contractor. It is expressly acknowledged and agreed that the Consultant shall have no authority to bind the Companies to any agreement or obligation with any third party. The Consultant acknowledges and agrees further that, since the Consultant is not an employee of any of the Companies, the Companies shall not be responsible for the withholding or payment of any taxes. Nothing in this Agreement shall be construed to interfere with or otherwise affect the rendering of services by the Consultant in accordance with the Consultant's independent

3

Belz0000117

business judgment or restrict the services the Consultant may provide to any Person other than the Companies, whether as an employee, consultant or otherwise.

5. **Representations and Warranties of the Consultant.** The Consultant hereby represents and warrants to the Companies:

(a) it has the power and authority to execute and deliver this Agreement and to perform the duties and responsibilities contemplated hereby; and

(b) that neither the execution of this Agreement nor performance hereunder will (i) violate, conflict with or result in a breach of any provisions of, or constitute a default (or an event which, with notice or lapse of time or both, would constitute a default) under the terms, conditions or provisions of any contract, agreement or other instrument or obligation to which Consultant is a party, or by which the Consultant may be bound, or (ii) violate any order, judgment, writ, injunction or decree applicable to the Consultant.

6. **Representations and Warranties of the Companies.** The Companies hereby jointly and severally represent and warrant to the Consultant:

(a) each Company is duly organized, validly existing and in good standing under the laws of its State of organization;

(b) each Company has full corporate power and authority to execute and deliver this Agreement and to perform the duties and responsibilities contemplated hereby;

(c) the execution, delivery and performance of this Agreement has been duly authorized by all necessary corporate actions by each Company; and

(d) that neither the execution of this Agreement nor performance hereunder will (i) violate, conflict with or result in a breach of any provisions of, or constitute a default (or an event which, with notice or lapse of time or both, would constitute a default) under the terms, conditions or provisions of its certificate of incorporation or any comparable agreement or other instrument or obligation to which it is a party, or by which it may be bound, or (ii) violate any order, judgment, writ, injunction or decree applicable to it.

7. **Successors; Assignment and Beneficiaries.**

(a) Successors. Each Company will require any successor (whether direct or indirect, by purchase, merger, consolidation, reorganization, sale of assets or otherwise) to the business or assets of such Company, to assume and agree to perform this Agreement in the same manner and to the same extent such Company would be required to perform if no such succession had taken place. As used in this Agreement, "Company" shall mean a Company as herein before defined and any successor to its business and/or assets (by merger, purchase or otherwise) or which otherwise becomes bound by the terms and provisions of this Agreement by operation of law.

(b) Assignment and Beneficiaries. No Company may assign its rights or obligations under this Agreement. No rights or obligations of the Consultant under this Agreement

4

may be assigned or transferred by the Consultant other than to an Affiliate of the Consultant. All rights of the Consultant or any Affiliate of the Consultant hereunder shall inure to the benefit of and be enforceable by and against the Consultant's or its Affiliates' beneficiary of beneficiaries, personal or legal representatives, or estate, to the extent any such person succeeds to the Consultant's interests under this Agreement (any such person, a "Successor"). For purposes of this Section 7(b), Affiliate of the Consultant means any trust created by the Consultant for estate planning purposes solely for the benefit of the Consultant or any Member of his Immediate Family, and Member of his Immediate Family means, with respect to the Consultant, his spouse, parents, brothers, sisters, children (natural or adopted), stepchildren and grandchildren but no other members of his extended family.

8. **Notices**. Any notice required or permitted to be given pursuant to this Agreement shall be deemed to have been duly given when delivered by hand or sent by certified or registered mail, return receipt requested and postage prepaid, overnight mail or facsimile as follows:

If to the Companies:	Blue Diamond Sheet Metal, Inc.
	Diam-N-Blue Mechanical Corp.
	Mirage Mechanical Systems, Inc.
	Blue Station Realty LLC
	1165 Station Rd,
	Medford, NY 11763
	Attention: Al LaBella
	Email: alabella@bdsheetmetal.com

with a copy (which shall not constitute notice) to:

	Campolo, Middleton & McCormick, LLP
	4175 Veterans Memorial Highway, Suite 400
	Ronkonkoma, NY 11779
	Attention: Joseph N. Campolo, Esq.
	Facsimile: (631) 738-0659
	Email: jcampolo@cmmllp.com

If to the Consultant:	Douglas Belz
	22 S. Gillette Avenue
	Bayport. NY 11705
	Email: rbelz@dnbmechanical.com

with a copy (which shall not constitute notice) to:

5

Ruskin Moscou Faltischek, P.C.
East Tower, 15th Floor
1425 RXR Plaza
Uniondale, NY 11556-1425
Attention: Adam P. Silvers, Esq.
Facsimile: (516) 663-6719
Email: asilvers@rmfpc.com

or at such other address as any party shall designate by notice to the other party given in accordance with this Paragraph 8.

