# EXHIBIT "M"

# AMENDED AND RESTATED

# SHAREHOLDERS' AGREEMENT

among

**DOUGLAS BELZ**

**STEPHEN DIMEGLIO**

**JAMES DVORAK**

and

**MEGHAN LABELLA**

and

**Severally, each of**

**(A) BLUE DIAMOND SHEET METAL, INC.**

**(B) DIAM-N-BLU MECHANICAL CORP.**

**(C) MIRAGE MECHANICAL SYSTEMS, INC.**

**NEW YORK CORPORATIONS**

Dated: December 22, 2008

Belz0000124

# TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| 1. | Voting and Election of Directors | 2 |
| 2. | Officers and Employment | 2 |
| 3. | Disability | 5 |
| 4. | Covenant Not to Compete; Non-Interference; Non-Disclosure | 5 |
| 5. | Life Insurance | 7 |
| 6. | Restrictions on Disposition of Shares | 8 |
| 7. | Inter-Vivos Disposition of Shares | 9 |
| 8. | Disposition of Shares Upon Death or Permanent Disability | 11 |
| 9. | Disposition of Shares Upon Termination of an Officer-Employee's Employment | 12 |
| 10. | Failure to Purchase of Close | 13 |
| 11. | Valuation | 13 |
| 12. | Closing, Security and Related Provisions for Payment of the Purchase Price; Terms of Escrow | 14 |
| 13. | SMACNA | 16 |
| 14. | Issuance of Shares Below Fair Market Value | 16 |
| 15. | Notices | 17 |
| 16. | Acts Required to Effectuate Agreement | 17 |
| 17. | Unenforceable Provisions | 17 |
| 18. | Entire Agreement and Modifications of Agreement | 17 |
| 19. | Waiver | 17 |
| 20. | Headings | 17 |

Belz0000125

21.   Duration ......................................................................................................17

22.   Governing Law ...........................................................................................18

23.   Parties Subject to Agreement.....................................................................18

24.   Counterparts................................................................................................18

25.   Specific Performance .................................................................................18

26.   Indemnification...........................................................................................18

27.   Gender and Number ...................................................................................18

28.   Blue Station................................................................................................18

29.   Legal Representation of Parties .................................................................18

---

Belz0000126

# AMENDED AND RESTATED
# SHAREHOLDERS' AGREEMENT

AGREEMENT made as of the 22nd day of December, 2008, by and among DOUGLAS BELZ ("Belz"), residing at 22 S. Gillette Avenue, Bayport, New York 11705, STEPHEN DIMEGLIO ("DiMeglio"), residing at 335 Lagoon Drive South, Copiague, New York 11726, JAMES DVORAK ("Dvorak") residing at 179 Oakwood Avenue, Bayport, New York 11705, and Meghan LaBella ("LaBella") residing at 11 Beaverbrook Drive, Brookhaven, NY 11719 (Belz, DiMeglio, Dvorak, and LaBella being sometimes referred to as a "Shareholder" and collectively as the "Shareholders") and severally, each of BLUE DIAMOND SHEET METAL, INC. ("Blue Diamond"), DIAM-N-BLU MECHANICAL CORP. ("Diam-N-Blu") and MIRAGE MECHANICAL SYSTEMS, INC. (Mirage"), each a New York corporation (the "Corporations"), each having its principal office at 1165 Station Road, Medford, New York 11763.

## RECITALS

The common stock ("Common Stock") of each of the Corporations is owned by each of the Shareholders as set forth on Exhibit A.

The Shareholders and each Corporation intend that this Agreement is to be between the Shareholders of such Corporation, and such Corporation, and therefore, that this instrument constitutes three separate and distinct agreements, namely (A) among the Shareholders of Blue Diamond, and Blue Diamond, (B) among the Shareholders of Diam-N-Blu, and Diam-N-Blu and (C) among the Shareholders of Mirage, and Mirage.

For convenience, this Agreement refers to Shareholders, the Corporation, Shares and the Board of Directors with the understanding that such terms refer, severally to (A) Blue Diamond, its shareholders, the shares of Blue Diamond held by them, and the Blue Diamond Board of Directors; (B) Diam-N-Blu, its shareholders, the shares of Diam-N-Blu held by them, and the Diam-N-Blu Board of Directors; and (C) Mirage, its shareholders, the shares of Mirage held by them, and the Mirage Board of Directors.

## WITNESSETH:

The Shareholders desire to provide for the conduct of the affairs of the Corporation, to regulate the issuance and transfer of the Shares and to define certain of their rights and obligations with respect to the operation of the Corporation.

NOW, THEREFORE, in consideration of the mutual promises and other good and valuable consideration, each of the parties agree with the others, as follows:

Belz0000127

1.    Voting and Election of Directors.

(a)    All action proposed to be taken by the Shareholders as such must be approved by the affirmative vote of the holders of majority of the outstanding Shares entitled to vote thereon (i) at a meeting of Shareholders or (ii) by written consent as permitted by New York law.

(b)    All action proposed to be taken by the Board of Directors of the Corporation must be approved by the affirmative vote of a majority of all directors entitled to vote thereon except as otherwise specified herein.

(c)    Each of the Shareholders agrees to vote all of the Shares owned by such Shareholder and to take such other action as may be necessary (including by written consent) so that each of the following occurs and remains in effect throughout the term of this Agreement:

(i)    The Board of Directors shall consist of four (4) members, as follows:

| Name of Director | Nominee of |
|------------------|------------|
| Douglas Belz | Belz |
| Stephen DiMeglio | DiMeglio |
| James Dvorak | Dvorak |
| Al LaBella | LaBella |

(d)    In the event of a deadlock among the directors, the same shall be resolved by the sole determination of the then President of the Corporation, unless the Board of Directors otherwise determines.