        9.     **Governing Law.** This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York applicable to agreements made and to be performed entirely in New York and all legal actions arising out of this Agreement shall be subject to the exclusive jurisdiction of the appropriate Federal or State courts of the States of New York.

        10.     **Waiver of Breach; Partial Invalidity.** The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach. If any provision, or part thereof, of this Agreement shall be held to be invalid or unenforceable, such invalidity or unenforceability shall attach only to such provision and not in any way affect or render invalid or unenforceable any other provisions of this Agreement, and this Agreement shall be carried out as if such invalid or unenforceable provision, or part thereof, had been reformed, and any court of competent jurisdiction or arbiters, as the case may be, are authorized to so reform such invalid or unenforceable provision, or part thereof, so that it would be valid, legal and enforceable to the fullest extent permitted by applicable law.

        11.     **Representation by Counsel; Interpretation.** Each Party acknow-ledges that it or he has been represented by counsel, or has been afforded the opportunity to be represented by counsel in connection with this Agreement and the transactions contemplated hereby. Accordingly, any rule or law or any legal decision that would require the interpretation of any claimed ambiguities in this Agreement against the party that drafted it has no application and is expressly waived by the parties. The provisions of this Agreement shall be interpreted in a reasonable manner to give effect to the intent of the Parties.

        12.     **Entire Agreement.** This Agreement (and the documents referred to in the Equity Security Purchase Agreement) constitutes the entire agreement between the Parties and there are no representations, warranties or commitments except as set forth herein or therein. This Agreement supersedes all prior agreements, understandings, negotiations and discussions, whether written or oral, of the Parties hereto relating to the transactions contemplated by this Agreement. This Agreement may be amended only by a writing executed by the Parties hereto.

        13.     **Counterparts; Facsimile Signatures.** This Agreement may be executed in two or more counterparts, which, when taken together, shall constitute one complete Agreement. Signatures transmitted herein via facsimile or other electronic image shall be deemed to be original signatures.

14. **Indemnification; Expenses.** During the Term and thereafter, the Companies jointly and severally agree: (i) to pay and reimburse the Consultant for reasonable and documented out-of-pocket costs and expenses incurred in connection with the enforcement or preservation of any rights under this Agreement, including the reasonable and documented fees, disbursements and other charges of its counsel; and (ii) to pay, indemnify and hold harmless the Consultant from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever, including reasonable and documented fees, disbursements and other charges of counsel for the Consultant in connection with an event of default or noncompliance with or liability applicable to the operations of the Companies; provided that the Companies shall not have any obligation hereunder to the Consultant with respect to damages caused directly by the gross negligence or willful misconduct of the Consultant as determined by a non-appealable final judgment.

*[Signature page follows]*

IN WITNESS WHEREOF, the Consultant and the Companies have executed or have caused this Agreement to be duly executed as of July 1, 2020 to be effective as of the Effective Date.

**COMPANIES:**

**BLUE DIAMOND SHEET METAL, INC.**

By: _____
Name:  Al LaBella
Title:  Vice President

**DIAM-N-BLUE MECHANICAL CORP.**

By: _____
Name:  Al LaBella
Title:  Vice President

**MIRAGE MECHANICAL SYSTEMS, INC.**

By: _____
Name:  Al LaBella
Title:  Vice President

**BLUE STATION REALTY LLC**

By: _____
Name:  Meghan LaBella
Title:  Authorized Member

**CONSULTANT:**

_____
Douglas Belz

[Consulting Agreement Signature Page]

IN WITNESS WHEREOF, the Consultant and the Companies have executed or have caused this Agreement to be duly executed as of July 1, 2020 to be effective as of the Effective Date.