(e)    The provisions of this Section 1 shall supersede any contrary or inconsistent provision in any By-law, agreement or Certificate of Incorporation of the Corporation, or any amendment thereof, and any such contrary or inconsistent provision shall be deemed amended hereby. This Agreement shall be deemed to be the unanimous written consent of all shareholders and directors of the Corporation pursuant to Business Corporation Law ("BCL") sections 615 and 708, and the Bylaws and Certificate of Incorporation shall, in accordance with sections 616 and 709 of the BCL, be deemed amended in conformance herewith and any officer of the Corporation is authorized and directed at any time to execute in any capacity or capacities and to file a certificate or certificates, including an amendment of the Certificate of Incorporation, to effectuate such amendment.

2.    Officers and Employment.

(a)    The officers of the Corporation ("Officer Employees") shall be as follows, unless modified by the Board of Directors, from time to time, by unanimous approval all of the directors and shall be full time employees of the Corporations:

2

Belz0000128

Blue Diamond
    President                   Douglas Belz
    Vice President          Stephen DeMeglio
    Treasurer                  Douglas Belz
    Secretary                 Stephen DeMeglio

Diam-N-Blu
    President                   Douglas Belz
    Vice President          James Dvorak
    Treasurer                  Douglas Belz
    Secretary                 James Dvorak

Mirage
    President                   Douglas Belz
    Vice President          Al LaBella
    Treasurer                  Douglas Belz
    Secretary                 Al LaBella

(b)     The duties of the Officers-Employees shall be such full time executive duties as are determined by the Board of Directors. Each Officer-Employee shall give his best efforts and full time employment to the performance of such duties and shall not be employed by any other person while acting as an Officer-Employee of the Corporation, other than as an Officer-Employee at the other Corporations. No Shareholder shall be employed by the Corporation unless expressly approved by the Board of Directors.

(c)     The compensation and benefits of each Officer-Employee shall be determined by the Board of Directors, it being understood that each Officer-Employee shall receive compensation and benefits of a value equal to that received by each other Officer-Employee. If different sums are allocated to components such as salary, bonus, automobile, vacation, and the like, at the request of the Officer-Employee, the total compensation shall nevertheless be equalized among all of the Officer-Employees.

(d)     Employment of an Officer-Employee shall terminate as follows:

    (i)     Upon the death of the Officer-Employee;

    (ii)     Upon the Permanent Disability of the Officer-Employee (as defined below);

    (iii)     Upon the commission by an Officer-Employee of a fraud or misappropriation relating to the Corporation, or one of the other Corporations, as determined by the Board of Directors of the Corporation or upon conviction of an Officer-Employee of a felony offense;

3

Belz0000129

(iv) Upon the failure of the Officer-Employee to perform his duties hereunder in all material respects, which is not remedied within 45 days after notice thereof to the Officer-Employee setting forth such failure in reasonable detail, as determined by the Board of Directors;

(v) Upon the Officer-Employee attaining the age of 62 years or, at the election of the Officer-Employee communicated on or before attaining the age of 60 years, and if he is not in breach, upon attaining the age of 64 years;

(vi) Upon the voluntary resignation of an Officer-Employee; or.

(vii) Upon the refusal of an Officer-Employee to promptly and timely guarantee the obligations of the Corporation to any third party requiring the same under an arrangement approved by the Board of Directors (the refusal of LaBella shall be deemed a refusal of Al LaBella).

(e) Upon termination of the employment of an Officer-Employee, compensation will be as follows:

(i) For a termination under Section 2(d)(i), (v), (vi) or (vii) – the estate of the Officer-Employee, or the Officer-Employee, as the case may be, will receive his compensation accrued or income earned but unpaid through the date of termination;

(ii) For a termination under Section 2(d)(ii), the Officer-Employee will receive compensation as set forth in Section 3 hereof;

(iii) For a termination under Section 2(d)(iii), or Section 2(d)(iv), the Officer-Employee shall receive compensation accrued and/or income earned but unpaid through the date of termination, less any sum determined to be due to the Corporation resulting from a breach of this Agreement by the Officer-Employee.

(f) For purpose of determining income which may be due to a terminated Officer-Employee, the books of the Corporation will be closed as of the end of the previous or following calendar month, as determined by the Board of Directors.

(g) Upon termination of employment of an Officer-Employee, such Officer-Employee or his legal representative shall promptly return to the Corporation all of the property of the Corporation in the possession of the Officer-Employee or such representative, including books, records, files, credit cards and the like. In addition, such termination shall constitute a resignation from all offices held with the Corporation.

4

3.    Disability.

(a)    In the event that an Officer-Employee shall be "disabled" for a period of nine (9) months during any twelve (12) consecutive months (a "Permanent Disability") such Officer-Employee being hereinafter referred to as being Permanently Disabled. During the nine (9) month period prior to the time the Officer-Employee has a Permanent Disability, he shall be paid his full compensation by the Corporation less all disability insurance paid by policies of insurance owned by the Corporation, if any, received directly by him or for his benefit. An Officer-Employee shall be considered "disabled" under the following circumstances:

(i)    If the Corporation or another Officer-Employee shall have a policy of disability insurance covering the purported disability, he shall be deemed to be disabled within the meaning contained in the terms of the disability insurance policy.

(ii)    If neither the Corporation nor another Officer-Employee shall have a policy of disability insurance covering the purported disability, he shall be deemed disabled if the Board of Directors of the Corporation determines in good faith that he is unable to discharge his usual business responsibilities and duties required by virtue of his employment by the Corporation in the normal course of business.

(b)    The cost of disability insurance maintained by the Corporation for an Officer-Employee shall be charged to such Officer-Employee's earnings account.