**COMPANIES:**

**BLUE DIAMOND SHEET METAL, INC.**

By:_____
Name: Al LaBella
Title: Vice President


**DIAM-N-BLUE MECHANICAL CORP.**

By:_____
Name: Al LaBella
Title: Vice President


**MIRAGE MECHANICAL SYSTEMS, INC.**

By:_____
Name: Al LaBella
Title: Vice President


**BLUE STATION REALTY LLC**

By:_____
Name: Meghan LaBella
Title: Authorized Member


**CONSULTANT:**

_____
Douglas Belz

[Consulting Agreement Signature Page]

8

## CONSULTING AGREEMENT

This Consulting Agreement (this "Agreement"), effective as of the Closing Date under the Equity Security Purchase Agreement referred to below (the "Effective Date"), is entered into between Blue Diamond Sheet Metal, Inc. ("Blue Diamond"), Diam-N-Blue Mechanical Corp. ("Diam-N-Blue") and Mirage Mechanical Systems, Inc. ("Mirage"), each a New York corporation, and Blue Station Realty LLC ("Blue Station), a New York limited liability company (Blue Diamond, Dian-N-Blue, Mirage and Blue Station are referred to herein, individually, as a "Company" and collectively, as the "Companies"), and James Dvorak (the "Consultant"). The Companies and the Consultant are collectively referred to herein as the "Parties" and individually as a "Party".

The Companies are in the business of HVAC/sheet metal, design, detailing, installing and servicing of ductwork and equipment (the "Business").

On the date of this Agreement, the Consultant has entered into an equity security purchase agreement with the Companies (the "Equity Security Purchase Agreement") pursuant to which he has agreed to sell all of his equity interests in the Companies and resign as a director, officer, manager or holder of any comparable positions in the Companies.

The Companies desire to retain the Consultant to perform consulting services with respect to guidance and advice solely in connection with the Business, and the Consultant is willing to perform such services (the "Consulting Services") on a non-exclusive basis, upon the terms and conditions herein.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants hereinafter set forth, the parties hereto do hereby agree, as follows:

1. **Retention; Consultant Duties**

    (a)     Subject to the terms and conditions set forth herein, the Companies hereby retain the Consultant, and the Consultant hereby accepts such retention, to act as a consultant, on a non-exclusive basis, with respect to providing the Consulting Services.

    (b)     The Consultant will, subject to his availability, provide the Consulting Services, from time-to-time, upon the request of the Chief Executive Officer of Blue Diamond, but shall be required to devote only such time (in no event to exceed five (5) hours in any one-month period) as the Consultant believes necessary to provide the Consulting Services. The Consultant may, in his sole discretion, provide the Consulting Services by e-mail, telephone or other means of communication as determined by the Consultant and shall not be required to provide the Consulting Services at any of the Companies' offices.

2. **Term**.

    (a)     The term (the "Term") of this Agreement shall be in effect from the Effective Date until the fifteenth (15th) day of the forty-second (42nd) month after the Effective

Date, such that forty-two (42) payments shall be made under this Agreement pursuant to Section 3(a) hereof.

(b)     Other than as set forth in Section 3(e), no Party shall have the right to terminate this Agreement for any reason.

3.   **Compensation; Acceleration; Prepayment**.

(a)     As compensation for the Consulting Services provided hereunder, the Companies jointly and severally agree to pay the Consultant (or an Affiliate or Successor as defined in Section 7(b)) $3,683.33 on the date hereof and $3,683.33 on the fifteenth (15th) day of each month during the Term (which amounts include a $350 gas allowance in lieu of the gas credit card currently provided to the Consultant) such that the Consultant shall receive a total of forty-two (42) payments (all of which amounts have been earned by the Consultant prior to the Effective Date hereof but are payable as aforesaid).

(b)     In addition to the compensation set forth in Section 3(a), the Companies shall continue to provide Company owned cell phones to, and maintain cell phone service for, the Consultant and the members of the Consultant's family, in the manner currently provided and at the sole cost and expense of the Companies, for the period commencing on the Effective Date and terminating on the expiration of the term of the Companies' current agreement with the provider of such cell phone service, after which period the Consultant and such members of the Consultant's family may retain their current cell phone numbers and equipment at their sole cost and expense. The provision of cell phone service shall comply with the applicable rules set forth under Treas. Reg. §1.409A-3(i)(1)(iv).