4.    Covenant Not to Compete; Non-Interference; Non-Disclosure.

(a)    Each Shareholder, and each Officer-Employee nominated by a Shareholder, covenants and agrees that so long as he, or his nominating Shareholder, is a Shareholder and for a period of five (5) years thereafter, he will not, without the prior written consent of the Corporation, directly or indirectly, and whether as principal, agent, officer, director, employee, consultant, or otherwise, alone or in association with any other person, firm, corporation or other business organization, (i) be engaged in, concerned, take part in, render services to, own, share in the earnings of, own or invest in the stock, bonds or other securities of any person, firm, corporation, or other business organization engaged in a business located in the Counties of Nassau or Suffolk or the New York City Metropolitan Area, which is the same, similar to or in competition with any of the business operations then or theretofore carried on by any of the Corporations, including, but not limited to, sheet metal design, contracting and engineering services (a "Similar Business"), or (ii) interfere with any Corporation's relationship with, or endeavor to entice away from any such Corporation, any person, firm, corporation or other business organization who or which at any time during the last twenty-four (24) months of the term of his employment or association with any such Corporation was an employee, consultant, agent, supplier, or customer of, or in the habit of dealing with, such Corporation. The Shareholder and Officer-Employee nominated by a Shareholder may, however, invest in stock, bonds or other securities of any Similar Business (but without otherwise participating in the activities of such Similar Business) if: (A) such stock, bonds or other securities are listed on any national or regional securities exchange or have been registered under Section 12 of the Securities Exchange Act of 1934; and (B) the investment does not exceed, in the case of any

5

class of the capital stock of any one issue, two (2%) percent of the issued and outstanding shares, or in the case of bonds or other securities, two (2%) of the aggregate principal amount thereof issued and outstanding. The ownership and operation of Green Bella Consulting, Inc., a New York corporation, by LaBella shall not be deemed a violation of the provisions of Section 4(a)(i). Furthermore, in the event an Officer-Employee's employment is terminated under Section 2(d)(v) at age 62 and he is not offered substantially similar continuing employment with the Corporation at prevailing market rates for his duties, by unanimous vote of the Board of Directors, the provisions of Section 4(a)(i) shall not apply to such person.

(b)     Each Shareholder or Officer-Employee nominated by a Shareholder covenants and agrees that he will not (i) at any time reveal, divulge, or make known any customer lists, trade secrets, or any secret or confidential information of any kind used by any of the Corporations while he was an employee, officer or director of the Corporation, and made known (whether or not with the knowledge and permission of any such Corporation, whether or not developed, devised or otherwise created in whole or in part by his efforts) to him by reason of his being an employee, officer or director of any such Corporation, to any person, firm, corporation, or other business organization which is in competition with any such Corporation, or (ii) use the confidential information for his own account in competition with any such Corporation.

(c)     If any provision of this Section 4 is held by any court of competent jurisdiction to be unenforceable because of the scope, duration or area of its applicability, the Corporation shall have the right to modify such scope, duration or area, or all of them so as to render them enforceable, and such provision shall then be applicable in such modified form, without the consent of any other person.

(d)     Each Shareholder and Officer-Employee who is a nominee of a Shareholder acknowledges that the Corporation will have no adequate remedy at law if he breaches any covenant contained in this Section 4. Accordingly, in the event of any such breach, the Corporation shall have the right, in addition to any other remedy that it may have, to obtain from any court of competent jurisdiction, injunctive relief to restrain any breach or threatened breach of or otherwise to specifically enforce any of the covenants contained in this Section 4.

(e)     The covenants contained in this Section 4 shall survive the termination of this Agreement and may be enforced by the Corporation or any of the Shareholders, provided that the Shareholder seeking enforcement hereunder is still a shareholder of the Corporation.

(f)     In consideration of the covenants contained in this Section 4, the Corporation shall reimburse each Shareholder, on a dollar for dollar basis, for the cost of all insurance premiums paid by such Shareholder for the life insurance policies described in Section 5(a) below which are purchased and maintained by such Shareholder.

6

Belz0000132

5. **Life Insurance.**

(a)    Each Shareholder shall, promptly following the execution of this Agreement, purchase life insurance and disability buy-out insurance insuring, respectively, the life and Permanent Disability of each of the other Shareholders (collectively, the "Insurance Policies") as set forth on Exhibit B or as otherwise agreed to by the Shareholders, except that the Insurance Policies relating to LaBella shall instead cover Al LaBella provided he has an agreement with LaBella to obtain ownership of her Shares in the event of her death. All Insurance Policies shall name the Escrowee (as hereinafter defined), in its capacity as escrow agent, as the beneficiary thereof. Each of the Insurance Policies shall be deposited with the Escrowee who shall hold them and the proceeds received thereunder in escrow and dispose of such proceeds in accordance with the purposes and provisions of this Agreement. Each Shareholder shall pay all premiums due on the Insurance Policies owned by such Shareholder. The Insurance Policies shall provide for written notice to the insured Shareholder in the event of default and shall allow the insured Shareholder at least ten (10) days to cure any such default. If for any reason an insured Shareholder shall pay a premium due on an Insurance Policy, another Shareholder who is otherwise responsible for the payment of such premium shall immediately reimburse him therefor. Each Shareholder shall be the beneficial owner of the Insurance Policy taken out for him hereunder, but shall not have the right, during the term of this Agreement, to withdraw any policy from the Escrowee or to modify or impair any of the rights or values under such policies, or to encumber (except in connection with borrowing cash surrender values to maintain such policies) or dispose of any of the policies, or exercise any right under any of the policies without the written consent of the insured Shareholder. Upon the death or Permanent Disability, as the case may be, of a Shareholder, the proceeds of the Insurance Policies shall be paid in accordance with the provisions of this Agreement.

(b)    Upon the death or Permanent Disability of a Shareholder, the remaining Shareholder or Shareholders, as the case may be, shall have the right to purchase from the estate of the Deceased Shareholder, the Insurance Policy or Policies covering such remaining Shareholder or Shareholders' lives and Permanent Disability. The purchase price shall equal the net cash surrender value of the policies at the date of purchase plus the unearned portion of any premiums as of that date. This right may be exercised at any time: (A) within sixty (60) days after the qualification of the legal representative of the estate of the Deceased Shareholder by the payment of the purchase price to the legal representative of the estate of the Deceased Shareholder. Upon receipt of the purchase price, the said legal representative shall assign the Insurance Policies to the purchaser together with appropriate documents effectuating transfers of such Insurance Policies.