(c)     All amounts due and owing under this Agreement during the Term (including the value of the cell phones and service set forth in Section 3(a)) shall immediately be paid in full upon a Change of Control (as defined below) and if the Companies fail to make any payment within fifteen (15) days after Consultant's demand for such payment such payment shall bear interest at the maximum rate permitted by law until paid in full.

(d)     The Companies may terminate this Agreement at any time and the Consultant shall have no further obligation to provide the Consulting Services upon payment to the Consultant of the remaining balance of compensation (including the value of the cell phones and service set forth in Section 3(a)) due to the Consultant over the remainder of the Term as set forth in Section 3(a)

(e)     For purposes of this Agreement but subject to the provisions of Treas. Reg. §1.409A-3(i)(5)(v), (vi) and (vii), a "Change of Control" means the occurrence of any of the following events:

(i)     A change in the ownership of any of the Companies which occurs on the date that any one person, or more than one person acting as a group ("Person"), acquires ownership of the stock of such Company that, together with the stock held by such Person, constitutes more than fifty percent (50%) of the total power of the stock of such Company; provided, however, that for purposes of this subsection, the acquisition of additional stock by any

one Person who owns more than fifty percent (50%) of the total voting power of the stock of such Company, will not be considered a Change of Control; or

(ii) A change in the effective control of any of the Companies which occurs on the date that a majority of members of the board or comparable governing body of such Company (the "Board") is replaced during any twelve (12) month period by Persons whose appointment or election is not endorsed by a majority of the members of the Board prior to the date of the appointment or election of such Persons. For purposes of this clause (ii), if any Person is considered to be in effective control of such Company, the acquisition of additional control of such Company by the same Person will not be considered a Change of Control; or

(iii) A change in the ownership of a substantial portion of any of the Companies' assets which occurs on the date that any Person acquires (or has acquired during the twelve (12) month period ending on the date of the most recent acquisition by such Person or Persons) assets from such Company that have a total gross fair market value equal to or more than fifty percent (50%) of the total gross fair market value of all of the assets of such Company immediately prior to such acquisition or acquisitions; provided, however, that for purposes of this subsection (iii), the following will not constitute a change in the ownership of a substantial portion of such Company's assets; (A) a transfer to an entity that is controlled by such Company's equityholders immediately after the transfer, or (B) a transfer of assets by such Company to: (1) an equityholder of such Company (immediately before the asset transfer) in exchange for or with respect to such Company's stock, (2) an entity, fifty percent (50%) or more of the total value or voting power of which is owned, directly or indirectly, by such Company, (3) a Person that owns, directly or indirectly, fifty percent (50%) or more of the total value or voting power of all outstanding stock of such Company, or (4) an entity, at least fifty percent (50%) of the total value or voting power of which is owned, directly or indirectly, by a Person described in this subsection (iii)(B)(3). For purposes of this subsection (iii), gross fair market value means the value of the assets of such Company, or the value of the assets being disposed of, determined without regard to any liabilities associated with such assets.

For purposes of this definition, Persons will be considered to be acting as a group if they are owners of an entity that enters into a merger, consolidation, purchase or acquisition of stock, or similar business transaction with a Company.

Further and for the avoidance of doubt, a transaction will not constitute a Change of Control if: (i) its sole purpose is to change the state of a Company's incorporation or organization, or (ii) its sole purpose is to create a holding company that will be owned in substantially the same proportions by the Persons who held such Company's securities immediately before such transaction.

4. **Independent Contractor.** The relationship created hereunder is that of the Consultant acting as an independent contractor. It is expressly acknowledged and agreed that the Consultant shall have no authority to bind the Companies to any agreement or obligation with any third party. The Consultant acknowledges and agrees further that, since the Consultant is not an employee of any of the Companies, the Companies shall not be responsible for the withholding or payment of any taxes. Nothing in this Agreement shall be construed to interfere with or otherwise affect the rendering of services by the Consultant in accordance with the Consultant's independent

3

Dvorak0000100

business judgment or restrict the services the Consultant may provide to any Person other than the Companies, whether as an employee, consultant or otherwise.