(c)    In the event of a purchase of a Shareholder's Shares pursuant to Section 7 or 9 herein, such Shareholder shall have the right to purchase the Insurance Policies covering such Shareholder's life and Permanent Disability. The purchase price shall equal the net cash surrender value of the policies at the date of purchase plus the unearned portion of any premiums as of that date. This right may be exercised within sixty (60) days after closing of the purchase of the Shareholder's Shares.

Belz0000133

6.    Restrictions on Disposition of Shares.

(a)    No Shareholder shall pledge or otherwise encumber his Shares, nor dispose of his Shares by gift, sale, inheritance or otherwise (including, without limitation, involuntary transfers) except with the prior written consent of the other Shareholders or as otherwise specifically permitted by this Agreement. Any purported pledge, encumbrance or disposition in violation of the terms of this Agreement shall be null and void ab initio. Notwithstanding the foregoing, LaBella and Al LaBella and may transfer Shares between them upon notice to the Corporation. The Corporation's certificates representing the Shares shall have inscribed thereon the following endorsement:

"THE PLEDGE, TRANSFER OR SALE OF SHARES REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO THE TERMS OF THE SHARE REPURCHASE AND SHAREHOLDERS AGREEMENT DATED DECEMBER ___, 2008, A COPY OF WHICH IS ON FILE AT THE OFFICE OF THE CORPORATION."

(b)    No transfer of Shares to any person to whom such Shares may be transferred pursuant to this Agreement shall be effective unless, as a condition of such transfer, such proposed transferee assumes and agrees in writing to be bound by the provisions of this Agreement (unless already a party), all of which shall apply to such proposed transferee. To the extent permitted by law, the restrictions and provisions of this Agreement shall apply to any person acting on behalf of any of the Shareholders or succeeding to, or having a power over his interest by operation of law or otherwise. Notwithstanding anything contained herein to the contrary, each Shareholder shall have the right to transfer his Shares to his spouse and his lineal descendants, or trusts for them, provided that such Shares ("Family Shares") shall be treated hereunder in all respects as if the same were owned by the Shareholder, meaning that provisions hereof relating to the voting and/or transfer of a Shareholders' Shares shall continue to apply to such Shareholder's Family Shares, except only that funds payable on or for the Family Shares shall be payable to the record owner of the same. No holder of Family Shares shall, as a result thereof, have any right to act as a director hereunder, or as an employee of the Corporation.

(c)    Although Family Shares are subject to repurchase from the transferor, as set forth herein, a number of Family Shares not in excess of five (5%) percent of the outstanding common stock of the Corporation held by a Subject Holder (as hereinafter defined) would not be subject to sale under provisions binding the transferor thereof if the holder ("Subject Holder") (i) is a family member of the transferor; (ii) has been employed by the Corporation for at least four (4) years and (iii) has been unanimously approved by the Board of Directors.

(d)    All Shares, including any shares that may be issued to the Shareholders after the date hereof, whether or not transferred pursuant to the provisions of this Agreement, shall remain in all respects subject to this Agreement and every transferee thereof shall by his acceptance be deemed to have consented thereto. Nevertheless, each authorized transferee of Shares shall deliver all stock certificates representing Shares to the Corporation to

8

be legended in accordance with Section 6(a) hereof, and shall execute and deliver to the Corporation, at the transferee's own cost and expense, all documents, instruments or agreements to bind the transferee to the terms of this Agreement. If the transferee refuses or fails to deliver any such document, instrument or agreement within thirty (30) days after demand thereof by the Corporation, the transfer of the Shares to such transferee shall be null and void.

7.    Inter-Vivos Disposition of Shares.

(a)    If any Shareholder (the "Offeror") wishes to transfer all (but not less than all) of his Shares ("the Offered Shares"), other than as otherwise expressly permitted by, or provided in, this Agreement, the Offeror shall send written notice to the other Shareholders of his desire to sell his Shares and offer (the "Offer") to sell his Shares to the other Shareholders (collectively, the "Remaining Shareholders"). The Offer shall be made in writing and shall include all of the terms and conditions of the proposed transfer. Each of the Remaining Shareholders shall have the right to purchase a number of Offered Shares calculated as follows: the Shares offered for sale multiplied by a fraction, the numerator of which is the number of Shares then owned by a Remaining Shareholder, and the denominator of which is the number of Shares then owned by all of the Remaining Shareholders (the "Percentage Interest").

(b)    Each of the Remaining Shareholders shall have forty-five (45) days after delivery of written notice of the Offer from the Offeror to accept or reject the Offer by sending written notice to the Offeror, the Remaining Shareholders and the Corporation. If all of the Offered Shares are not accepted for purchase by the Remaining Shareholders, then the Remaining Shareholder(s) who has accepted the Offer (the "Accepting Remaining Shareholder(s)") shall have the right for thirty (30) days after rejection of the Offer by the other Remaining Shareholder(s), upon written notice to the Offeror, the other Remaining Shareholder(s) and the Corporation, to purchase the remainder of the Offered Shares (the "Remaining Offered Shares") in proportion to their respective Percentage Interests. If an Accepting Remaining Shareholder(s) does not exercise his option to purchase his portion of the Remaining Offered Shares, then the Corporation shall have the right, for thirty (30) days following the rejection of the offer to purchase the Remaining Offered Shares by an Accepting Remaining Shareholder, upon written notice to the Shareholders, to purchase any Offered Shares that have not been accepted for purchase by the Remaining Shareholders. Failure by the Remaining Shareholders and the Corporation to duly deliver notice within the prescribed time periods shall be deemed a rejection of the Offer.