5. **Representations and Warranties of the Consultant.** The Consultant hereby represents and warrants to the Companies:

(a) it has the power and authority to execute and deliver this Agreement and to perform the duties and responsibilities contemplated hereby; and

(b) that neither the execution of this Agreement nor performance hereunder will (i) violate, conflict with or result in a breach of any provisions of, or constitute a default (or an event which, with notice or lapse of time or both, would constitute a default) under the terms, conditions or provisions of any contract, agreement or other instrument or obligation to which Consultant is a party, or by which the Consultant may be bound, or (ii) violate any order, judgment, writ, injunction or decree applicable to the Consultant.

6. **Representations and Warranties of the Companies.** The Companies hereby jointly and severally represent and warrant to the Consultant:

(a) each Company is duly organized, validly existing and in good standing under the laws of its State of organization;

(b) each Company has full corporate power and authority to execute and deliver this Agreement and to perform the duties and responsibilities contemplated hereby;

(c) the execution, delivery and performance of this Agreement has been duly authorized by all necessary corporate actions by each Company; and

(d) that neither the execution of this Agreement nor performance hereunder will (i) violate, conflict with or result in a breach of any provisions of, or constitute a default (or an event which, with notice or lapse of time or both, would constitute a default) under the terms, conditions or provisions of its certificate of incorporation or any comparable agreement or other instrument or obligation to which it is a party, or by which it may be bound, or (ii) violate any order, judgment, writ, injunction or decree applicable to it.

7. **Successors; Assignment and Beneficiaries.**

(a) Successors. Each Company will require any successor (whether direct or indirect, by purchase, merger, consolidation, reorganization, sale of assets or otherwise) to the business or assets of such Company, to assume and agree to perform this Agreement in the same manner and to the same extent such Company would be required to perform if no such succession had taken place. As used in this Agreement, "Company" shall mean a Company as herein before defined and any successor to its business and/or assets (by merger, purchase or otherwise) or which otherwise becomes bound by the terms and provisions of this Agreement by operation of law.

(b) Assignment and Beneficiaries. No Company may assign its rights or obligations under this Agreement. No rights or obligations of the Consultant under this Agreement

4

912448

may be assigned or transferred by the Consultant other than to an Affiliate of the Consultant. All rights of the Consultant or any Affiliate of the Consultant hereunder shall inure to the benefit of and be enforceable by and against the Consultant's or its Affiliates' beneficiary of beneficiaries, personal or legal representatives, or estate, to the extent any such person succeeds to the Consultant's interests under this Agreement (any such person, a "Successor"). For purposes of this Section 7(b), Affiliate of the Consultant means any trust created by the Consultant for estate planning purposes solely for the benefit of the Consultant or any Member of his Immediate Family, and Member of his Immediate Family means, with respect to the Consultant, his spouse, parents, brothers, sisters, children (natural or adopted), stepchildren and grandchildren but no other members of his extended family.

8. **Notices**. Any notice required or permitted to be given pursuant to this Agreement shall be deemed to have been duly given when delivered by hand or sent by certified or registered mail, return receipt requested and postage prepaid, overnight mail or facsimile as follows:

If to the Companies:   Blue Diamond Sheet Metal, Inc.
                       Diam-N-Blue Mechanical Corp.
                       Mirage Mechanical Systems, Inc.
                       Blue Station Realty LLC
                       1165 Station Rd,
                       Medford, NY 11763
                       Attention: Al LaBella
                       Email: alabella@bdssheetmetal.com

with a copy (which shall not constitute notice) to:

                       Campolo, Middleton & McCormick, LLP
                       4175 Veterans Memorial Highway, Suite 400
                       Ronkonkoma, NY 11779
                       Attention: Joseph N. Campolo, Esq.
                       Facsimile: (631) 738-0659
                       Email: jcampolo@cmmllp.com

If to the Consultant:  James Dvorak
                       179 Oakwood Avenue
                       Bayport, NY 11765
                       Email: jdvorak@dnbmechanical.com

with a copy (which shall not constitute notice) to:

> Ruskin Moscou Faltischek, P.C.
> East Tower, 15th Floor
> 1425 RXR Plaza
> Uniondale, NY 11556-1425
> Attention: Adam P. Silvers, Esq.
> Facsimile: (516) 663-6719
> Email: asilvers@rmfpc.com

or at such other address as any party shall designate by notice to the other party given in accordance with this Paragraph 8.