(c)    At the option of the purchasing Shareholder(s) or the Corporation, as the case may be, the purchase price per share of the Offered Shares shall be, either (i) the price specified in the Offer, payable upon the terms and conditions contained therein; or (ii) the price determined in accordance with Section 11 hereof. A closing (the "Closing") shall be held within thirty (30) days following delivery of the last notice accepting the offer for the Offered Shares. The purchase price described above shall be payable in accordance with provisions of Section 12 below.

(d)    If all (i.e., not less than all) of the Offered Shares are not accepted for purchase by the Remaining Shareholders and/or the Corporation pursuant to this Section 7,

9

then the Offeror shall have the right for a period of ninety (90) days following the termination of the right of the Remaining Shareholders and/or the Corporation to purchase the Offered Shares, whichever is later, to sell all (i.e., not less than all) of the Offered Shares to a third party, but only upon the terms and conditions contained in the Offer.

(e)    In determining whether or the extent to which the Corporation will exercise its option to purchase Offered Shares from the Offeror, the Offeror will abstain from voting at any directors' meeting on any resolution concerning the same, and unanimous action of the Board of Directors shall be calculated as if the Offeror was not a member of the Board of Directors.

(f)    If at any time, one or more Shareholders ("Majority Sellers") propose to sell a majority of the outstanding Shares to a bona fide purchaser (a "BFP") which is not controlled, directly or indirectly, by any of them, in an arm's-length transaction for fair value pursuant to Section 7(d) above, the Majority Sellers shall provide the Remaining Shareholders with not less than thirty (30) days' prior written notice of such proposed sale, which notice shall include (i) all of the terms and conditions of such proposed sale, (ii) the identity and address of the BFP, and (iii) whether the Majority Sellers elect to require the Remaining Shareholders to sell the BFP the same percentage of the Remaining Shareholders' Shares at a purchase price ("Purchase Price") equal to the price per share at which the Majority Sellers sell their Shares, times the number of Shares held by the Remaining Shareholders, and on such other terms and conditions as the Selling Shareholder intends to sell to such BFP, and if such Majority Sellers so elect, the Remaining Shareholders shall thus sell the same percentage of the Shares owned by them to the BFP at the same time and for an amount equal to the Purchase Price and upon such other terms and conditions at which, the Majority Sellers sell the Shares of the Corporation owned by them (for example, if the Majority Sellers are proposing to sell 100% of their Shares, the Remaining Shareholders would be obligated to sell 100% of their Shares).

If the Majority Sellers do not elect to require the Remaining Shareholders to sell the same percentage of their Shares to such BFP as the Majority Sellers intend to sell to such BFP, the Remaining Shareholders shall have the option, exercisable by written notice to the Majority Sellers within twenty (20) days after the receipt of the Majority Sellers' notice, to require the Majority Sellers to arrange for the BFP to purchase the same percentage of the Shares held by the Remaining Shareholders as the Majority Sellers intend to sell to such BFP, at the same time and for an amount equal to the Purchase Price, and upon such other terms and conditions at which the Majority Sellers shall sell their Shares. If the Remaining Shareholders shall make this election, the Majority Sellers agree that they shall either (i) arrange for the proposed BFP to purchase the same percentage of the Shares then owned by the Remaining Shareholders, at the same time and for an amount equal to the Purchase Price, and upon such other terms and conditions at which the Majority Sellers sell their Shares, or (ii) not effect the proposed sale of Shares to the BFP.

(g)    Anything hereto the contrary notwithstanding, no transfer shall be permitted which had any of the following effects: (i) the transfer would result in a loss of the Corporation's S election status, (ii) the transfer would have adverse effect on, or cause an acceleration of, the Corporation's institutional borrowing; and/or (iii) the transfer would

Belz0000136

adversely affect the Corporation's ability to obtaining contract bonds. Furthermore, no transfer shall be permitted unless the Offeror has then fully satisfied his obligations under a loan in connection with the purchase by the Offeror of any Shares of the Corporation from Robert Lawless.

8.    Disposition of Shares Upon Death or Permanent Disability.

(a)    In the event of the death or Permanent Disability of a Shareholder (a "Deceased or Disabled Shareholder"), the representative of the Deceased Shareholder; or Disabled Shareholder or his legal representative, shall, within thirty (30) days following either (i) the occurrence of such Permanent Disability; or (ii) the appointment and qualification of the legal representative, as the case may be, provide written notice to the Corporation and the Remaining Shareholders of such Deceased or Disabled Shareholder's death or Permanent Disability.

(b)    The Remaining Shareholders shall purchase all, but not less than all, of the Deceased or Disabled Shareholder's Shares in proportion to the Percentage Interest of each Remaining Shareholder, upon the terms set forth in Sections 11 and 12 below.

(c)    A closing shall be held within one hundred twenty (120) days after delivery of the notice provided for in Paragraph 8(a) hereof. The purchase price per Share of the Deceased or Disabled Shareholder's Shares shall be determined in accordance with Section 11 hereof. The purchase price for the Shares shall be payable to the Estate of the Deceased Shareholder, or the Disabled Shareholder or his representative with ten (10%) percent at Closing and the balance in ninety-six (96) consecutive equal monthly installments. At Closing, any life insurance or permanent disability insurance proceeds received by the Escrowee (which are not from key person insurance) shall be applied first of such 10% amount, and then to the payment of such installments in reverse order of maturity, with an appropriate recalculation to remove unearned interest. In the event the amount of the proceeds payable from the Insurance Policies insuring the Deceased or Disabled Shareholder's life or Permanent Disability exceed the aggregate purchase price of the Shares, then any such excess proceeds shall be deemed to increase the purchase price so that it equals the amount of such insurance. Any monies received by a Disabled Shareholder pursuant to Section 3(a) above shall be credited on a dollar for dollar basis, against the aggregate amount of disability income insurance premiums paid by the Corporation to insure the Disabled Shareholder through the trigger date, or if no disability benefit is paid, the aggregate amount of disability income payments made by the Corporation in lieu of disability income insurance payments.