9. **Governing Law**. This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York applicable to agreements made and to be performed entirely in New York and all legal actions arising out of this Agreement shall be subject to the exclusive jurisdiction of the appropriate Federal or State courts of the States of New York.

10. **Waiver of Breach; Partial Invalidity**. The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach. If any provision, or part thereof, of this Agreement shall be held to be invalid or unenforceable, such invalidity or unenforceability shall attach only to such provision and not in any way affect or render invalid or unenforceable any other provisions of this Agreement, and this Agreement shall be carried out as if such invalid or unenforceable provision, or part thereof, had been reformed, and any court of competent jurisdiction or arbiters, as the case may be, are authorized to so reform such invalid or unenforceable provision, or part thereof, so that it would be valid, legal and enforceable to the fullest extent permitted by applicable law.

11. **Representation by Counsel; Interpretation**. Each Party acknow-ledges that it or he has been represented by counsel, or has been afforded the opportunity to be represented by counsel in connection with this Agreement and the transactions contemplated hereby. Accordingly, any rule or law or any legal decision that would require the interpretation of any claimed ambiguities in this Agreement against the party that drafted it has no application and is expressly waived by the parties. The provisions of this Agreement shall be interpreted in a reasonable manner to give effect to the intent of the Parties.

12. **Entire Agreement**. This Agreement (and the documents referred to in the Equity Security Purchase Agreement) constitutes the entire agreement between the Parties and there are no representations, warranties or commitments except as set forth herein or therein. This Agreement supersedes all prior agreements, understandings, negotiations and discussions, whether written or oral, of the Parties hereto relating to the transactions contemplated by this Agreement. This Agreement may be amended only by a writing executed by the Parties hereto.

13. **Counterparts; Facsimile Signatures**. This Agreement may be executed in two or more counterparts, which, when taken together, shall constitute one complete Agreement. Signatures transmitted herein via facsimile or other electronic image shall be deemed to be original signatures.

Dvorak0000103

14. **Indemnification; Expenses**. During the Term and thereafter, the Companies jointly and severally agree: (i) to pay and reimburse the Consultant for reasonable and documented out-of-pocket costs and expenses incurred in connection with the enforcement or preservation of any rights under this Agreement, including the reasonable and documented fees, disbursements and other charges of its counsel; and (ii) to pay, indemnify and hold harmless the Consultant from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever, including reasonable and documented fees, disbursements and other charges of counsel for the Consultant in connection with an event of default or noncompliance with or liability applicable to the operations of the Companies; provided that the Companies shall not have any obligation hereunder to the Consultant with respect to damages caused directly by the gross negligence or willful misconduct of the Consultant as determined by a non-appealable final judgment.

[*Signature page follows*]

Dvorak0000104

IN WITNESS WHEREOF, the Consultant and the Companies have executed or have caused this Agreement to be duly executed as of July 1, 2020 to be effective as of the Effective Date.

**COMPANIES:**

**BLUE DIAMOND SHEET METAL, INC.**

By: ███████████████
Name: Al LaBella
Title: Vice President

**DIAM-N-BLUE MECHANICAL CORP.**

By: ███████████████
Name: Al LaBella
Title: Vice President

**MIRAGE MECHANICAL SYSTEMS, INC.**

By: ███████████████
Name: Al LaBella
Title: Vice President

**BLUE STATION REALTY LLC**

By: ███████████████
Name: Meghan LaBella
Title: Authorized Member

**CONSULTANT:**

_____
James Dvorak

[Consulting Agreement Signature Page]

8

IN WITNESS WHEREOF, the Consultant and the Companies have executed or have caused this Agreement to be duly executed as of July 1, 2020 to be effective as of the Effective Date.

**COMPANIES:**

**BLUE DIAMOND SHEET METAL, INC.**

By:_____
Name: Al LaBella
Title: Vice President


**DIAM-N-BLUE MECHANICAL CORP.**

By:_____
Name: Al LaBella
Title: Vice President


**MIRAGE MECHANICAL SYSTEMS, INC.**

By:_____
Name: Al LaBella
Title: Vice President


**BLUE STATION REALTY LLC**

By:_____
Name: Meghan LaBella
Title: Authorized Member


**CONSULTANT:**

_____
James Dvorak

[Consulting Agreement Signature Page]

8