(d)    If the legal representative of the estate of a Deceased Shareholder or a Disabled Shareholder or his representative shall fail, within thirty (30) days after appointment, to offer the Shareholder's Shares for sale, as provided in Section 8(a) hereof, or if no such legal representative shall be appointed within sixty (60) days after death or a Permanent Disability, the Shares of the Deceased Shareholder or Disabled Shareholder shall be deemed to have been offered for sale by notice to the Remaining Shareholders in accordance with Section 8(a) hereof and the provisions of this Agreement relative to acceptance of the offer, purchase price, terms of payment and the like, shall apply.

11

Belz0000137

(e)    Anything herein to the contrary notwithstanding, if any payments are to be made for the purchase of Shares, the proceeds thereof shall first be paid to fully satisfy the Deceased of Disabled Shareholder's obligations under a loan from The Suffolk County National Bank in connection with his purchase of Shares of the Corporation from Robert Lawless.

9.    <u>Disposition of Shares Upon Termination of an Officer-Employee's Employment</u>.

(a)    In the event of the termination of the employment of a Shareholder (a "Terminated Shareholder") who is an Officer-Employee (termination of the employment of Al LaBella will be deemed a termination affecting LaBella, who will then be considered the "Terminated Shareholder"), other than due to Death or Permanent Disability as set forth in Sections 2(d)(i) and (ii) the Terminated Shareholder shall sell, and the Remaining Shareholders may, at their election purchase in proportion to their respective Percentage Interests, all, but not less than all, of the Terminated Shareholder's Shares upon the following terms and conditions:

(i)    In the event the employment of a Terminated Shareholder is terminated under Sections 2(d)(iii) and (iv), the purchase price for the Terminated Shareholder's Shares shall be the aggregate purchase price paid by the Terminated Shareholder for the Shares or the amount calculated in accordance with Section 11, whichever is less. At any closing required hereunder, the Terminated Shareholder shall deliver his Shares to the Remaining Shareholders, free and clear of all liens, claims and encumbrances, duly endorsed for transfer. Such payment shall be offset by all sums due by the Terminated Shareholder to the Corporation.

(ii)    In the event the employment of a Terminated Shareholder is terminated under Section 2(d)(v), then the purchase price for the Terminated Shareholder's Shares shall be calculated in accordance with Section 11. If the Section 2(d)(v) termination occurs at age 62, all of the shares will be subject to purchase, and if the Section 2(d)(v) termination occurs at age 64, one-half (1/2) of the shares shall be subject to purchase at age 62 and the remaining one-half (1/2) of the shares will be subject to purchase at age 64.

(iii)    In the event the employment of a Terminated Shareholder is terminated under Section 2(d)(vi), then the purchase price for the Terminated Shareholder's Shares shall be calculated in accordance with Section 11, provided that if the terminated Shareholder (or Al LaBella in the case of LaBella) has been then employed for less than ten (10) years, the purchase price shall be reduced by 4% for each year or fraction thereof which is less than 10 years from the date of the commencement of his employment or the date of this Agreement, whichever is later.

(iv)    In the event the employment of a Terminated Shareholder is terminated under Section 2(d)(vii), then the purchase price for the Terminated Shareholder's Shares shall be calculated in accordance with Section 11 below, including however a minority discount and a liquidity discount in a total amount of 21% and the reduction set forth in subsection (iii) above.

12

Belz0000138

(b)    Anything herein to the contrary notwithstanding, if any payments are to be made for the purchase of Shares, the proceeds thereof shall first be paid to satisfy the selling Shareholder's obligations for a loan from The Suffolk County National Bank in connection with his purchase of Shares of the Corporation from Robert Lawless.

(c)    All payments of amounts due under this Section 9 shall be made in accordance with Section 12 hereof.

10.    Failure to Purchase or Close.  If the Corporation and/or the Remaining Shareholders shall fail to deliver the purchase price and documents herein required at a Closing, pursuant to Section 12 hereof (a "Failure"), relating to a Deceased or Disabled Shareholder the Disabled Shareholder or his representative, or the representative of the estate of the Deceased Shareholder, as the case may be, shall have the right within sixty (60) days thereafter, to elect by notice to the Corporation and the Remaining Shareholders to have the Corporation sold or dissolved.  In such event, the Shareholders shall forthwith vote their Shares and take such other necessary steps to forthwith effectuate the sale of the Corporation, and if this is not possible within one hundred eighty (180) days, effect the voluntary dissolution and liquidation of the Corporation.  In dissolving and liquidating the Corporation, the Shareholders shall use all reasonable efforts to maximize the assets or proceeds available for distribution to the Shareholders and, to that end, shall, if the opportunity therefore is available, sell the business of the Corporation as a "going concern" to any Shareholder or any third party.  If, in maximizing the assets or proceeds available for distribution, the business of the Corporation is sold as a going concern to a third party, the Shareholders shall execute and deliver such undertakings consistent with Section 4 above as may be reasonably requested by such third-party purchaser.  In addition, upon the occurrence of a Failure, the Disabled Shareholder or his representative or representative of the estate of the Deceased Shareholder, as the case may be, shall have the right to exercise such other remedy available to him at law or in equity.

11.    Valuation.  The purchase price per Share to be paid by the Corporation and the Remaining Shareholders pursuant to Sections 7(c)(ii) and 8 hereof, shall be as follows:

(a)    The value last previously determined by the Shareholders and the Corporation as set forth in a valuation certificate substantially in the form annexed hereto as Exhibit C one (1) years or less in age, or

(b)    If more than one (1) year has elapsed since the date of the execution of the most recent valuation certificate, the valuation will be carried out by an independent nationally recognized valuation firm selected by the Board of Directors, which shall consider prior and perspective operations and which shall render a written report to the Board of Directors.  All expenses of the valuation firm shall be paid by the Corporation.

(c)    A Shareholder whose Shares are purchased hereunder shall have the right to receive ownership of all life and disability insurance policies insuring such Shareholder's life and Permanent Disability maintained by the Corporation or the Shareholders as elsewhere set forth herein.

13

Belz0000139

12.    Closing, Security and Related Provisions for Payment of the Purchase Price; Terms of Escrow.

(a)    All Closings required by the sale of Shares under Sections 7, 8 and 9 of this Agreement involving other Shareholders or the Corporation will take place at the principal office of the Corporation within the time prescribed by this Agreement on the business day and at the time set forth by the seller of the Shares in a notice delivered to the purchaser(s) ("Purchaser(s)") at least five (5) days before the Closing.

(b)    At the Closing, unless otherwise specified herein, the Purchaser(s) shall (i) pay by certified or bank cashier's check that portion of the purchase price equal to 10% of the total price required to be paid at that time (except if the proceeds of any Insurance Policy or Policies exceed said amount, in which event the down payment shall equal the insurance proceeds), and (ii) execute and deliver to the selling Shareholder or the legal representative of the estate of the Deceased Shareholder (the "Seller") a non-negotiable promissory note in the required principal, bearing interest at the rate equal to the Prime Rate charged by JP Morgan Chase in effect at the close of business on the day immediately preceding the Closing, payable in ninety-six (96) equal monthly installments of principal and interest. The promissory note shall provide that (x) upon default for ten (10) days after written notice, the principal amount of the promissory note and all unpaid interest shall be immediately due and payable, and (y) the maker shall have the right of prepayment without penalty at any time. The obligations evidenced by the promissory note, if delivered by the Corporation, shall be guaranteed as to payment by the Remaining Shareholders, and if delivered by a Remaining Shareholder, shall be guaranteed as to payment by the Corporation. Notwithstanding the foregoing, any shares purchased on account of an Officer-Employee attaining the age of 62 years shall be paid for only in cash.

(c) (i)    Unless shares are purchased only for cash, at the Closing, the Seller shall deliver to Ruskin, Moscou, Evans & Faltischek, P.C., as escrow agent (the "Escrowee") the following:

(A)    all certificate(s) representing the Shares owned by the Seller;

(B)    blank stock powers, properly executed, with all the necessary transfer stamps affixed;

(C)    a letter of resignation from the Seller as an officer and director of the Corporation and all of its subsidiaries, if any; and

(D)    such other documents as may be reasonably required by the Purchaser in connection with the Share purchase.

(ii)    The Escrowee shall hold all of the certificates, stock powers and other documents delivered above as security for the payment of the promissory note described herein.

14

(iii)   So long as the Purchaser is not in default under the promissory note, the Purchaser shall have the right to vote the shares in escrow, and the Seller shall, on demand, execute and deliver an effective proxy or proxies in favor of the Purchaser.

(iv)   Upon receipt of notice by the Escrowee of payment in full of the Purchaser's promissory note, the Escrowee shall deliver a copy thereof to the Seller. If within fifteen (15) days thereafter notice is not delivered by the Seller contradicting such notice, the Escrowee shall deliver the certificate(s) representing the Shares to the Purchaser.

(v)   If the Escrowee receives notice of a default in payment of the promissory note at any time prior to the fifteenth (15th) day following delivery of the Escrowee's notice above and notifies the alleged defaulting party, which notice is not contradicted by notice delivered to the Escrowee by the alleged defaulting party, the Escrowee shall sell the Shares held in escrow and all other property, if any, held in escrow at a public or private sale upon at least ten (10) days' advance notice to the parties, in which case Section 12(c)(vii) shall apply. The Escrowee shall apply the proceeds of any sale in the following order: (A) to the payment of expenses of sale, including reasonable attorney's fees, (B) to the payment of the balance owed by the Purchaser to the Seller, and (C) to the Purchaser. The Seller shall also have any and all rights and remedies available at law.

(vi)   If the Escrowee receives conflicting notices from the Seller and the Purchaser, the Escrowee shall not act in response to either notice and shall thereafter act only in accordance with any of the following:

(A)   A new notice signed by the Seller and the Purchaser; or

(B)   A certified copy of a judgment of a court of competent jurisdiction, as to which the Escrowee shall have received an opinion of counsel satisfactory to the Escrowee in its sole and absolute discretion, that such judgment is final beyond appeal.

(vii)   Upon performance of its duties in accordance with the provisions of this Agreement, the Escrowee shall be relieved and discharged of any and all liabilities hereunder. The Escrowee shall in no event have any liability for any act or omission to act, except those acts and/or omissions which constitute willful misconduct, and shall be indemnified and held harmless, jointly and severally, by the Shareholders from and against any loss, liability and expense incurred without willful misconduct on the part of the Escrowee arising out of or in connection with the acceptance by the Escrowee of the Escrowee's duties hereunder, including the cost and expense of defending any claim of liability hereunder.

(viii)   If the Escrowee is threatened with litigation by reason of the escrow, the Escrowee is authorized to interplead all interested parties in any court of competent jurisdiction and to deposit with the Clerk of such Court any funds, securities or other property held by the Escrowee and thereupon the Escrowee shall stand fully relieved and discharged of any further duties under the escrow.

Belz0000141

(ix)     The Escrowee may rely upon, and shall be protected in acting or refraining from acting in reliance on, any written notice, instructions or request furnished to the Escrowee and believed by the Escrowee to be genuine and to have been signed by the proper party or parties.

(x)     The Escrowee shall not be liable for any action taken by said Escrowee in good faith and believed by Escrowee to be authorized or within the rights or powers conferred upon the Escrowee by this Agreement. The Escrowee may consult with counsel of its own choosing and shall have full and complete authorization and protection for any action taken or suffered by the Escrowee under the escrow in accordance with the opinion of such counsel.

(xi)     The Shareholders hereby, jointly and severally, agree to indemnify the Escrowee from and to hold the Escrowee harmless against any loss, liability or expense incurred without gross negligence or bad faith on the Escrowee's part, arising out of or in connection with the Escrowee's duties under this Agreement, including the costs and expenses of defending itself against any claims of liability, and to pay or reimburse the Escrowee upon request for all expenses, disbursements and advances, including the costs of reasonable attorney's fees incurred by the escrowee in connection with carrying out its duties hereunder.

(xii)     The Escrowee may resign and be discharged from its duties or obligations at any time by giving notice in writing of such resignation specifying a date when such resignation shall take effect. In such event, the Shareholders shall within ten (10) days thereafter designate a successor, who shall be a corporate fiduciary or any other person, firm or corporation mutually satisfactory to the Shareholders. In the absence of such designation, the Escrowee may appoint a successor which shall be a corporate fiduciary, who shall be bound by the terms of this Agreement.

(xiii)     The Escrowee is counsel to the Corporation. Nothing herein shall prohibit the Escrowee from continuing to act as counsel to the Corporation or to represent the Corporation in any dispute arising hereunder.

(xiv)     With respect to the Shares that are held in escrow pursuant to this Section 12, this provision is intended to and will create a security interest in favor of the Seller pursuant to the Uniform Commercial Code, in addition to such other rights and remedies available under applicable law.

13.     SMACNA. For so long as Al LaBella is an Officer-Employee, he shall be entitled to exercise the Corporations' vote, for the best interest of the Corporations, at all SMACNA meetings and he shall be entitled to attend all SMACNA meetings, together such other Officer-Employees who desire to attend, subject to any numerical limitation on attendance at SMACNA meetings.

14.     Issuance of Shares Below Fair Market Value. The Corporation shall not issue any securities of the Corporation for a consideration less than the fair market value of such securities as determined without the prior written consent of all of the Shareholders.

16

Belz0000142

15. **Notices.** Notices or other communications required or permitted to be given hereunder shall be in writing, and shall be deemed given upon the first attempted date of delivery by a recognized overnight carrier to the addresses set forth herein or such other address as a party shall give notice of in accordance within.

16. **Acts Required to Effectuate Agreement.** The parties hereto specifically agree that they will, as parties hereto and as shareholders, officers and/or directors of the Corporation, duly perform any and all acts and will execute any and all agreements, proxies, documents, resolutions and other instruments which may be required of each of them or which may be necessary for the purpose of fulfilling, effectuating or implementing any of the provisions of this Agreement.

17. **Unenforceable Provisions.** If any provision of this Agreement is determined to be legally invalid, inoperative or unenforceable, only that particular provision shall be effected, and the determination shall have no effect whatsoever on any other provision of this Agreement, and all other provisions shall remain in full force and effect and fully enforceable.

18. **Entire Agreement and Modifications of Agreement.** This Agreement constitutes the entire understanding among the parties hereto, supersedes all prior agreements and understandings with respect to the subject matter hereof, and shall not be modified except in writing signed by either (a) all of the parties or (b) by the party or parties against whom such modification is sought to be enforced.

19. **Waiver.** No delay or failure to exercise any remedy or right occurring upon any default shall be construed as a waiver of such remedy or right or acquiescence in such default, nor shall it affect any subsequent default of the same or a different nature. All rights and remedies herein conferred shall be in addition to and not exclusive of any and all other rights or remedies now or hereafter existing at law or equity.

20. **Headings.** The headings in this Agreement have been inserted as a matter of convenience and shall not affect the construction hereof.

21. **Duration.** This Agreement shall continue in full force and effect until terminated by the occurrence of any of the following events, whichever first occurs:

(a) Dissolution of the Corporation and or liquidation of the Corporation and its business;

(b) The death or disability of all of the Shareholders;

(c) The termination of the employment of all of the Officers-Employees;

(d) The filing of a voluntary petition of bankruptcy by the Corporation, or an adjudication of bankruptcy of the Corporation;

17

(e).    The appointment of a receiver for the Corporation or the substantial portion of its assets which has not vacated within sixty (60) days; or

(f)    The unconditional assignment for the benefit of creditors by the Corporation of its assets.

22.    Governing Law.  This Agreement and all questions, claims, controversies and other matters arising hereunder shall be governed by the laws of the State of New York, without regard to its principles of conflicts of laws.  All disputes shall be heard only by the Federal and New York State courts sitting in Suffolk County, State of New York.

23.    Parties Subject to Agreement.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.  This Agreement may not be assigned, except as otherwise permitted hereunder.

24.    Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

25.    Specific Performance.  The parties agree that the Shares are unique and that failure to perform the obligations under this Agreement will result in irreparable damage to the other parties and that specific performance of these obligations may be obtained by a suit in equity.

26.    Indemnification.  Each Shareholder shall indemnify and hold the other Shareholders harmless from and against any and all claims, suits, actions, proceedings (formal and informal), damages, costs and expenses (including legal fees) as and when incurred arising out of or based upon any breach by such Shareholder of any representation, warranty or covenant in this Agreement.

27.    Gender and Number.  Whenever the context of this Agreement requires, the masculine gender includes the feminine and neuter, and the singular number includes the plural, and vice versa.

28.    Blue Station.  This Agreement has no application whatsoever to Blue Station Realty, LLC, a New York limited liability company, or to Blue Station Realty, Inc., a New York corporation.

29.    Legal Representation of Parties.  The parties declare that each has been urged to seek and obtain independent legal advice by counsel of his own choosing in connection with the preparation and execution of this Agreement and has had the opportunity to do so.

[Balance of page left blank]

18

IN WITNESS WHEREOF, the parties have hereunto set their hands and seals the day and year first above written.

DOUGLAS BELZ

STEPHEN DIMEGLIO

JAMES DVORAK

MEGHAN LABELLA

BLUE DIAMOND SHEET METAL, INC.

By: _____
Douglas Belz, President

DIAM-N-BLU MECHANICAL CORP.

By: _____
Douglas Belz, President

MIRAGE MECHANICAL SYSTEMS, INC.

By: _____
Douglas Belz, President

RUSKIN MOSCOU FALTISCHEK, P.C., as Escrow Agent

By: _____
Michael Faltischek

As to Section 4 hereof

AL LABELLA

19